## Page 1

1
2  IN THE UNITED STATES DISTRICT COURT
   DISTRICT OF UTAH
3     Case No.: 2:03-CV-0294
4
5  THE SCO GROUP, INC.,            )
   A DELAWARE CORPORATION          )
6                                  )
7        Plaintiff,                )
8        -vs-                      )
                                   )
   INTERNATIONAL BUSINESS MACHINES )
9  CORPORATION, A NEW YORK CORPORATION, )
                                   )
10       Defendant.                )
   ------------------------------)
11
12
13
14       Videotaped Deposition of Otis L. Wilson,
15            (Taken by Defendant)
16         Greensboro, North Carolina
17          Thursday, June 10, 2004
18
19
20
21
22
23
24       Reported in Stenotype by
         Lisa A. DeGroat, Registered Professional Reporter
25  Transcript produced by computer-aided transcription

## Page 2

1            APPEARANCES
2  ON BEHALF OF PLAINTIFF:
3       SCOTT E. GANT, Esquire
        STEVEN W. DAVIS, Esquire
4       Boies, Schiller & Flexner, L.L.P.
        5301 Wisconsin Avenue, N.W.
5       Washington, D.C. 20015
        (202) 237-2727
6
        ALDO NOTO, Esquire
7       Andrews Kurth, L.L.P.
        1701 Pennsylvania Avenue, N.W.
8       Suite 300
        Washington, D.C. 20006
9       (202) 662-3051
10
11  ON BEHALF OF DEFENDANT:
12       DAVID R. MARRIOTT, Esquire
         Cravath, Swaine & Moore, L.L.P.
         Worldwide Plaza
13       825 Eighth Avenue
         New York, New York 10019
14       (212) 474-1000
15  ALSO PRESENT: Jason Zoladz
                 Carolyn Badertscher
16               John Ghose
17  VIDEOGRAPHER: Staples N. Kute, CLVS
18
19
20       VIDEOTAPED DEPOSITION OF OTIS L. WILSON, a
21  witness called on behalf of Defendant, before
22  Lisa A. DeGroat, RPR, Notary Public, in and for the
23  State of North Carolina, at the O. Henry Hotel,
24  624 Green Valley Road, Greensboro, North Carolina,
25  on Thursday, June 10, 2004, commencing at 9:27 a.m.

## Page 3

1            INDEX OF EXAMINATIONS
2  BY MR. MARRIOTT . . . . . . . . . . . . . PAGE 10
3  BY MR. GANT . . . . . . . . . . . . . . . PAGE 113
4  BY MR. MARRIOTT . . . . . . . . . . . . . PAGE 333
5  BY MR. GANT . . . . . . . . . . . . . . . PAGE 338
6  BY MR. MARRIOTT . . . . . . . . . . . . . PAGE 352
7  BY MR. GANT . . . . . . . . . . . . . . . PAGE 354
8  BY MR. MARRIOTT . . . . . . . . . . . . . PAGE 356
9
10           INDEX OF EXHIBITS
11  NUMBER      EXHIBIT      MARKED  IDENTIFIED
12  75    Declaration of Otis L. Wilson,
            2003, 92 pgs.          5      24
13
14  76    Declaration of Otis L. Wilson,
            2004, 111 pgs.         5      24
15  77    Subpoena, 1 pg.          5      6
16  78    5/6/04 letter from Cravath,
            Swaine & Moore, 2 pgs.  5     7
17
18  79    Royalty stmt. as of 6/30/87,
            1 pg.                276    276
19  80    Software agreement to Digital
            Equipment Corp., 9 pgs.  323  323
20
21  81    Sublicensing agreement to
            Sequent, 2 pgs.        323    327
22  82    Software agreement to IBM,
            3 pgs.                 323    328
23
24  83    Educational software agreement
            to AT&T, 8 pgs.         323   329
25

## Page 4

1            INDEX OF EXHIBITS
2  NUMBER       EXHIBIT       MARKED  IDENTIFIED
3  84    Educational software agreement
          to AT&T, 8 pgs.         323    331
4
5  85    Software agreement to IBM,
          3 pgs.                  332    332
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 1:06-mc-00046-PTS    Document 6-5    Filed 04/21/2006    Page 1 of 28    Dockets.Justia.com

**Page 5**

(DEPOSITION EXHIBIT NUMBERS 75, 76, 77 AND 78 WERE MARKED FOR IDENTIFICATION)

THE VIDEOGRAPHER: Here begins videotape number one in the deposition of Otis L. Wilson, in the matter of The SCO Group, Incorporated versus IBM Corporation, in the United States District Court, District of Utah.

The case number is 2:03CV-0294. Today's date is June 10th, 2004. The time on the video monitor is 9:28 a.m. The video operator today is Staples Kute, CLVS. This video deposition is taking place at the O. Henry Hotel, in Greensboro, North Carolina.

Counsel, please, voice identify yourselves and state who you represent.

MR. MARRIOTT: David Marriott, of Cravath, Swaine & Moore, for the witness and for International Business -- Business Machines Corporation.

MR. ZOLADZ: Jason Zoladz, of Cravath, Swaine & Moore, for IBM.

MS. BADERTSCHER: Carrie Badertscher, Cravath, Swaine & Moore, for IBM.

MR. GHOSE: John Ghose: Cravath, Swaine & Moore.

**Page 6**

MR. GANT: Scott Gant, from Boies, Schiller & Flexner, for the SCO Group.

MR. NOTO: Aldo Noto, from Andrews Kurth, L.L.P., for the SCO Group.

MR. DAVIS: Steve Davis, Boies, Schiller & Flexner, for the SCO Group.

THE VIDEOGRAPHER: Thank you.

The court reporter today is Lisa DeGroat of Russell Court Reporting.

Would the reporter, please, swear in the witness.

OTIS L. WILSON,

having first been duly sworn, was examined and did testify as follows:

\* \* \*

THE VIDEOGRAPHER: You may begin.

MR. MARRIOTT: Why don't we just say at the outset a couple of things. First, is that Mr. Wilson is here pursuant to a subpoena, and we will -- we've marked that subpoena as an exhibit to the deposition. It's Exhibit Number 77.

Mr. Wilson has indicated to me that he is amenable to being deposed for seven hours, allotted by the -- the rules, and doesn't wish to be deposed for longer than that.

**Page 7**

Counsel discussed before the deposition the ways in which we might allocate time, and we did not reach, I believe, a firm agreement, but it was at least proposed that we each contemplate taking somewhere in the order of 3.5 hours, and then if a party feels they -- they require more time, that's something they would take up with the appropriate court.

So I think our agreement, and you can tell me if I've got it right, Counsel, is that we'll each endeavor to be finished within -- within, say, our 3.5 hours, and --

MR. GANT: We will each endeavor to roughly take that much time. We will endeavor not to take more of Mr. Wilson's time than necessary. And I don't anticipate that we'll have problems doing that, but that we can address the issue amongst ourselves or with the court, if necessary, if either party thinks they need more time.

MR. MARRIOTT: Okay. Thank you.

As I think you know, we, at Cravath, represent, not only IBM, but also Mr. Wilson. And I've provided for you as an exhibit a copy of the retention letter that exists between Mr. Wilson and Cravath. That's Exhibit 78.

**Page 8**

And I point this out, merely to say that Mr. Wilson retained us in or about the 6th of May 2004. So any communications that we had with Mr. Wilson before then, so far as we're concerned, are fair game for inquiry.

Communications after the time in which we began to represent him become a bit more problematic, and we can confront those when we -- when we do.

Mr. Wilson has -- has, as you know, I believe, Counsel, provided two sworn statements for litigation, and I want to just say for the record that those have been provided to you as -- not only this morning before the deposition, but as -- as required, as I understand it, by Magistrate Judge Wells in advance of the deposition.

MR. GANT: And I'll confirm that we received those at approximately 11:00 p.m. this past Tuesday. And, although, I don't think anyone has an interest in re-arguing any of the issues related to that, I just want to note for the record SCO's objection, which we registered at the time of the deposition, which occurred this past Tuesday, where this issue first surfaced, that we do not believe that we were given an adequate opportunity

1  to review declarations that were executed by third
2  parties, and that it has prejudiced our ability to
3  properly examine the witnesses, and these documents
4  should have been produced earlier, and we will
5  reserve all rights and the opportunity to request
6  appropriate relief from the court on this issue.
7          MR. MARRIOTT: Okay. Well, I appreciate
8  your position, and, as I think you know, disagree
9  with it, but let me ask you a question, however.
10  Is it your position that -- that any third party's
11  sworn statement is required to have -- to have been
12  produced and should have been produced in the
13  litigation?
14          MR. GANT: I'll -- I'll answer your
15  question briefly. Although, in the interest of not
16  wasting Mr. Wilson's time, I suggest we not spend
17  too much time on this, but I don't want to --
18          MR. MARRIOTT: Sure.
19          MR. GANT: -- be nonresponsive. I will
20  focus my response on the declarations that have
21  been used in depositions that were not given to us.
22  And it's our position that they should have been
23  provided to us earlier, and, obviously, the court
24  will make any determinations about that issue.
25          MR. MARRIOTT: Okay. Well, just to be

1  clear, no -- no affidavits have been used in any
2  deposition that you didn't have in advance of the
3  deposition; correct?
4          MR. GANT: That is incorrect.
5          MR. MARRIOTT: Well, I don't want to argue
6  with you about the Frasure deposition, but were you
7  not given a copy of Mr. Frasure's declarations
8  before the examination began?
9          MR. GANT: No.
10          MR. MARRIOTT: You were given a copy
11  during the examination?
12          MR. GANT: Correct.
13          MR. MARRIOTT: And then took a break for
14  an hour to review the declarations?
15          MR. GANT: I don't remember exactly how --
16  when the break was.
17          MR. MARRIOTT: All right. I think we're
18  probably wasting time.
19          Mr. -- and, of course, on behalf of
20  Mr. Wilson, we'd like to reserve the right to -- to
21  have him review it and read the transcript.
22          DIRECT EXAMINATION
23  BY MR. MARRIOTT:
24      Q.  Mr. Wilson, would you state your name,
25  please, and spell it for the -- for the record?

1      A.  It's Otis L. Wilson, O-T-I-S, middle
2  initial, L., W-I-L-S-O-N.
3      Q.  What is your current address, Mr. Wilson?
4      A.  5 Round Hill Court, in Greensboro,
5  North Carolina.
6      Q.  Are you presently employed?
7      A.  I'm retired. I do quite a bit of
8  community work, and I'm heavily involved with
9  our -- with my church, and spend quite a bit of
10  time over there, as well as other civic things that
11  I do.
12      Q.  Could you just briefly describe the
13  community work that you do, please?
14      A.  I work with United Way on the area of
15  preparing children to succeed. It's about a
16  $5,000,000 annual budget for programs and agencies
17  that participate in activities that prepare
18  children to succeed in school, and I do quite a bit
19  of work in diversity training in the community.
20      Q.  How long have you been involved with
21  United Way?
22      A.  Oh, probably 30 years.
23      Q.  And what is it that you do with respect to
24  diversity training?
25      A.  We actually bring different groups of

1  folks together and deal with issues of race, sex,
2  the different isms, to try to promote better
3  understanding among all people.
4      Q.  And, please, describe, if you would, just
5  generally, the nature of your work with the church?
6      A.  At the church I'm the minister of
7  facilities. I'm responsible for the -- all of the
8  physical plant associated with our church. We have
9  a fairly large church, about 5,000 members, and I
10  kind of oversee those different locations with
11  regard to the disciplined support required for the
12  ministries.
13      Q.  Were you previously employed by AT&T,
14  Mr. Wilson?
15      A.  Yes.
16      Q.  For how long were you employed by AT&T?
17      A.  Right about 30 years.
18      Q.  And during what specific 30-year period,
19  if you recall?
20      A.  From 1963 through early '90-'91.
21      Q.  And what positions, if you could just
22  briefly summarize them, did you hold while employed
23  by AT&T?
24      A.  They vary from repair operations,
25  distribution. Some -- actually, training, and for

1 the last several years I was involved with
2 intellectual property licensing.
3     Q. And when you say you were involved with
4 intellectual property licensing, with what
5 intellectual property were you involved?
6     A. My main focus was in the area of computer
7 software.
8     Q. Were you responsible for any particular
9 type of computer software?
10     A. Yes. I was responsible for the licensing
11 worldwide of the -- of the operating system
12 software and associated programs in with it.
13     Q. Okay. And which operating system software
14 are you referring to?
15     A. The most popular name would be UNIX
16 software, and there were several, but probably the
17 most popular one was UNIX System V, its
18 predecessors and those that came after it.
19     Q. Did you have responsibility for all of
20 AT&T's UNIX licensing?
21     MR. GANT: Objection. Vague, leading.
22     Q. You can answer.
23     A. Yes. My organization was responsible for
24 licensing of the software worldwide.
25     Q. Did you have any responsibility for AT&T's

1 licensing of UNIX to IBM?
2     A. Yes.
3     Q. Did you have any responsibility for AT&T's
4 licensing of UNIX to Sequent?
5     MR. GANT: Objection. Vague.
6     Q. You can answer.
7     A. Yes.
8     Q. Are you familiar with AT&T's licensing
9 agreements regarding UNIX?
10     MR. GANT: Objection. Vague.
11     THE WITNESS: Yes. I'm familiar with
12 those agreements.
13 BY MR. MARRIOTT:
14     Q. How did you -- how did you come to be
15 familiar with those agreements, Mr. Wilson?
16     MR. GANT: Same objection.
17     THE WITNESS: Those agreements were --
18 were provided for my organization to the -- to our
19 licensees, with Sequent and IBM being two of those
20 companies that licensed the software from AT&T. So
21 I was responsible for preparing and negotiating
22 those licenses.
23 BY MR. MARRIOTT:
24     Q. Do you have personal knowledge as to what
25 AT&T intended regarding its licensing agreements

1 with respect to UNIX?
2     MR. GANT: Objection. Vague, foundation,
3 calls for speculation.
4     Q. You can answer.
5     A. Would you restate the question?
6     MR. MARRIOTT: Could you just read it back
7 for the witness, please.
8     (PREVIOUS QUESTION THEN READ)
9     MR. GANT: Same objections.
10     THE WITNESS: Yes. As I understand the
11 question, we were -- our licensing program was --
12 was -- was designed to provide software to
13 licensees under protective clauses, which are
14 contained in those agreements. Mainly for their
15 internal use.
16 BY MR. MARRIOTT:
17     Q. Do you have --
18     MR. GANT: Motion to strike as
19 nonresponsive.
20     Q. Do you have personal knowledge of AT&T's
21 licensing agreements between IBM and AT&T regarding
22 UNIX?
23     MR. GANT: Objection. Vague, foundation.
24     MR. MARRIOTT: Do you want to just have a
25 continuing objection to every question?

1     MR. GANT: No. Thank you.
2     MR. MARRIOTT: Okay. Do you want the
3 question read back? I think there may be a little
4 confusion as to what it is. So if you could read
5 back the question, I think it might help the
6 witness.
7     (PREVIOUS QUESTION THEN READ)
8     MR. GANT: Same objections.
9     THE WITNESS: Yes.
10 BY MR. MARRIOTT:
11     Q. Could you generally describe, please,
12 Mr. Wilson, the rights granted by AT&T's UNIX
13 licensing agreements?
14     MR. GANT: Objection. Vague and compound.
15     THE WITNESS: The UNIX software
16 agreements -- this is a little confusing, going
17 back and forth here, but the UNIX software
18 agreements provided rights to our licensees to use
19 the software to develop modification and derivative
20 works to use for their internal business purposes.
21 BY MR. MARRIOTT:
22     Q. Was that, "modifications and derivative
23 works," or, "modifications of derivative works"?
24     A. "And."
25     MR. GANT: Could -- could you read back

4 (Pages 13 to 16)

Page 17

1 that Q and A, please.
2 (REQUESTED PORTION OF THE RECORD READ)
3 BY MR. MARRIOTT:
4 Q. Okay. Let me try that again, Mr. Wilson.
5 I think the exchange confused the -- the colloquy.
6 Do you -- could you, please, generally
7 describe the rights granted by AT&T's UNIX
8 licensing agreements?
9 MR. GANT: Objection. Vague, compound,
10 foundation, calls for speculation and legal
11 conclusions.
12 MR. MARRIOTT: You may answer the
13 question.
14 THE WITNESS: Okay. You've got two
15 questions. Would you read it back again?
16 (PREVIOUS QUESTION THEN READ)
17 MR. GANT: Same objections.
18 MR. MARRIOTT: Okay. Let me just -- as an
19 aside, I don't -- maybe we can just agree that you
20 don't have to say, same objections. She doesn't
21 retype the question when she reads it, and so --
22 MR. GANT: That's fine. Then don't --
23 MR. MARRIOTT: She's not saying it.
24 MR. GANT: True.
25 MR. MARRIOTT: So I just think its going

Page 18

1 to further confuse the witness. And I'll endeavor
2 to do the same, if you have questions, but --
3 MR. GANT: Sure. As long as you'll
4 stipulate to that, that's fine.
5 MR. MARRIOTT: I think they're on the --
6 they're on the record.
7 So I think we -- now I've further probably
8 confused the matter. So can you just read the
9 question one more time, and then we'll let the
10 witness answer it.
11 (PREVIOUS QUESTION THEN READ)
12 THE WITNESS: Basically the rights granted
13 was for the licensee to use the software under
14 this -- under -- under the stipulations in the
15 agreement for their internal business purposes. So
16 they could use it within their own company or their
17 licensing areas.
18 BY MR. MARRIOTT:
19 Q. Did the agreements allow licensees to
20 prepare modifications and derivative works of the
21 software product subject to the licensing
22 agreements?
23 MR. GANT: Objection. Foundation,
24 calls --
25 THE WITNESS: Yes, it did.

Page 19

1 MR. GANT: I'm sorry. I was waiting for
2 the cough.
3 Foundation, calls for speculation and
4 legal conclusions.
5 THE WITNESS: Yes, they do.
6 BY MR. MARRIOTT:
7 Q. Could -- did the agreements place any
8 restrictions on the licensees, Mr. Wilson?
9 MR. GANT: Objection. Vague, foundation,
10 calls for speculation and legal conclusions.
11 THE WITNESS: Yes. There were -- there
12 were specific granted rights in the agreements with
13 restrictions with what you could do and what you
14 could not do.
15 BY MR. MARRIOTT:
16 Q. Could you just generally, please, describe
17 the restrictions the agreements placed on
18 licensees?
19 MR. GANT: Same objections.
20 THE WITNESS: The primary was that they
21 could use -- they could use the software products,
22 but not disclose the software products.
23 BY MR. MARRIOTT:
24 Q. Did the agreements place any restrictions
25 on what licensees could do with modifications or

Page 20

1 derivative works of the software product?
2 MR. GANT: Objection. Vague, foundation,
3 calls for speculation and legal conclusions.
4 THE WITNESS: The -- the restrictive
5 covenant of the licensing agreements only pertained
6 to that portion of the software product originally
7 supplied to our licensees.
8 And so any -- any derivative or
9 modification of work that they produced that
10 contained parts of the software product that they
11 were licensed for had to be protected under the
12 same covenants of the software licensing agreement.
13 BY MR. MARRIOTT:
14 Q. Did -- did AT&T, as you understand it,
15 Mr. Wilson, intend its licensing agreements to
16 protect anything other than the software product,
17 as that term is defined in the AT&T, UNIX licensing
18 agreements?
19 MR. GANT: Objection. Leading, vague,
20 foundation, calls for speculation and legal
21 conclusions.
22 THE WITNESS: We did not.
23 BY MR. MARRIOTT:
24 Q. Did AT&T intend its UNIX licensing
25 agreements to place restrictions on the extent to

5 (Pages 17 to 20)

Case 1:06-mc-00046-PTS    Document 6-5    Filed 04/21/2006    Page 5 of 28

Page 21

1 which its licensees could use, distribute, disclose
2 or transfer modifications and derivative works of
3 the software product independent of any software
4 product included in the modification or derivative
5 work?
6           MR. GANT:  Same objections and also
7 compound.
8           THE WITNESS:  We did not.
9           (DISCUSSION OFF THE RECORD)
10 BY MR. MARRIOTT:
11      Q.  Are you familiar, Mr. Wilson, with the
12 term methods and concepts?
13      A.  Yes, I am.
14      Q.  And what -- what does that mean to you,
15 sir?
16      A.  Methods and concepts was a -- a clause
17 that we used in our software agreement to protect
18 the originality of the ideas and concepts embodied
19 in that particular software product or work.
20      Q.  And what -- what very precisely does that
21 mean, Mr. Wilson?
22           MR. GANT:  Objection.  Vague.
23           THE WITNESS:  It evolved over time.  When
24 we first started licensing software products, it --
25 it pretty much pertained to the UNIX operating

Page 22

1 system, which at the time was fairly new in the
2 industry.
3           It was a new concept of how to license
4 operating systems for computers, and so any methods
5 and concepts associated with that was what that was
6 doing.  Later on we -- we abandoned it.
7      Q.  Are you familiar with the terms of AT&T's
8 licensing agreements with IBM concerning methods
9 and concepts?
10           MR. GANT:  Objection.  Vague, lack of
11 foundation.
12           THE WITNESS:  Yes, I am.
13 BY MR. MARRIOTT:
14      Q.  And could you describe that, please, sir?
15           MR. GANT:  Same objections.
16           THE WITNESS:  As I mentioned earlier,
17 the -- the methods and concepts was in our earlier
18 agreements, and -- and through negotiations with
19 IBM, we later removed that particular clause.
20           Mainly because the -- because time had
21 passed, and the -- pretty much the methods and
22 concepts associated with those software products
23 were pretty well -- pretty much widely known.  So
24 it wasn't really necessary to be there.
25           MR. GANT:  I -- I couldn't understand the

Page 23

1 last part of what you said.  I assume you got it.
2 So, if you could, read it back, please.
3           (PREVIOUS ANSWER THEN READ)
4           MR. GANT:  Thank you.
5           And if I could just ask you to speak up a
6 tad.  I'm having a little trouble hearing you.
7           THE WITNESS:  Okay.
8           MR. GANT:  Thank you.
9 BY MR. MARRIOTT:
10      Q.  Are you familiar with the concept of the
11 software product that products -- withdrawn.
12           Are you familiar with the concept of the
13 software products covered by the AT&T, UNIX
14 licensing -- licensing agreements becoming
15 available without restriction to the general
16 public?
17           MR. GANT:  Objection.  Vague, leading.
18           THE WITNESS:  Yes.  There was -- there was
19 concern expressed by several licensees, and the
20 program itself, about inadvertent disclosure of
21 software, and would the licensee be held liable for
22 that particular act.
23           And we -- we assured our licensees that
24 they would not be responsible for the protection of
25 software, which was made publicly available,

Page 24

1 without any act attributable to them personally or
2 directly.
3 BY MR. MARRIOTT:
4      Q.  Have you provided sworn statements
5 concerning your understanding of the AT&T, UNIX
6 licensing agreements, Mr. Wilson?
7           MR. GANT:  Objection.  Vague.
8           THE WITNESS:  The -- the declarations that
9 we have here today?  I --
10 BY MR. MARRIOTT:
11      Q.  Have you provided those?
12      A.  Yes, I have.
13      Q.  Let me show the witness what has
14 previously been marked as Exhibit 75, which is the
15 declaration of Otis L. Wilson, dated December 11th,
16 2003.  Copies have previously been provided to
17 counsel.
18           I wish also to show you, Mr. Wilson, a
19 copy of -- well, Exhibit 76, which is the
20 declaration of Otis L. Wilson, dated April 26,
21 2004.  A copy of which has also been provided to
22 counsel.
23           MR. GANT:  And, just for the record, these
24 exhibits contain declarations, as well as
25 attachments to the declarations.

6 (Pages 21 to 24)

1      MR. MARRIOTT: Thank you. That is
2  correct. Thank you for the clarification.
3  BY MR. MARRIOTT:
4      Q.  Are Exhibits 75 and 76 copies of the sworn
5  statements that you have provided concerning your
6  understanding of AT&T's licensing agreements
7  concerning UNIX, Mr. Wilson?
8      A.  Not going through in complete detail of
9  what I was just handed, I believe it to be so. I
10 think these are true documents. Sorry.
11     Do you want me to read them?
12     MR. GANT: It's Mr. Marriott's
13 examination.
14     MR. MARRIOTT: If you -- if you feel you
15 need to read them -- I do intend to walk you
16 through them. If you feel you need to read them to
17 answer the question of whether those are yours, by
18 all means, please, do.
19     THE WITNESS: They appear to be. Yes,
20 they do.
21 BY MR. MARRIOTT:
22     Q.  Would you take a look, please, Mr. Wilson,
23 at the signature page of Exhibit 75, which is your
24 declaration, dated December 11, 2003, and direct
25 your attention to the middle of the page, please,

1  sir?
2      A.  Uh-huh.
3      Q.  Is that, in fact, your signature,
4  Mr. Wilson?
5      A.  Yes, it is.
6      MR. GANT: Just -- I know exactly what you
7  mean, but you're referring to the signature page of
8  the exhibit. And this is the declaration at the
9  front of the exhibit, because there are other
10 signatures, I think perhaps even his signature, and
11 other signature pages in the exhibit. So --
12     MR. MARRIOTT: Fair enough. Let me --
13     MR. GANT: I'm not trying to make it
14 difficult. I just want a clear record.
15     MR. MARRIOTT: I'm happy for the
16 clarification. Let me try to -- let me try to be a
17 little bit more clear in my question, Mr. Wilson.
18 BY MR. MARRIOTT:
19     Q.  Exhibit 75 is a copy of a sworn
20 declaration that you provided in this litigation,
21 to which are appended nine exhibits; is that right?
22     A.  That's correct.
23     Q.  And Exhibit Number 76 is, similarly, a
24 copy of a sworn -- of a sworn declaration that you
25 provided in litigation, to which are appended ten

1  exhibits; is that right?
2      A.  Yes, it is.
3      Q.  Okay. Let me now, if I may, direct your
4  attention, Mr. Wilson, to the signature page of the
5  declaration portion of Exhibit 75, and ask you
6  whether your signature appears at page 20 of
7  Exhibit 75? Page 20 of the declaration, not the
8  attachments?
9      THE VIDEOGRAPHER: I'm sorry to interrupt,
10 but you're obscuring the question with that. Thank
11 you.
12     THE WITNESS: Yes, it is.
13     (DISCUSSION OFF THE RECORD)
14     THE WITNESS: Yes, it is.
15 BY MR. MARRIOTT:
16     Q.  Would you take a look, please, Mr. Wilson,
17 at the declaration that appears at Exhibit 76? And
18 that's at page 13 of the declaration, not the
19 attachments.
20     A.  Uh-huh.
21     Q.  Does your signature appear at page 13 of
22 the declaration portion of Exhibit 76?
23     A.  Yes, it does.
24     Q.  Is it agreeable, Mr. Wilson, during the
25 course of the deposition that when I refer to your

1  declaration in Exhibit 75, you'll understand I'm
2  talking about -- withdrawn.
3      Is it agreeable that when I refer to
4  Exhibit 75 and the pages of Exhibit 75, you'll
5  understand I'm referring to the pages of the
6  declaration itself, unless I specifically call your
7  attention to the attachments to the declaration?
8      A.  (WITNESS NODS HEAD UP AND DOWN)
9      Q.  And, similarly, is it agreeable during the
10 course of the deposition, Mr. Wilson, that when I
11 refer to Exhibit 76 and the pages of Exhibit -- of
12 Exhibit 76 that I'm referring to the pages of the
13 declaration, not the attachments, unless I
14 specifically call the attachments to your
15 attention?
16     A.  Yes. I understand.
17     Q.  Did -- did you review Exhibit 75,
18 Mr. Wilson, before you signed the declaration?
19     A.  Yes, I did.
20     Q.  Did you review Exhibit 76 before you
21 signed the declaration that's part of that exhibit?
22     A.  Yes, I did.
23     Q.  Is the information provided in Exhibit 75
24 true and correct, Mr. Wilson?
25     MR. GANT: Objection. Leading, vague,

1 compound.
2     MR. MARRIOTT: Withdrawn.
3 BY MR. MARRIOTT:
4     Q.  Is the information provided in Exhibit --
5 Exhibit 76 correct, Mr. Wilson?
6     MR. GANT: Objection. Compound.
7     Q.  You can answer, please?
8     A.  Yes.
9     Q.  Is the information provided in Exhibit --
10 in Exhibit 75 correct?
11     MR. GANT: Objection. Compound.
12     THE WITNESS: To the best of my knowledge,
13 yes.
14 BY MR. MARRIOTT:
15     Q.  Is there anything about the content of the
16 declaration found in Exhibit 75 that you would
17 change?
18     A.  I missed a typo on one of them the first
19 time I went through, and I picked it up as I was
20 looking again.  On page five of the Exhibit 70 --
21 76, I guess it is.
22     Q.  Is it --
23     A.  It refers on page five to paragraph 4.03.
24 Section 4.03 should really read section 4.01.
25     Q.  Is there anything else about Exhibit 76

1 that you would change?
2     A.  There is not.
3     Q.  Is there anything about Exhibit 75 that
4 you would change?
5     A.  There is not.
6     Q.  Both exhibits are, to the best of your
7 knowledge and understanding, true and correct?
8     A.  They are.
9     Q.  You stand by the statements in these -- in
10 these declarations, sir?
11     A.  I do. Yes, I do.
12     Q.  Are you familiar, Mr. Wilson, with the
13 documents appended to Exhibit 75?
14     A.  Yes.
15     Q.  Would you turn, please, to tab one of
16 Exhibit 75 and tell me what that is?
17     A.  Tab one is a copy of a software agreement
18 between AT&T Technologies and the IBM Corporation.
19     Q.  And was Exhibit 1 signed on your behalf by
20 David Frasure?
21     A.  Yes, it is.
22     Q.  Would you -- may I direct your attention,
23 please, to tab two of Exhibit 75.  Would you tell
24 me what that is, sir?
25     A.  Tab two is an AT&T Technologies

1 sublicensing agreement between International
2 Business Machines Corporation and AT&T
3 Technologies, and it was executed by Dave Frasure,
4 in 1985, on my behalf.
5     Q.  May I direct your attention to tab three,
6 please?  Would you tell me what that is?
7     A.  Tab three is a substitution agreement
8 between IBM Corporation and AT&T Technologies,
9 executed by David Frasure on my behalf.
10     Q.  Would you take a look, please, at tab
11 four, and tell me what that is?
12     A.  Tab four is a -- a letter for my
13 signature, written to the IBM Corporation,
14 referencing software agreements and the
15 sublicensing agreement and the substitution
16 agreement.
17     Q.  Would you take a look, please, at tab five
18 and tell me what that is?
19     A.  Tab five is an AT&T Technologies, Inc.
20 software agreement between AT&T Technologies and
21 Sequent Systems, which was executed by myself.
22     Q.  And when was that executed, Mr. Wilson?
23     A.  That was executed in April of 1985.
24     Q:  Would you take a look, please, at tab six
25 and tell me what that is?

1     A.  Tab six is an AT&T Technologies
2 sublicensing agreement between Sequent Computer
3 Systems, Incorporated and AT&T, Incorporated,
4 executed in January of 1986, executed by myself.
5     Q.  Would you take, please, a look at
6 Exhibit 7 and tell me what that is?
7     MR. GANT: Tab seven?
8     MR. MARRIOTT: Tab seven.  Thank you.
9     THE WITNESS: Tab seven is a substitution
10 agreement between AT&T Technologies and Sequent
11 Computer Systems, Incorporated, executed in 1986
12 by -- by myself.
13 BY MR. MARRIOTT:
14     Q.  Would you take a look, please, Mr. Wilson,
15 at tab eight and tell me what that is?
16     A.  Tab eight is an AT&T Information Systems,
17 Incorporated licensing agreement between AT&T-IS
18 and the Santa Cruz operation, dated 1997 -- no.
19 1987. Excuse me.
20     Q.  And, finally, would you take a look,
21 please, at tab nine and tell me what that is?
22     A.  Tab nine is a -- a general public license,
23 known as -- as GNU.
24     Q.  You're referring in tab nine to the --
25 the, G-N-U, the general public license; is that

8 (Pages 29 to 32)

1 right?
2    A.  That's correct.
3    Q.  Would you take a look, please, Mr. Wilson,
4 at Exhibit 76, the first tab of that, and tell me,
5 please, what tab one of Exhibit 76 is?
6    A.  It's the AT&T Technologies, Incorporated
7 software agreement between IBM Corporation and AT&T
8 Technologies, executed by David Frasure in 1985.
9    Q.  Was that executed on your behalf,
10 Mr. Wilson?
11    A.  Yes, it was.
12      MR. GANT:  I'm sorry. Objection. Vague.
13    Q.  Would you take a look, please, at
14 Exhibit -- at tab two and tell me what that is?
15    A.  Tab two is an AT&T sublicensing agreement
16 with AT&T Technologies, Incorporated, sublicensing
17 agreement between AT&T Technologies, Incorporated
18 and the IBM Corporation, executed by Dave Frasure
19 on my behalf in 1985.
20    Q.  Would you take a look, please, Mr. Wilson,
21 at tab three and tell me what that is?
22    A.  Tab three is a substitution agreement
23 executed between AT&T Technologies, Incorporated
24 and the International Business Machines
25 Corporation, executed by Dave Frasure on my behalf

1 in 1985.
2    Q.  Would you take a look, please, at tab four
3 and tell me what that is?
4    A.  Tab four is a -- is a letter regarding
5 software agreements and sublicensing agreement
6 and -- and substitution agreement in place with the
7 IBM Corporation, which is executed on my behalf by
8 David Frasure in 1985.
9    Q.  Would you take a look, please, at tab five
10 and tell me what that is?
11    A.  Tab five is an AT&T Technologies software
12 agreement between AT&T Technologies, Incorporated
13 and Sequent Computer Systems, Incorporated,
14 executed by myself on April 18th, 1985.
15    Q.  Would you take a look, please, at tab six
16 and tell me what that is?
17    A.  Tab six is a sublicensing agreement
18 between AT&T Technologies, Incorporated and Sequent
19 Computer Systems, which I executed in 1986.
20    Q.  Would you take a look, please, at tab
21 seven and tell me what that is?
22    A.  Tab seven is a substitution agreement
23 between AT&T Technologies, Incorporated and Sequent
24 Computer Systems, which I executed in January of
25 1986.

1    Q.  Would you take a look, please, at tab
2 eight and tell me what that is?
3    A.  Tab eight is a copy of the April issue of
4 the -- of the AT&T $ echo publication.
5    Q.  When you say, "the April issue,"
6 Mr. Wilson, April of what year?
7    A.  April of 1985.
8    Q.  Could you take a look, please, at tab nine
9 and tell me what that is?
10    A.  Tab nine is a -- is a copy of the -- also
11 a copy of a $ echo publication, dated August 1985.
12    Q.  And, finally, could you take a look,
13 please, at tab ten of Exhibit 76 and tell me what
14 that is?
15    A.  Tab ten is an AT&T Information Systems,
16 Incorporated software agreement between AT&T
17 Information Systems, Incorporated and the Santa Cruz operation,
18 which I executed in May of 1987.
19    Q.  Direct your attention, if I may,
20 Mr. Wilson, to Exhibit 76, and ask you to look,
21 please, at page 12 of that exhibit -- actually, let
22 me, instead, direct you to paragraph 12, if I may,
23 which appears at page six.
24      MR. GANT:  It starts on five. Do you want
25 to go in the middle of it?

1 BY MR. MARRIOTT:
2    Q.  Take a look, please, in the middle of
3 Exhibit 76, paragraph 12, where -- where it begins,
4 "At least as I understood."
5    A.  Okay.
6    Q.  As you sit -- there, it states,
7 Mr. Wilson, "At least as I understood these
8 sections." Are the, "these sections," referred to
9 at page six the sections appearing on the previous
10 page, as sections 2.01, section 2.05, section 4.01,
11 as you indicated in your prior answer, section
12 7.06(a) and section 7.10 of the AT&T, UNIX
13 sublicensing -- UNIX licensing agreement concerning
14 IBM?
15      MR. GANT:  Objection. Vague.
16      THE WITNESS:  Yes.
17 BY MR. MARRIOTT:
18    Q.  Okay. In fact, those are the provisions
19 of AT&T's standard software sublicense -- software
20 agreement at that time; correct?
21      MR. GANT:  Objection. I'm sorry, David.
22 I didn't mean to cut you off.
23      Objection. Vague.
24      MR. MARRIOTT:  It was a very bad question.
25 It probably should have been cut off. So let me

9 (Pages 33 to 36)

Case 1:06-mc-00046-PTS    Document 6-5    Filed 04/21/2006    Page 9 of 28

Page 37

1   sort of start again. Okay. Make your life and
2   mine much easier.
3           Let's just go off the record for one
4   second.
5           THE VIDEOGRAPHER: One moment, please.
6   Going off the record. The time is
7   10:03 a.m.
8           (MR. DAVIS HAS EXITED THE ROOM)
9           (RECESS TAKEN AT 10:03 A.M. TO 10:05 A.M.)
10          THE VIDEOGRAPHER: Back on the record.
11  The time is 10:05 a.m.
12          Please, continue.
13  BY MR. MARRIOTT:
14      Q.   Mr. Wilson, let me direct your attention,
15  please, to Exhibit 76, to the second page and the
16  first numbered paragraph. Let me know when you
17  have that, sir?
18      A.   I have it.
19      Q.   Would you, please, read into the record
20  paragraph one of your declaration?
21      A.   "I was responsible for the licensing
22  operating" -- or, "licensing operating systems
23  under the UNIX brand from 1980 until 1981" --
24  "1991." Excuse me. "First with the American
25  Telephone and Telegraph Company," paren, "AT&T, and

Page 38

1   then with its subsidiary, UNIX System Laboratories.
2           "Initially I was on the staff responsible
3   for negotiating license agreements with our
4   customers. From 1983 until I retired in 1991, I
5   was the head of the group responsible for licensing
6   the UNIX System V operating system worldwide."
7       Q.   Is that an accurate statement, Mr. Wilson?
8       A.   Yes, it is.
9           MR. GANT: Objection. Let me put on my
10  objection, which is compound, vague, lack of
11  foundation.
12          And if I could just ask you to just try
13  and pause a tad more between the question and your
14  response to allow me to put my objections on for
15  the record, which you can tune out.
16          THE WITNESS: Okay. Got you.
17          MR. GANT: Thank you.
18          THE WITNESS: Will do.
19  BY MR. MARRIOTT:
20      Q.   Direct your attention to paragraph three,
21  Mr. Wilson. In paragraph three your declaration
22  states that you joined AT&T in 1963; is that right?
23      A.   That's correct.
24      Q.   What were you doing before you joined AT&T
25  in 1963?

Page 39

1       A.   I was in the U.S. Air Force.
2           (MR. DAVIS THEN RE-ENTERED THE ROOM)
3           THE WITNESS: No. Correction. I was out
4   of the Air Force.
5   BY MR. MARRIOTT:
6       Q.   Well, it was 40 years ago. So --
7       A.   Yeah, right. No. Yeah. There was a
8   period there. What was I doing? I was kind of
9   traveling around. I was working in Kannapolis,
10  North Carolina.
11      Q.   Do you recall what you were doing there?
12      A.   Yeah. I was working in a bakery.
13      Q.   Okay.
14      A.   Uh-huh.
15          MR. GANT: Air Force, bakery.
16          THE WITNESS: Which I got out of the Air
17  Force -- I left the Air Force in 1982 and came --
18  came to North Carolina, because my family was here.
19  I hadn't seen them in four years. And I was
20  working part time in a bakery. Ironically, I got
21  an offer for a job at AT&T and IBM the same week.
22  And so --
23  BY MR. MARRIOTT:
24      Q.   You declined the job from IBM, I take it?
25      A.   Well, they wanted me to go to Cleveland.

Page 40

1   The other one I would go to Charlotte. So at the
2   time I wanted to stay here around the family. So I
3   went to work for AT&T. At that time it was Western
4   Electric.
5       Q.   In -- in the next sentence of paragraph
6   three you state, "In 1980, after completing a
7   company-sponsored management training program, I
8   left the Princeton office of AT&T to join the
9   patent and licensing group in Greensboro,
10  North Carolina." Could you describe, please, what
11  the company-sponsored management training program
12  was about?
13      A.   It was a -- an accelerated MBA program for
14  selected management employees. You were required
15  to be in the program for a year, almost a year.
16  And the best way to describe it was an accelerated
17  MBA program.
18          And out of that program you were assigned
19  to a -- a location in the company, in an area which
20  you had not worked before, for people you had not
21  worked before. So it was -- it was all part of a
22  plan to make you versatile enough to work in any
23  part of the AT&T company or its subsidiaries.
24      Q.   And how did you come to be involved in
25  that training program?

10 (Pages 37 to 40)

Page 41

1    A.  It was a competitive selection.  I was
2  number one out of 10,000 people that were -- that
3  went in for it.
4    Q.  Further, in paragraph two, you say, "I was
5  responsible for licensing operating systems under
6  the UNIX brand beginning in 1980.  Initially I was
7  on the staff for negotiating license agreements
8  with our customers.
9        "Beginning in 1983 until I retired in 1991
10  I was the head of the group responsible for
11  licensing the UNIX System V operating system
12  worldwide."  Is that an accurate description of
13  your employment at AT&T during the relevant period?
14    A.  Yes, it is.
15    Q.  Would you read, please, into the record
16  paragraph four?
17    A.  "In 1989 AT&T separated the organizations
18  responsible for UNIX, and associated system
19  software products and services, into a business
20  unit called UNIX software operation.  In 1991 the
21  rights to the UNIX operating system and related
22  products, technology and intellectual property were
23  transferred to USL."  I remained the head of the
24  organization -- licensing organization throughout
25  these changes.

Page 42

1    Q.  Does that accurately describe your
2  employment at AT&T?
3    A.  Yes.
4        MR. GANT:  Objection.  Compound, vague.
5        THE WITNESS:  Yes, it does.
6  BY MR. MARRIOTT:
7    Q.  In paragraph five you state that, "During
8  the period from 1980 to 1991 AT&T and USL licensed
9  UNIX source code, including UNIX System V source
10  code, to hundreds of licensees.  Nearly every UNIX
11  license agreement executed by AT&T" -- well,
12  withdrawn.
13        In paragraph five you state, "During the
14  period from 1980 to 1991 AT&T and USL licensed UNIX
15  source code, including UNIX System V source code,
16  to hundreds of licensees.  Nearly every UNIX
17  license agreement executed by AT&T during this
18  period was signed by me or on my behalf by people
19  that reported to me."  Is that an accurate
20  statement, Mr. Wilson?
21        MR. GANT:  Same objections.
22        THE WITNESS:  Yes, it is.
23    Q.  And how is it that you know that to be an
24  accurate statement, Mr. Wilson?
25        MR. GANT:  Same objection.  Vague.

Page 43

1        THE WITNESS:  The organization responsible
2  for this, the licensing of software, was one I was
3  a part of, and I was there at the -- the inception.
4  So I know all of the agreements concerning the
5  software products actually came through my
6  organization.
7  BY MR. MARRIOTT:
8    Q.  Would you read, please, paragraph six into
9  the record?
10    A.  "The UNIX System V source code license
11  agreements generally included a number of standard
12  form agreements with each licensee.  The standard
13  software agreement granted the licensee the right
14  to use and modify the source code for its own
15  internal business purposes.
16        "In addition, many licensees were parties
17  to sublicensing agreements, which granted the
18  licensee the right to furnish sublicensed products
19  based on UNIX System V to customers in object code
20  format.
21        "A substitution agreement provided that
22  the software agreement, and, if applicable, the
23  sublicensing agreement, replaced earlier agreements
24  relating to UNIX System V.software."
25    Q.  Are you sure that's true, Mr. Wilson?

Page 44

1        MR. GANT:  Objection.  Compound, vague,
2  leading, foundation.
3        THE WITNESS:  Yes.
4  BY MR. MARRIOTT:
5    Q.  In paragraph seven you state that you are
6  familiar with licensing agreements between AT&T
7  Technologies, Inc. and IBM, which you say were
8  negotiated under your supervision while you were
9  head of AT&T's licensing group.  Is that an
10  accurate statement?
11        MR. GANT:  Same objections.
12        THE WITNESS:  Yes, it is.
13  BY MR. MARRIOTT:
14    Q.  Who's David Frasure, Mr. Wilson?
15    A.  David Frasure was one of the negotiators
16  in our organization that reported -- whom I
17  supervised.
18    Q.  Okay.  And during what period of time did
19  Mr. Frasure report to you?
20    A.  Oh.
21    Q.  Withdrawn.
22        Over what period of time roughly did
23  Mr. Frasure report to you?
24    A.  About six years.  The period -- I'm trying
25  to -- the period from about '84 to '91, I would

11 (Pages 41 to 44)

1 think.
2  MR. GANT: I couldn't hear the end of your
3 answer.
4  THE WITNESS: '84 to '91. I'm not exactly
5 sure exactly the period, but he was -- he was there
6 for a good six years, I guess.
7 BY MR. MARRIOTT:
8  Q. And how did Mr. Frasure come to work for
9 you at AT&T?
10  A. I actually recruited Dave Frasure for one
11 of the other organizations within Western Electric
12 at the time.
13  Q. Why did you do that, Mr. Wilson?
14  A. Personal knowledge of his work and the --
15 his expertise with the software and -- and through
16 the interview process.
17  Q. In paragraph eight you state that you were
18 familiar with licensing agreements between AT&T
19 Technologies and Sequent Computer Systems, which
20 you say were also supervised under your
21 supervision; is that correct?
22  MR. GANT: Objection. Vague, compound,
23 foundation.
24  THE WITNESS: Yes, it is.
25 BY MR. MARRIOTT:

1  Q. And did you, as stated in -- in paragraph
2 eight, sign those agreements on behalf of AT&T,
3 Mr. Wilson?
4  A. Yes, I did.
5  MR. GANT: Same -- same objections.
6 Excuse me.
7  THE WITNESS: Excuse me.
8  Yes, I did.
9 BY MR. MARRIOTT:
10  Q. And is it, in fact, your understanding
11 that Sequent has now been acquired by and merged
12 into IBM?
13  A. Yes.
14  Q. You need to speak audibly.
15  A. Yes.
16  No. I was waiting --
17  MR. GANT: I appreciate it. Thank you.
18 Contrary to Mr. Marriott's suggestion, I'm not
19 going to object to every question, only
20 objectionable questions.
21 BY MR. MARRIOTT:
22  Q. Take a look, if you would, Mr. Wilson, to
23 paragraph nine. Would you read that for me,
24 please, into the record?
25  A. "As a result of my role as head of the

1 group responsible for negotiating the IBM
2 agreements and the Sequent agreements and hundreds
3 of other UNIX System V licensing agreements, I have
4 a thorough understanding of these agreements and
5 what the parties intended" -- "intended them to
6 accomplish."
7  Q. Why did you say that in your declaration,
8 Mr. Wilson?
9  A. That's -- that's a statement of fact.
10 It's -- it's what I believe.
11  Q. Let me direct your attention, if I may, to
12 paragraph ten of your declaration. There you state
13 that from 1983 until 1991, while you were
14 responsible for licensing UNIX System V for AT&T
15 and USL, your group licensed UNIX System V source
16 code and related materials to a large number of
17 licensees around the world. Is that an accurate
18 statement of your activities during the period from
19 1983 to 1991?
20  MR. GANT: Objection. Leading, compound,
21 vague, foundation.
22  THE WITNESS: Yes, it is.
23 BY MR. MARRIOTT:
24  Q. Would you read paragraph 11 into the
25 record for me, please?

1  A. "The standard software agreement that we
2 used to license UNIX System V source code and
3 related materials sets forth the various rights
4 given to licensees and the restrictions imposed on
5 the licensees with respect to such materials, which
6 were called the," quote, "software product or
7 software products in the agreement."
8  Q. To the best of your understanding,
9 Mr. Wilson, is there anything inaccurate about that
10 statement?
11  MR. GANT: Same objections and leading.
12  THE WITNESS: I believe that to be an
13 accurate statement.
14  (DISCUSSION OFF THE RECORD)
15 BY MR. MARRIOTT:
16  Q. Mr. Wilson, may I direct your attention to
17 paragraph 12 of your declaration, dated April 26th,
18 2004?
19  A. Okay.
20  Q. Paragraph 12 lists five provisions of what
21 you describe here as the standard early software
22 agreement of AT&T. Are you familiar with each of
23 the provisions listed there?
24  MR. GANT: Objection. Mischaracterizes
25 the document, vague, foundation, compound.

12 (Pages 45 to 48)

Page 49

1    THE WITNESS: Yes, I am.
2  BY MR. MARRIOTT:
3    Q.  Would you describe -- would you read for
4  me paragraph 12, Mr. Wilson?
5    A.  "Among the standard provisions in our
6  early software agreements, including the IBM
7  software agreement and the Sequent software
8  agreement, were the following:
9    "Section 2.01," colon, "AT&T grants the
10  licensee a personal, nontransferable and
11  nonexclusive right to use in the United States each
12  software product identified in one or more of the
13  supplements hereto, solely for the licensee's own
14  internal business purposes."  Starting from,
15  "AT&T," to, "business purposes," are in quotes.
16    "Section 2.05," colon, quotation -- open
17  quotation.  "No right is granted by this agreement
18  for the use of software products directly for
19  others or for any use of software products by
20  others," close quotation.
21    THE WITNESS:  Do I need to read all of
22  those?
23    MR. GANT:  You have to ask Mr. Marriott
24  what he wants.
25    MR. MARRIOTT:  Do whatever you're

Page 50

1  comfortable with, Mr. Wilson.
2    THE WITNESS:  "Section 4.03," colon, open
3  paren.  "Licensee agrees that it will not, without
4  the prior written consent of AT&T, export directly
5  or indirectly software products covered by this
6  agreement to any country outside of the
7  United States," close quote.
8    "Section 7.06," parentheses, little A,
9  colon, open quotation.  "Licensee agrees that it
10  shall hold all parts of the software products
11  subject to this agreement in confidence for AT&T,"
12  close quotation.
13    "Section 7.10," colon, open quote.
14  "Except as provided in section 7.06," paren, small
15  B, "nothing in this agreement grants to licensee
16  the right to sell, lease or otherwise transfer or
17  dispose of a software product in whole or in part."
18  Close quote.
19    Q.  Let me just stop you there, if I may,
20  Mr. Wilson, is -- is there anything, to your
21  understanding, inaccurate about what you've read so
22  far from paragraph 12?
23    MR. GANT:  Objection -- objection.  Vague,
24  compound, foundation, calls for speculation and
25  legal conclusions.

Page 51

1    THE WITNESS:  No.
2  BY MR. MARRIOTT:
3    Q.  You made reference in previous testimony
4  to there being a typo in -- in the third bullet
5  point at page five.  Could you describe what you
6  meant by that, please?
7    A.  Section -- as indicated in the page five
8  of this document, section -- it references section
9  4.03.  The reference should be to section 4.01.
10  The text that follows that is correct, but the
11  reference to the section should be 4.01.
12    Q.  How did that come to your attention,
13  Mr. Wilson?
14    A.  In reading it.  Reading -- actually
15  reading -- excuse me.  In reading the document.
16    Q.  Would you look, please, at page six and
17  that remaining portion of paragraph 12 of your
18  declaration, which begins, "These provisions"?
19    A.  Uh-huh.
20    Q.  Would you just read that section to
21  yourself and tell me when you're finished, please?
22    A.  Okay.
23    Q.  Is there anything inaccurate about what
24  you've read in the remaining portions of paragraph
25  12?

Page 52

1    MR. GANT:  Same objections.
2    THE WITNESS:  There is not.
3  BY MR. MARRIOTT:
4    Q.  There's nothing about that you'd change?
5    A.  (WITNESS SHOOK HEAD FROM SIDE TO SIDE)
6    Q.  Let me direct your attention in
7  particular, Mr. Wilson --
8    MR. GANT:  Was there an answer?  I didn't
9  hear it.
10    MR. MARRIOTT:  He said, no.
11    THE WITNESS:  No.
12    MR. GANT:  Okay.  Thanks.
13  BY MR. MARRIOTT:
14    Q.  Would you -- direct your attention,
15  please, to that portion of the latter part of
16  paragraph 12 that begins, "At least as I
17  understood."  Could you read that portion, please,
18  for me into the record?
19    A.  "At least as I understood these sections
20  and discussed them with our licensees, they do not,
21  and were not intended to, restrict our licensees'
22  rights to use, export, disclose or transfer their
23  own products and source code, as long as they did
24  not use, export, disclose or transfer AT&T's UNIX
25  System V source code along with it.  I never

13 (Pages 49 to 52)

1   understood AT&T's software agreements to place any
2   restriction on our customers' use of their own
3   original work."
4       Q.   What is the basis, Mr. Wilson, of -- of
5   those statements?
6       MR. GANT:  Objection.  Vague, compound.
7       THE WITNESS:  The -- the statement goes
8   to -- goes to the heart of the licensing program,
9   from the standpoint that we required our licensees
10  to protect the software products under the -- under
11  the stipulations in the software agreement, and we
12  did not intend to exercise any control or
13  restriction on those products that did not contain
14  portions of the software products.
15  BY MR. MARRIOTT:
16      Q.   Did AT&T intend to exercise any control
17  over modifications or derivative works that --
18  withdrawn.
19      Did AT&T intend to exercise any control
20  over those portions of modifications or derivative
21  works of the software product that did not include
22  UNIX System V source code?
23      MR. GANT:  Objection.  Leading, compound,
24  vague, lack of foundation, calls for speculation
25  and for legal conclusions.

1       Q.   Would you like the question read back?
2       A.   No.
3       No.  We didn't -- we did not intend to
4   extend our licensing agreement clauses to anything
5   other than the software product delivered with
6   those -- those agreements.
7       Q.   Direct your attention, please, Mr. Wilson,
8   to paragraph 13.
9       MR. GANT:  I'm sorry, David.  Can I ask
10  that last answer to be read back?
11      MR. MARRIOTT:  Sure.
12      MR. GANT:  It was long, and I want to make
13  sure I got it.  Thank you.
14      (DISCUSSION OFF THE RECORD)
15      (REQUESTED PORTION OF THE RECORD READ)
16      MR. GANT:  Thank you.  Thank you, David.
17      (DISCUSSION OFF THE RECORD)
18  BY MR. MARRIOTT:
19      Q.   May I look at paragraph -- may I direct
20  your attention rather to paragraph 13, Mr. Wilson.
21  Paragraph 13 states, "AT&T's standard software
22  agreements also granted licensees the right to
23  modify UNIX System V source code and to prepare
24  derivative works based upon that code.  Section
25  2.01 of our early software agreement, including the

1   IBM software agreement and the Sequent software
2   agreement, included the following language:  Such
3   right to use includes the right to modify such
4   software product and to prepare derivative works
5   based on such software product provided the
6   resulting materials are treated hereunder as part
7   of the original software product."
8       Do you see that, sir?
9       A.   Yes, I do.
10      Q.   Do you agree with the statements made in
11  paragraph 13 of your declaration?
12      MR. GANT:  Objection.  Leading,
13  foundation, vague, calls for speculation and legal
14  conclusions.
15      THE WITNESS:  Yes.
16  BY MR. MARRIOTT:
17      Q.   Is there anything about that statement you
18  would change, Mr. Wilson?
19      MR. GANT:  Objection.  Vague.
20      THE WITNESS:  I would not.
21      Q.   Would you, please, read into the record
22  for me paragraph 14 of your declaration?
23      A.   "As my staff and I communicated to our
24  licensees, this provision was only intended to
25  ensure that if a licensee were to create a

1   modification or derivative work based on UNIX
2   System V, any material portion of the original UNIX
3   System V source code provided by AT&T or USL that
4   was included in the modification or derivative work
5   would remain subject to the confidentiality and
6   other restrictions of the software agreement.
7       "As we understood section 2.01, any source
8   code developed by or for a licensee and included in
9   a modification or a derivative work would not
10  constitute resulting materials to be treated as
11  part of the original software product, except for
12  any material proprietary UNIX System V source code
13  provided by AT&T or USL and included therein."
14      Q.   Is that an accurate statement, sir?
15      MR. GANT:  Objection.  Vague, compound,
16  lack of foundation, calls for speculation and legal
17  conclusions.
18      THE WITNESS:  Yes, it is.
19  BY MR. MARRIOTT:
20      Q.   Would you, please, read for me into the
21  record paragraph 15?
22      A.   "AT&T and USL did not intend to assert
23  ownership or control over modifications and
24  derivative works prepared by licensees, except to
25  the extent of the original UNIX System V source

14 (Pages 53 to 56)

1  code included in such modifications and derivative
2  works.
3      "Although, the UNIX System V source
4  contained in a modification or derivative work
5  continued to be owned by AT&T or USL, the code
6  developed by or for the licensee remained the
7  property of the licensee, and could, therefore, be
8  used, exported, disclosed or transferred freely by
9  the licensee."
10      Q.  You testified, Mr. Wilson, previously that
11  that paragraph represents a true statement.  Why
12  did you provide that testimony?
13      A.  Because I believe it to be a true
14  statement.
15      Q.  May I direct your attention, please, to
16  paragraph 16.  There you say, "I do not believe
17  that our licensees would have been willing to enter
18  into the software agreement if they understood
19  section 2.01 to grant AT&T or USL the right to own
20  or control source code developed by the licensee or
21  provided to the licensee by a third party.
22      "I understood that many of our licensees
23  invested substantial amounts of time, effort and
24  creativity in developing products based on UNIX
25  System V.  The derivative works provision of the

1  software agreement was not meant to appropriate for
2  IBM" -- "was not meant to appropriate for AT&T,"
3  rather, "or USL the technology developed by our
4  licensees."  Is that --
5      MR. GANT:  Where is Dr. Freud when we need
6  him?
7      MR. MARRIOTT:  Dead.
8  BY MR. MARRIOTT:
9      Q.  Is -- is that an accurate statement,
10  Mr. Wilson?
11      MR. GANT:  Same objections.
12      THE WITNESS:  Yes.
13      Q.  And why do you say what you say there in
14  paragraph 16 of your declaration?
15      MR. GANT:  Objection.  Vague, compound.
16      THE WITNESS:  Both 15 and 16 were -- are
17  directed towards clarifying what was the intent of
18  our software licensing program, and that -- that
19  was what I was trying to -- to focus on with these
20  two statements.
21  BY MR. MARRIOTT:
22      Q.  In paragraph 17 of your declaration you
23  say, "In fact, some licensees sought to clarify
24  that under the agreements the licensee, not AT&T or
25  USL, would own and control modifications and

1  derivative works prepared by or for the licensee,
2  except for any original UNIX System V source code
3  provided by AT&T or USL and included therein.
4      "We provided such clarification when
5  asked, because that is what we understood the
6  language in the standard software agreement to mean
7  in any event.  In some cases we provided this
8  clarification orally, and in some cases we provided
9  it in writing."
10      Is there anything you would change about
11  the accuracy of that statement, Mr. Wilson?
12      MR. GANT:  Objection.  Foundation.
13      THE WITNESS:  I would not.
14  BY MR. MARRIOTT:
15      Q.  In paragraph 18 you state, "In fact,
16  although I am not a lawyer, it was my view at the
17  time that we could not claim any rights to non-UNIX
18  System V source code, as the plaintiff here appears
19  to be doing, without raising serious antitrust
20  issues.
21      "In light of the divestiture of AT&T
22  around that time, we, as a company, were very
23  concerned with the potential anticompetitive
24  effects of our actions.
25      "As a result, one of the reasons we made

1  clear to our licensees that our UNIX System V
2  software agreements did not impose any restrictions
3  on the use or disclosure of their own original
4  code, except insofar as it included UNIX System V
5  code, was to avoid any appearance of impropriety."
6      Why do you say that in paragraph 18,
7  Mr. Wilson?
8      MR. GANT:  Objection.  Vague, leading,
9  calls for speculation and legal conclusions.
10      THE WITNESS:  I stated that, because
11  during this period of time -- 1983 being the date
12  that really kicked off -- the Bell system was going
13  through another separation or breakup.  The first
14  was in 1956, when Sequenta decreed our -- our
15  business with the AT&T Bell system was limited to
16  communication.
17      And in 1983 there was a major separation
18  of the operating telephone companies and AT&T into
19  different groups.  And there was a high level of
20  concern that we did not infringe on any businesses
21  that we were not supposed to be into.
22      And so the whole software program was
23  started with software that was developed for other
24  purposes within AT&T, and we went through our
25  patent licensing organization as a -- stuff that

15 (Pages 57 to 60)

Page 61

1  had been used for a primary purpose was now made
2  available to the -- to licensees under -- under
3  these agreements.
4      Q.  Let me just -- and I don't want to cut off
5  your answer, but let me just caution you in
6  responding to the question not to provide any
7  information that might be privileged of AT&T. So
8  with that caveat, continue, if you -- if you have
9  more to say.
10     A.  No.  I'll -- I'll stop right there.
11     MR. GANT:  Well, let me just ask for a
12 clarification.  Has that been the case with all of
13 your prior questions and all of the witness' prior
14 answers, that none of the answers that he has
15 provided have been based in any way on any
16 communications with AT&T's counsel?
17     MR. MARRIOTT:  Well, you'll have to ask
18 that question of the witness, but it's certainly
19 not my intent by way of any of my questions to seek
20 information that -- that is privileged.
21     MR. GANT:  And has that been your intent
22 during the -- your questions that you've already
23 asked?
24     MR. MARRIOTT:  I think I just said that.
25     MR. GANT:  Okay.  I just wanted to make it

Page 62

1  clear, if you did.  So --
2      MR. MARRIOTT:  Yeah.
3      Q.  To -- just so -- for clarity, to your
4  understanding, Mr. Wilson, has the testimony you've
5  provided to this point in the deposition in any way
6  required you to disclose information that you
7  believe to be protected by an attorney/client
8  privilege?
9      MR. GANT:  Objection.  Vague, calls for a
10 legal conclusion.
11     THE WITNESS:  It has not.
12 BY MR. MARRIOTT:
13     Q.  In paragraph 19 you state, "We provided
14 IBM with just such a clarification in paragraph A.2
15 of the IBM side letter."  The side letter
16 referenced there, Mr. Wilson, is attached to this
17 declaration as -- as tab four; is that correct?
18     A.  That is correct.
19     Q.  Direct your attention, if I may,
20 Mr. Wilson, to page two of the side letter, which
21 is at tab four of your declaration.  Do you see --
22 do you see on page two, paragraph two --
23     A.  Yes, I do.
24     Q.  -- what's stated in the beginning,
25 "Regarding"?  Is that accurately -- is that

Page 63

1  accurately quoted in your declaration at page
2  eight, paragraph 19?
3      MR. GANT:  Objection.  Vague.
4      THE WITNESS:  It's not -- it's not
5  verbatim, but it -- it -- it captures the essence
6  of both places.
7  BY MR. MARRIOTT:
8      Q.  When you say, "It's not verbatim," I'm
9  actually referring only to the quoted portion in
10 paragraph 19, where it says, "Regarding section
11 2.01."
12     MR. GANT:  I think he means because of the
13 brackets it's not verbatim.
14     THE WITNESS:  Right.
15     MR. MARRIOTT:  Okay.  Fair enough.  Thank
16 you for the clarification.
17 BY MR. MARRIOTT:
18     Q.  Do you think in substance that what's
19 quoted at page eight of your declaration accurately
20 reflects paragraph two of the side letter at tab
21 four of your declaration?
22     MR. GANT:  Objection.  Vague.
23     THE WITNESS:  Yes, I do.
24 BY MR. MARRIOTT:
25     Q.  Under the quote at paragraph 19 of your

Page 64

1  declaration you state, "I understood this
2  language," referring to the language of the side
3  letter, "to mean that IBM, not AT&T or USL, would
4  have the right to control modifications and
5  derivative works prepared by or for IBM.
6      "IBM, like all licensees under the
7  agreements, fully owns any modifications of and
8  derivative works based on UNIX System V prepared by
9  or for IBM, and can freely use, copy, distribute or
10 disclose such modifications and derivative works,
11 provided that IBM does not copy, distribute or
12 disclose any material portions of the original UNIX
13 System V source code provided by AT&T or USL,
14 except as otherwise permitted by the IBM
15 agreements."
16     Does paragraph 19 reflect your
17 understanding, Mr. Wilson?
18     MR. GANT:  Objection.  Vague, compound,
19 lack of foundation, calls for speculation and for
20 legal conclusions.
21     THE WITNESS:  Yes, they do.
22 BY MR. MARRIOTT:
23     Q.  In -- in paragraph 20 you say,
24 "Clarifications of the kind reflected in" -- "in
25 paragraph A.2 of the IBM side letter did not

16 (Pages 61 to 64)

Page 65

1　represent a substantive change to the standard
2　software agreement, since AT&T and USL never
3　intended to assert ownership or control over
4　modifications and derivative works prepared by
5　licensees, except to the extent of any material
6　portions of the original UNIX System V source code
7　provided by AT&T or USL and included in such
8　modifications and derivative works."
9　　　Do you see that?
10　A. Yes, I do.
11　Q. Is there anything about that that you
12　would change, Mr. Wilson?
13　　　MR. GANT: Objection. Vague, leading.
14　　　THE WITNESS: I do not.
15　BY MR. MARRIOTT:
16　Q. You do not --
17　A. I do not see anything that I would change.
18　Q. Okay. Thank you.
19　　　In the following paragraph you make
20　reference to numerous inquiries received from
21　licensees. Could you explain, please, what you
22　meant by that?
23　A. We got numerous inquiries -- we were
24　constantly having questions about our licensing
25　agreements and what they meant and how to interpret

Page 66

1　them. You mean the whole paragraph or just that
2　sentence?
3　Q. Just that -- you've answered the question.
4　A. Okay.
5　Q. Do you -- do you have familiarity with
6　something known as the $ echo publication?
7　A. Yes, I do.
8　Q. And you made reference to that in prior
9　testimony; right?
10　A. Yes, I did.
11　Q. Would you just briefly describe what the
12　$ echo publication was?
13　A. $ echo was a newsletter prepared for
14　distribution to our licensees, and it covered
15　product information, licensing information and
16　anything of general interest to all of our
17　licensees as a way to convey it to them.
18　Q. Did Mr. Frasure have any role with respect
19　to the $ echo publication?
20　　　MR. GANT: Objection. Vague, leading.
21　　　THE WITNESS: Mr. Frasure, as long as with
22　other folks in the licensing organization, were
23　contributing to the information concerning
24　licensing that was contained within the $ echo
25　newsletter. He, among others. In other words,

Page 67

1　this was just clarifications with regard to
2　licensing. That was a section of the newsletter.
3　BY MR. MARRIOTT:
4　Q. Did you have any role in reviewing and
5　approving the content of the $ echo publications?
6　　　MR. GANT: Objection. Vague.
7　　　THE WITNESS: Yes, I did. I was
8　responsible to ensure the accuracy of the
9　information concerning licensing policies and
10　agreements.
11　BY MR. MARRIOTT:
12　Q. In paragraph 23 of your declaration you
13　make reference to seminars at which Mr. Frasure
14　discussed the newsletter. Can you tell -- tell us,
15　please, what you're referring to there?
16　　　MR. GANT: Objection. Vague, compound.
17　　　THE WITNESS: Just saying in addition to
18　the newsletter, we actually presented the material
19　in the newsletter to our licensees at seminars and
20　conferences that we held for UNIX system licensees.
21　BY MR. MARRIOTT:
22　Q. Was the -- withdrawn.
23　　　Was the purpose of the $ echo publication
24　to change the -- the terms or meaning of the AT&T,
25　UNIX licensing agreements?

Page 68

1　　　MR. GANT: Objection. Leading, vague,
2　compound, foundation, calls for speculation and
3　legal conclusions.
4　　　THE WITNESS: Our purpose with the
5　newsletter was just to provide information to our
6　licensees, to keep them abreast of what was going
7　on with the product.
8　　　MR. GANT: Objection. Move to strike as
9　nonresponsive.
10　BY MR. MARRIOTT:
11　Q. What was the purpose of the newsletter,
12　Mr. Wilson?
13　A. The purpose of the newsletter was to
14　provide information on our licensing agreements and
15　policies, our software products and any -- any
16　other information that would be beneficial to our
17　licensees in using those software products.
18　Q. And what -- what gave rise to the
19　publication of the newsletter?
20　　　MR. GANT: Objection. Vague.
21　　　THE WITNESS: The -- the numerous
22　inquiries that we received from our licensees
23　concerning any specific issue. We felt it was a
24　more efficient way to communicate the same message
25　to all licensees in a way that they could receive

17 (Pages 65 to 68)

Case 1:06-mc-00046-PTS　　Document 6-5　　Filed 04/21/2006　　Page 17 of 28

1  it without -- you know, try to reduce the number of
2  phone calls we had about repetitive issues that
3  would come up in those inquiries.
4  BY MR. MARRIOTT:
5      Q.   Would you read to yourself, please,
6  paragraph 25 of your declaration?
7      A.   (THE WITNESS COMPLIED)
8      Q.   Do you stand by that statement?
9          MR. GANT:  Objection.  Leading, vague,
10 compound, foundation, calls for speculation and for
11 legal conclusions.
12         THE WITNESS:  Yes, I do.
13 BY MR. MARRIOTT:
14     Q.   What is a specimen copy, Mr. Wilson?
15     A.   As referenced here, a specimen copy was
16 a -- what do you call it?  I'm trying to think of
17 the right term.  It was a -- it was a copy of the
18 agreement that could not be executed.  It was just
19 a copy of the language.
20     Q.   Did the $ echo publications provide
21 clarification to your licensees concerning AT&T's
22 understanding of the AT&T licensing agreements?
23         MR. GANT:  Objection.  Leading, vague,
24 foundation, calls for legal conclusions.
25         THE WITNESS:  I hope they did.  We got

1  good response from the licensing community with the
2  $ echo once we started putting it out.  We had very
3  positive response.
4  BY MR. MARRIOTT:
5      Q.   And who -- who did you intend to be the --
6  the beneficiaries of the clarifications made in the
7  $ echo publications?
8          MR. GANT:  Same objections.
9          THE WITNESS:  Both the licensing
10 organization and our licensees, because it was a --
11 it was a way -- a way of communicating.  And so it
12 was to our mutual benefit.  Us, by not having to
13 keep answering the same questions, and, also, it
14 assured our licensees that the information being
15 provided was being provided to everyone.
16 BY MR. MARRIOTT:
17     Q.   Are you familiar with the term side
18 letter?
19     A.   Yes, yes.
20         MR. MARRIOTT:  You're very good at helping
21 him.
22         MR. GANT:  I appreciate it, as does the
23 court reporter, I'm sure.
24         THE WITNESS:  Uh-huh.
25 BY MR. MARRIOTT:

1      Q.   What is a side letter, Mr. Wilson?
2      A.   A side letter is a term that we use to --
3  to classify a document that was written in response
4  to an inquiry about the base software agreement or
5  the sublicense agreement, what have you.  So it was
6  a -- usually a clarification or a modification of
7  terms.
8      Q.   In paragraph --
9          MR. GANT:  I'm sorry.  I wanted that read
10 back.  I'm sorry.  I didn't mean to -- the question
11 and the answer.
12         (REQUESTED PORTION OF THE RECORD READ)
13 BY MR. MARRIOTT:
14     Q.   I think that got a little confused.  Let
15 me ask you, by way of clarification, Mr. Wilson,
16 you say in paragraph 27 of your affidavit, "Whether
17 or not we entered into a side letter or other
18 agreements with our licensees to clarify the
19 treatment of modifications and derivative works or
20 altered the language of section 2.01, AT&T's and
21 USL's intent was always the same."  What do you
22 mean by that, sir?
23         MR. GANT:  Objection.  Leading, vague,
24 compound.
25         THE WITNESS:  What I meant by that is

1  section 2.01 in its original presentation, as well
2  as the -- the clarification that we provided later,
3  the intent behind the language in both cases was
4  the same.  It was just another way of stating what
5  was meant by our intent in writing the language the
6  way we did.
7  BY MR. MARRIOTT:
8      Q.   In the next sentence in paragraph 27 you
9  indicate that, "We never intended to assert
10 ownership or control over any portion of a
11 modification or derivative work that was not part
12 of the original UNIX System V source code provided
13 by AT&T or USL.
14         "The licensee was free to use, copy,
15 distribute or disclose its modifications and
16 derivative works, provided that it did not use,
17 copy, distribute or disclose any portions of the
18 original UNIX System V source code provided by AT&T
19 or USL, except as permitted by the license
20 agreements."
21         You say, Mr. Wilson, there that you never
22 intended to assert such ownership or control.  Why
23 is that, sir?
24         MR. GANT:  Same objections.
25         THE WITNESS:  That -- that just was not

18 (Pages 69 to 72)

Case 1:06-mc-00046-PTS    Document 6-5    Filed 04/21/2006    Page 18 of 28

1  our intent. We did not -- we did not want
2  ownership in any product that was created by or for
3  our licensees. We only wanted to protect the
4  underlying software product provided under the
5  licensing agreement.
6      MR. GANT: Move to strike as
7  nonresponsive.
8  BY MR. MARRIOTT:
9      Q. Did AT&T, Mr. Wilson, intend to assert
10  ownership or control over any portion of a
11  modification or derivative work that was not part
12  of the original UNIX System V source code provided
13  by AT&T or USL?
14      MR. GANT: Objection. Vague, compound,
15  foundation, calls for speculation and legal
16  conclusions.
17      THE WITNESS: No.
18  BY MR. MARRIOTT:
19      Q. Let me direct your attention, if I may --
20      MR. MARRIOTT: And I propose, if it's
21  agreeable, that upon conclusion of this declaration
22  we take a little break, if that's okay?
23      MR. GANT: That's fine.
24  BY MR. MARRIOTT:
25      Q. Okay. Let me just direct your attention

1  to paragraph 28, Mr. Wilson. There you say, "My
2  understanding is that IBM's AIX and Sequent's
3  Dynix," slash, "PTX operating system products
4  include some UNIX System V source code.
5      "I do not know whether AIX and Dynix/PTX
6  are sufficiently similar to UNIX System V that they
7  would constitute modifications of or derivative
8  works based on UNIX System V. However, even if AIX
9  or Dynix/PTX were modifications of or derivative
10  works based on UNIX System V, IBM and Sequent are
11  free to use, export, disclose or transfer AIX and
12  Dynix/PTX source code, provided that they do not
13  use, export, disclose or transfer any UNIX System V
14  source code provided by AT&T or USL, except as
15  otherwise permitted by the agreements.
16      "Therefore, IBM and Sequent are free,
17  under the IBM agreements and the Sequent
18  agreements, to open source all of AIX and
19  Dynix/PTX, other than those portions of the
20  original UNIX System V source code included
21  therein.
22      "Even portions of the original UNIX
23  System V source code included in AIX and Dynix/PTX
24  may be open sourced to the extent permitted by the
25  IBM agreements and the Sequent agreements."

1      Do the contents of that paragraph reflect
2  your intent, Mr. Wilson?
3      MR. GANT: Objection. Leading, vague,
4  compound.
5      THE WITNESS: Yes, it does.
6  BY MR. MARRIOTT:
7      Q. And do you believe the contents of
8  paragraph 28 reflect the intent of those with whom
9  you worked while employed at AT&T?
10      MR. GANT: Same objection, and, also,
11  foundation. It calls for speculation and legal
12  conclusions.
13      THE WITNESS: Yes, I do.
14  BY MR. MARRIOTT:
15      Q. Would you take a look, please, at
16  paragraph 29. You say there that, "I understand
17  that plaintiff claims that IBM and Sequent have
18  breached the IBM agreements and the Sequent
19  agreements by improperly using, exporting,
20  disclosing or transferring AIX and Dynix/PTX source
21  code, irrespective of whether IBM or Sequent have
22  disclosed any specific protected source code copied
23  from the UNIX System V source code provided by AT&T
24  or USL."
25      What is the basis of your understanding

1  about what it is that the plaintiff in this
2  litigation claims, Mr. Wilson?
3      (DISCUSSION OFF THE RECORD)
4      THE WITNESS: I think it's stated there.
5  In other words -- and this is sort of what was
6  related to me. That there was a -- that the
7  plaintiff claimed that they could -- they were
8  improperly distributing copies of their -- their
9  system, because of its association with the UNIX
10  System V products.
11  BY MR. MARRIOTT:
12      Q. Let me clarify my question a little. What
13  I'm really just asking you is: Is whether -- have
14  you read the Complaint in this case, Mr. Wilson?
15      A. I have not.
16      Q. For your understanding of what the
17  plaintiff -- what the plaintiff claims here, you
18  rely upon whom?
19      A. When I discussed it with the -- when I was
20  discussing preparing for this declaration with the
21  attorneys.
22      Q. When you say, "the attorneys," you're
23  referring to what the IBM attorneys described to
24  you as being the contentions made by the plaintiff;
25  is that right?

19 (Pages 73 to 76)

Page 77

1    A.   That's correct.
2    Q.   You say in paragraph 29, "In my view,
3  these claims are inconsistent with the provisions
4  of the IBM agreements and the Sequent agreements.
5  I do not believe that anyone at AT&T or USL
6  intended these agreements to be construed in this
7  way."
8         For how long, Mr. Wilson, did you work
9  with the AT&T, UNIX licensing agreements?
10         MR. GANT:  I'm going to object to the
11  question as vague.  You quoted from a paragraph,
12  and then you asked a seemingly unrelated question.
13  So if you're intending to link them somehow, I'm
14  going to object to that and object to the question
15  as vague and lacking foundation.
16         MR. MARRIOTT:  Okay.  Do you need the
17  question read back?
18         THE WITNESS:  Yes.
19         MR. GANT:  Stipulate the same objections;
20  right, David?
21         MR. MARRIOTT:  I don't think we need to
22  stipulate.  Just so it's clear, I think they're on
23  the record.  So when she repeats the question, she
24  doesn't re-type it.  So --
25         (PREVIOUS QUESTION THEN READ)

Page 78

1         (DISCUSSION OFF THE RECORD)
2  BY MR. MARRIOTT:
3    Q.   Okay.  During what period of time,
4  Mr. Wilson, did you -- did you work with the AT&T,
5  UNIX licensing agreements?
6         MR. GANT:  Objection.  Vague.
7         THE WITNESS:  Through the period of 1980
8  through 1991.
9  BY MR. MARRIOTT:
10    Q.   And based upon your having worked with
11  those agreements during that period do you believe
12  that anyone at AT&T or USL intended those
13  agreements to be construed in the way described in
14  paragraph 29 as being the claim of the plaintiff in
15  this litigation?
16         MR. GANT:  Objection.  Leading, vague,
17  compound, lack of foundation, calls for speculation
18  and for legal conclusions.
19         THE WITNESS:  I do not.
20  BY MR. MARRIOTT:
21    Q.   To the best of your understanding, is it
22  an accurate statement that modifications and
23  derivative works under these AT&T, UNIX licensing
24  agreements are not subject to the confidentiality
25  and other restrictions contained in the agreements,

Page 79

1  except for any protected UNIX System V source code
2  provided by AT&T or USL actually included in them,
3  because they are owned by the licensees?
4         MR. GANT:  Same objections.
5         THE WITNESS:  Yes.  I believe that to be
6  true.
7  BY MR. MARRIOTT:
8    Q.   In paragraph 30 of your declaration you
9  state, "In my view, any claim that the IBM software
10  agreement and the Sequent software agreement
11  prohibit the use, export, disclosure or transfer of
12  any code other than UNIX System V code is clearly
13  wrong.  Not only did we at AT&T not intend the
14  agreements to be read that way, but we also went
15  out of our way to assure our licensees that that is
16  not what the agreements meant."
17         Is that an accurate statement?
18         MR. GANT:  Same objections.
19         THE WITNESS:  Yes.  Yes, it is.
20  BY MR. MARRIOTT:
21    Q.   And, finally, in paragraph 31, Mr. Wilson,
22  you state that all of the statements made in your
23  declaration in Exhibit 76 are made under penalty of
24  perjury; is that right?
25    A.   That's correct.

Page 80

1         MR. MARRIOTT:  Okay.  Should we take a
2  break?
3         THE VIDEOGRAPHER:  One moment, please.
4         This marks the end of tape number one in
5  the deposition of Otis Wilson.  Going off the
6  record.  The time is 10:57 a.m.
7         (RECESS TAKEN AT 10:57 A.M. TO 11:21 A.M.)
8         THE VIDEOGRAPHER:  Back on the record.
9  Here marks the beginning of tape number two in the
10  deposition of Otis Wilson.  The time is 11:21 a.m.
11         Please, continue.
12  BY MR. MARRIOTT:
13    Q.   Mr. Wilson, I hand you what has been
14  previously marked as Exhibit 77, which I believe is
15  a copy of the subpoena served on you in -- in
16  connection with this matter.  Could you, please,
17  just tell me if that's the subpoena served on you
18  and whether you're appearing pursuant to the
19  subpoena?
20    A.   Yes, it is, and I am.
21    Q.   Thank you, sir.
22    A.   Uh-huh.
23    Q.   Let me now show you what I've previously
24  marked as Exhibit 78, which is a copy of a letter
25  sent from me to you on April 6th, 2004.  Would you

**Page 81**

1  take a look at that, please, and tell me if you've
2  seen that before?
3      A.   Yes, I have.
4      Q.   Would you just take a look in particular
5  at paragraph two and tell me whether that reflects
6  the circumstances under which you came to be
7  represented by -- by my law firm?
8      A.   Yes.
9      Q.   Okay.
10         MR. GANT:  Yes, you can tell him, or, yes,
11  it is?
12         THE WITNESS:  Yes, it is.
13         MR. MARRIOTT:  Thank you.
14  BY MR. MARRIOTT:
15      Q.   Let me direct your attention now, if I
16  may, Mr. Wilson, to Exhibit 75, which has been
17  previously marked.  This is, I believe, a copy of
18  your declaration, dated December 11, 2003?
19      A.   That's correct.
20      Q.   How did you come to sign this declaration,
21  Mr. Wilson?
22         MR. GANT:  Objection.  Vague.
23         THE WITNESS:  This -- this is what I was
24  asked to sign.
25         (MR. DAVIS THEN EXITED THE ROOM)

**Page 82**

1      Q.   And you signed it, because you believe
2  it's true and correct?
3         MR. GANT:  Objection.  Leading, vague,
4  compound.
5      Q.   Why did you sign the declaration,
6  Mr. Wilson?
7      A.   This -- it represented the declaration I
8  made, and it's been written up, and I agree with
9  it, and so I signed it after reading it.
10         MR. GANT:  Could you read back the answer,
11  and if David would like the question too, that's
12  fine.
13         MR. MARRIOTT:  Sure.
14         MR. GANT:  Thank you.
15         (REQUESTED PORTION OF THE RECORD READ)
16  BY MR. MARRIOTT:
17      Q.   Let me direct your attention, please, to
18  paragraph six of the declaration.
19      A.   Okay.
20      Q.   A reference is made here to methods or
21  concepts.  I believe you testified earlier that
22  that's a term with which you're familiar.  Do you
23  recall that testimony?
24         MR. MARRIOTT:  I'm on page six, at
25  paragraph 14, for example.

**Page 83**

1         MR. GANT:  Okay.  I thought you said
2  paragraph six.  I think you did, which is why I
3  couldn't find it.
4         MR. MARRIOTT:  I apologize.  It's
5  paragraph six, page 14.
6  BY MR. MARRIOTT:
7      Q.   A reference is made there on page six,
8  paragraph 14 to methods or concepts.  Is that a
9  term with which you're familiar, Mr. Wilson?
10      A.   Yes, it is.
11         (MR. DAVIS THEN RE-ENTERED THE ROOM)
12      Q.   And what rights as you understand IBM's
13  UNIX licensing agreements with AT&T does IBM have
14  with respect to the methods or the concepts of UNIX
15  System V?
16         MR. MARRIOTT:  Could I have the question
17  read back?
18         (PREVIOUS QUESTION THEN READ)
19         MR. GANT:  Are you sticking --
20         MR. MARRIOTT:  Let me restate the
21  question.
22         MR. GANT:  Okay.
23  BY MR. MARRIOTT:
24      Q.   You're familiar with the term methods or
25  concepts; right?

**Page 84**

1      A.   Yes, I am.
2      Q.   As you understand IBM's UNIX licensing --
3  licensing agreements with AT&T, what rights does
4  IBM have with respect to the methods and concepts
5  of UNIX?
6         MR. GANT:  Objection.  Vague, compound,
7  lack of foundation, calls for speculation and legal
8  conclusions.
9         THE WITNESS:  Of -- the phrase methods and
10  concepts was deleted from the IBM software
11  agreements.
12         MR. GANT:  Objection.  Move to strike as
13  nonresponsive.
14  BY MR. MARRIOTT:
15      Q.   Do you have an understanding, Mr. Wilson,
16  as to whether the term methods or concepts was
17  deleted from IBM's licensing agreements with AT&T?
18         MR. GANT:  Objection.  Foundation, calls
19  for speculation and legal conclusions.
20         THE WITNESS:  Yes, it was deleted.
21  BY MR. MARRIOTT:
22      Q.   Okay.  And what is your understanding as
23  to why it was deleted?
24         MR. GANT:  Same objection, as in vague.
25         THE WITNESS:  It was no longer applicable.

21 (Pages 81 to 84)

Page 85

1  The -- there was nothing that we could really
2  define as methods and concepts at this time that
3  would be -- would be protected. So we just removed
4  it from the agreement.
5  BY MR. MARRIOTT:
6  Q.  Is there anything, to your understanding,
7  that IBM cannot do properly with respect to UNIX
8  methods or concepts?
9          MR. GANT: Objection. Leading, vague,
10  foundation, compound, calls for speculation and
11  legal conclusions.
12         THE WITNESS: However you might want to
13  define methods and concepts, it just was no longer
14  applicable to the IBM software agreement. So
15  anything contained therein that might be considered
16  a method or concept is -- is no longer applicable.
17  BY MR. MARRIOTT:
18  Q.  As you understand AT&T's intent, at least
19  by the time you left the company, did AT&T seek to
20  enforce rights to methods or concepts of UNIX as
21  they related to any of its licensees?
22         MR. GANT: Objection. Leading, vague,
23  compound, lack of foundation, calls for speculation
24  and for legal conclusions.
25         THE WITNESS: We did not.

Page 86

1  BY MR. MARRIOTT:
2  Q.  Would you take a look, please, Mr. Wilson,
3  at paragraphs 12 through 15 of your declaration
4  that appears in Exhibit 75, and read those to
5  yourself and tell me when you've had the
6  opportunity to do that?
7          MR. GANT: That was 12 through 15?
8          MR. MARRIOTT: Yes.
9          THE WITNESS: Okay.
10  BY MR. MARRIOTT:
11  Q.  Is there anything about the content of
12  paragraphs 12 through 15 that you would change,
13  Mr. Wilson?
14         MR. GANT: Objection. Vague, compound,
15  lack of foundation.
16         THE WITNESS: I would not.
17  BY MR. MARRIOTT:
18  Q.  Paragraph 16 of your declaration states
19  that, "IBM had no confidentiality obligation with
20  respect to any UNIX System V information, other
21  than to refrain from disclosing the actual UNIX
22  System V source code provided by AT&T and USL, and
23  to refrain from referring to that source code while
24  developing or providing products or services. IBM
25  was free to use and disclose any of the ideas,

Page 87

1  concepts, know-how, methods or techniques embodied
2  in the software products."
3          Why did you say that, Mr. Wilson?
4          MR. GANT: Objection. Vague and leading.
5          THE WITNESS: In reading this again, it's
6  probably a little -- it's -- it's clear to me, but
7  I can see if someone else is reading it -- because
8  it says -- a clarification of this -- this
9  statement here.
10  BY MR. MARRIOTT:
11  Q.  Sure. How would you clarify the contents
12  of paragraph 16?
13  A.  Paragraph 16 is -- where it picks up,
14  "other than to refrain from disclosing the actual
15  UNIX System V source code," that should really be,
16  "software product."
17  Q.  Okay. Is there anything else about
18  paragraph 16 that you would change for
19  clarification?
20  A.  I would not.
21         (DISCUSSION OFF THE RECORD)
22  BY MR. MARRIOTT:
23  Q.  In paragraph 17 you say, "I did not view
24  these changes," referring to the changes made by
25  the side letter referenced in the preceding

Page 88

1  paragraphs, "as substantive. They were all
2  clarifications.
3          "Even though we may have" -- "have entered
4  into side letters or other agreements with a number
5  of licensees that clarified the confidentiality
6  restrictions and other provisions in the standard
7  software agreement, my intent was always to treat
8  all licensees the same."
9          Why was it your intent to treat all
10  licensees the same, Mr. Wilson?
11         MR. GANT: Objection. Vague, compound,
12  lack of foundation.
13         THE WITNESS: We were very careful to make
14  sure that all licensees and all licensing
15  agreements were the same for -- for all of our
16  licensees.
17         In other words, they were -- it was just a
18  matter of policy that no -- any -- any right or
19  clarification that we would give to any one
20  licensee, we would give to all of our licensees.
21  BY MR. MARRIOTT:
22  Q.  In -- in the following sections of 17 you
23  say, "In fact, clarifications provided to
24  particular licensees in side letters were generally
25  shared with other licensees through informal

22 (Pages 85 to 88)

Page 89

1    interpretive guidance that was provided either
2    orally or in writing.
3         "In any event," you say, "our intent was
4    always to treat all licensees equally, so that
5    relief from the confidentiality restrictions
6    provided to one licensee in a side letter benefited
7    all licensees."
8         Does that accurately reflect your practice
9    while you were employed at AT&T?
10        MR. GANT: Objection. Vague, compound,
11   leading, lack of foundation, calls for speculation
12   and for legal conclusions.
13        THE WITNESS: Yes, it does.
14   BY MR. MARRIOTT:
15        Q.   It's not my intent, at present at least,
16   Mr. Wilson, to -- to inquire specifically as to
17   every paragraph of your declaration in Exhibit 75.
18        Can you tell me whether as you view
19   Exhibit 75 there's anything inconsistent in
20   Exhibit 75 and Exhibit 76?
21        MR. GANT: You're referring to the
22   declarations at the front of each? You already
23   established that's what you're referring to. So --
24        MR. MARRIOTT: I'm happy to clarify.
25   BY MR. MARRIOTT:

Page 90

1         Q.   I don't intend specifically to take you
2    through each of the paragraphs of -- of your
3    exhibit -- of your declaration, which appears in
4    Exhibit 75. Are Exhibits 75 and 76 consistent, to
5    the best of your understanding?
6         MR. GANT: Objection. Vague.
7         THE WITNESS: Yes, they are.
8    BY MR. MARRIOTT:
9         Q.   Let me direct your attention, please, to
10   page 12 of your declaration in Exhibit 75,
11   paragraph 29 specifically. Would you read that
12   paragraph into the record, please?
13        A.   "As discussed above, because AT&T and USL
14   intended to widely distribute UNIX System V source
15   code and related information, we understood that it
16   would be difficult to require that the code and
17   related information be kept confidential.
18        "Since we believed that our licensees held
19   the same view, the standard software agreements
20   provided that a licensee would not be required to
21   keep a software product confidential if it became
22   available without restriction to the general
23   public."
24        Q.   Why did AT&T and USL intend widely to
25   distribute the UNIX System V source code and

Page 91

1    related information, Mr. Wilson?
2         MR. GANT: Objection. Leading, vague,
3    compound, lack of foundation, calls for speculation
4    and for legal conclusions.
5         THE WITNESS: We were trying to establish
6    the operating system as a -- as an industry
7    standard, and so we wanted to distribute it to both
8    universities and licensees, non-university
9    licensees in order to -- for that objective.
10   BY MR. MARRIOTT:
11        Q.   You say in -- in paragraph 29 that, "we
12   believed that our licensees held the same view."
13   What's the basis of your statement there, that your
14   licensees shared your same view with respect to the
15   content of paragraph 29?
16        MR. GANT: Objection. Vague, lack of
17   foundation, calls for speculation.
18        THE WITNESS: Just the -- the activity
19   that was associated with the software products,
20   especially UNIX System V, the operating system.
21   And the emergence of a very, very large user group
22   and the evolution from the academic community into
23   the commercial area with regard to that particular
24   software product. It was like an explosion.
25        MR. GANT: Move to strike as

Page 92

1    nonresponsive.
2    BY MR. MARRIOTT:
3         Q.   To what extent, Mr. Wilson, did you
4    interact with AT&T's licensees concerning licensing
5    matters?
6         MR. GANT: Objection. Vague, foundation.
7         THE WITNESS: Read the question back,
8    please.
9         (PREVIOUS QUESTION THEN READ)
10        THE WITNESS: Oh, I was intimately
11   involved with our licensees. In other words,
12   everything from discussing software product
13   attributes, licensing agreements, licensing policy,
14   participating in their user group in the way of
15   presentations.
16   BY MR. MARRIOTT:
17        Q.   In paragraph 30 you state, "I understood
18   section 7.06(a) to mean that the licensee was free
19   to disclose, without any restriction whatsoever,
20   any information that became available without
21   restriction to the general public by acts not
22   attributable to that particular licensee."
23        Do you see that?
24        A.   Yes, I do.
25        Q.   And does that reflect your understanding

23 (Pages 89 to 92)

**Page 93**

1  of AT&T's meaning with respect to that provision?

2      MR. GANT: Objection. Vague, compound,

3  lack of foundation, calls for speculation and for

4  legal conclusions.

5      THE WITNESS: Yes, it does.

6  BY MR. MARRIOTT:

7      Q. In paragraph 31 a reference is made to

8  trade secrets and efforts to protect trade secrets.

9  Can you explain what you mean by that, please?

10      A. The vehicle that we use for licensing our

11  software products was -- was a trade secret, as

12  opposed to other protective means that we could

13  have adopted. We used the trade secret provisions

14  of our -- I guess of the licensing law they used to

15  protect our software product.

16      Q. You say in the last sentence of paragraph

17  31, you did not intend to impose a confidentiality

18  obligation beyond what we could enforce under trade

19  secret law. Why do you say that, sir?

20      MR. GANT: Objection. Vague and lack of

21  foundation. Calls for speculation and for legal

22  conclusions.

23      THE WITNESS: Because that was our

24  intention. We did not intend to go anywhere beyond

25  what -- what covenants were provided to us under

**Page 94**

1  these software agreements using the trade secret

2  protections.

3  BY MR. MARRIOTT:

4      Q. In paragraph 32 you state that, "We never

5  attempted to list all the ways in which source code

6  could become available without restriction to the

7  general public within the meaning of the software

8  and related agreements."

9      Is that accurate?

10      MR. GANT: Objection. Vague, compound,

11  mischaracterizes the document, calls for

12  speculation and for legal conclusions.

13      THE WITNESS: Yes, it is.

14      MR. MARRIOTT: Could I just have my

15  question read back for the fun of it.

16      (PREVIOUS QUESTION THEN READ)

17      MR. MARRIOTT: I withdraw the assertion of a

18  mischaracterization. I thought you said, "you,"

19  and not, "we." I withdraw that.

20      MR. MARRIOTT: Thank you. Well, I'm

21  always sensitive to being said to mischaracterize

22  things.

23      MR. GANT: I withdraw that one. I'm glad

24  you had it read back. The other objections stand.

25  BY MR. MARRIOTT:

**Page 95**

1      Q. Take a look, if you would, at the second

2  sentence, please, Mr. Wilson. There you say, "I

3  believe that the UNIX System V source code, or any

4  part thereof, would be available without

5  restriction to the general public, if, for example,

6  it were published by a party other than the

7  licensee in question, accessible outside the limits

8  of a confidentiality agreement, such as for

9  download from the internet, available because its

10  owner, whether AT&T, USL or successors, failed,

11  even if by inadvertence or simple negligence, to

12  take sufficient precautions to ensure that it would

13  remain confidential, distributed so widely that

14  contractual confidentiality restrictions would be

15  insufficient to maintain confidentiality, made

16  available to a third party, who had the right to

17  disclose the software product, or any part thereof,

18  or distributed under an open-source license, like

19  the GNU," G-N-U, "General Public License, and the

20  GPL."

21      Does that list of examples reflect ways in

22  which you believe material may become available

23  without restriction to the general public within

24  the meaning of the software agreements of AT&T

25  concerning UNIX?

**Page 96**

1      MR. GANT: Objection. Leading, vague,

2  compound, lack of foundation, calls for speculation

3  and for legal conclusions.

4      THE WITNESS: Yes, I do.

5  BY MR. MARRIOTT:

6      Q. Let me just ask you, please, to read to

7  yourself -- and take whatever time you feel you

8  need -- paragraphs 33 through 42, and I just want

9  to ask you whether having read them anew today

10  there's anything about that you want to change or

11  clarify?

12      A. (THE WITNESS COMPLIED)

13      Okay.

14      MR. GANT: I don't think there's a

15  question pending.

16      Q. Oh, there's a question pending -- if there

17  isn't, I'll make one pending. The question is,

18  whether there's anything about the paragraphs that

19  you've just read that upon re-review you'd change

20  or you'd modify, in any way?

21      A. No.

22      Q. Let me direct your attention, please,

23  Mr. Wilson, to paragraph 34. There you referred to

24  the wide distribution of source code to

25  universities. Could you just explain briefly why

24 (Pages 93 to 96)

Case 1:06-mc-00046-PTS    Document 6-5    Filed 04/21/2006    Page 24 of 28

1   it is AT&T undertook to distribute source code
2   widely to universities?
3       MR. GANT: I am going to object to that as
4   a mischaracterization of the document, and then
5   I'll add other objections, if you want.
6       MR. MARRIOTT: Okay. Well, let me -- I
7   certainly didn't mean to mischaracterize it. So
8   let me -- let me try to fix what you may find
9   problematic with it.
10  BY MR. MARRIOTT:
11      Q.  Paragraph 34 states, "One purpose of
12  distributing the source code to universities was to
13  promote the wide adoption of UNIX operating systems
14  by ensuring the UNIX System V ideas, concepts
15  know-how, methods and techniques would be widely
16  known and understood by future programmers."
17      Why is that, Mr. Wilson?
18      MR. GANT: Objection. Vague, compound,
19  lack of foundation, calls for speculation.
20      THE WITNESS: Well, those students, being
21  exposed to the operating system, in turn go out and
22  propagate the system through commercial pursuits
23  they may pursue after college, and so it was a --
24  it was a good way to get programmers and d students
25  familiar with the operating system.

1   BY MR. MARRIOTT:
2       Q.  And why was it of interest to you to make
3   other people familiar with the system?
4       MR. GANT: Objection. Vague, compound.
5       THE WITNESS: Because there was a
6   commercial aspect to that. Once you were --
7   something that you were familiar with in college,
8   you could -- once you graduated and went into
9   business, it was a natural vehicle that you'd
10  return to. And that showed itself in the number of
11  commercial licensees that we eventually had
12  associated with the product.
13  BY MR. MARRIOTT:
14      Q.  In paragraph 36 you say that, "AT&T
15  intended UNIX to be an open operating system,
16  meaning that customers would not be locked in with
17  a particular hardware vendor or a particular
18  operating system vendor."
19      Could you just explain further, please,
20  what you mean by AT&T having intended UNIX to be an
21  open operating system?
22      A.  Well, inherent in the design of the UNIX
23  operating system software was that it was hardware
24  independent, and so it was designed such that it
25  could be easily ported from one hardware

1   manufacturer machine to another.
2       And so, thereby, minimizing the -- the
3   expense associated with moving those applications
4   over that were associated with the operating
5   system, but also giving the -- the customer the --
6   the end user customer the right to be able to pick
7   different vendors without worrying about their
8   installed software base being able to operate on
9   that new hardware.
10      Q.  In paragraph 37 you refer to the Lions'
11  Commentary. Have you actually read the Lions' --
12  or I shouldn't say read. Have you -- have you
13  actually -- one doesn't necessarily read source
14  code, but have you -- are you familiar with the
15  Lions' Commentary?
16      MR. GANT: Objection. Vague.
17      THE WITNESS: Yes, I am.
18  BY MR. MARRIOTT:
19      Q.  In paragraph 38 you say that you
20  understand that plaintiff has made certain UNIX
21  source code available for download without charge
22  on the internet. What's the basis of your
23  understanding that the plaintiff has made UNIX
24  source code available for download without charge
25  on the internet?

1       MR. GANT: Objection. Foundation,
2   leading.
3       THE WITNESS: That was based on my -- my
4   conversations with -- with counsel about this --
5   this particular Complaint.
6   BY MR. MARRIOTT:
7       Q.  And to just clarify, when you say,
8   "conversations with counsel" --
9       A.  Counsel.
10      Q.  -- you don't have personal knowledge as
11  to what --
12      A.  No.
13      Q.  -- plaintiff has or hasn't made available
14  for download?
15      A.  I do not.
16      THE WITNESS: Excuse me. Quick answer.
17      MR. GANT: He took my question. So,
18  please, answer it.
19  BY MR. MARRIOTT:
20      Q.  In paragraph 39 you refer to, AT&T Capital
21  Corp., then a subsidiary of AT&T, having sold
22  thousands of used or discontinued AT&T computer
23  systems, some of which included UNIX System V
24  source code, and AT&T -- that AT&T did not impose
25  confidentiality restrictions on. You say there

25 (Pages 97 to 100)

1  that you were told that. Do you have personal
2  knowledge of that as well, sir?
3     A.  I do not.
4     Q.  And while you were at AT&T did you -- did
5  you ever discuss with anyone AT&T Capital Corp.'s
6  having made computer systems available in the
7  marketplace, which included source code?
8     MR. GANT:  Objection. Vague and compound.
9     THE WITNESS:  Yes. I did have some
10  conversations with regard to that.
11  BY MR. MARRIOTT:
12     Q.  Could you just, please, generally describe
13  those conversations?
14     A.  Pretty much --
15     MR. GANT:  Same objections.
16     THE WITNESS:  Okay. Pretty much what's
17  stated here. I was told, you know, probably in the
18  next best of terms that someone had let software --
19  had let machines go and had not cleaned off the
20  hard drives and removed all of the stuff that was
21  on there.
22  BY MR. MARRIOTT:
23     Q.  So when you say -- when you said in your
24  previous answer that you didn't have personal
25  knowledge, you meant that you didn't actually see

1  the person do it, but you discussed that while you
2  were with AT&T with others at AT&T --
3     MR. GANT:  Objection.
4     Q.  -- is that right?
5     MR. GANT:  Objection. Leading, vague,
6  compound, lack of foundation.
7     THE WITNESS:  Yes.
8     MR. MARRIOTT:  I can withdraw the
9  question.
10  BY MR. MARRIOTT:
11     Q.  I'm just interested in understanding what
12  you -- you said that you didn't have personal
13  knowledge. That you had discussions. Can you
14  explain what you mean by your testimony about not
15  having personal knowledge?
16     A.  I didn't distribute any machines or
17  dispose of the machines myself, but I knew, because
18  of the relationship with the licensing aspect of
19  the source code -- I forget exactly who, but the
20  folks who were telling me said, well, AC Corp. made
21  these machines available, you know, with good
22  intentions, but failed to clean them up before they
23  let them go, and --
24     MR. GANT:  Objection. Move to strike as
25  nonresponsive.

1     Q.  Would you take a look, please, at
2  paragraph 40, the last sentence. Would you just
3  read the last sentence to me, beginning with the
4  word, "IBM"?
5     MR. GANT:  This is paragraph 40?
6     MR. MARRIOTT:  The last sentence begins,
7  "As a result."
8     MR. GANT:  Oh, okay.
9     THE WITNESS:  Oh.
10     MR. MARRIOTT:  I'm asking the witness to
11  read where it begins, "IBM."
12     MR. GANT:  I think you left out, "As a
13  result."
14     THE WITNESS:  "As a result, IBM may
15  properly disclose any such UNIX System V ideas,
16  concepts, know-how, methods and techniques to
17  anyone at any time without restriction. They are,
18  thus, available without restriction to the general
19  public."
20  BY MR. MARRIOTT:
21     Q.  Is that your understanding of the software
22  agreement, Mr. Wilson?
23     MR. GANT:  Objection. Leading, vague,
24  compound, lack of foundation, calls for speculation
25  and for legal conclusions.

1     THE WITNESS:  Yes, it is.
2     Q.  In paragraph 41 you make reference to a
3  license known as the GPL. Are you an expert with
4  respect to the GPL, Mr. Wilson?
5     A.  No, I'm not. It's --
6     Q.  Well, what's your understanding of what
7  the -- this GPL is?
8     MR. GANT:  Objection. Foundation, vague.
9     THE WITNESS:  I'm looking at it. It's
10  just a -- it's an example of an open license
11  agreement, which there is probably many different
12  kinds out there, but this is just an example.
13  BY MR. MARRIOTT:
14     Q.  Let me ask you, please, to just take a
15  look at paragraphs 43 through 46, and then I'll ask
16  a question for you about those, and perhaps several
17  questions for you about those?
18     A.  I read that earlier.
19     Q.  Oh, you read all of the way to the end?
20     A.  Yes.
21     Q.  Well, thank you very much.
22     Is there anything about 43 through 47 that
23  you'd change?
24     A.  No.
25     Q.  Did you actually write the declarations

Page 105

1   that are Exhibits -- that are included in
2   Exhibits 75 and 76, Mr. Wilson?
3       A.  Of course -- no.  No, I didn't.
4       Q.  Okay.  And who -- who, to your
5   understanding, prepared the documents that are --
6   that are your declarations in Exhibits 75 and 76?
7       A.  They were prepared by the -- the attorneys
8   referenced on the first page with -- and I reviewed
9   them before signing them.
10      Q.  Okay.  Though you didn't draft these,
11  Mr. Wilson, do you, nevertheless, endorse the
12  content of these, as if it were your own?
13          MR. GANT:  Objection.  Leading, vague,
14  foundation.
15          THE WITNESS:  Yes, I do.
16          MR. GANT:  Could you read back the Q and
17  A, please.
18          (REQUESTED PORTION OF THE RECORD READ)
19          MR. MARRIOTT:  Let me -- the question is
20  not a very good question.  I can withdraw the
21  question.
22          MR. GANT:  You are withdrawing it?
23          MR. MARRIOTT:  I'm withdrawing the
24  question, and I'm going to restate it.
25  BY MR. MARRIOTT:

Page 106

1       Q.  You didn't actually type up the contents
2   of the declaration in Exhibit 76, did you?
3       A.  I did not.
4       Q.  You didn't actually type up the contents
5   of the declaration in Exhibit 75, did you?
6       A.  I did not.
7       Q.  But you signed them, because you agree
8   with them; correct?
9           MR. GANT:  Objection.  Leading,
10  foundation.
11          THE WITNESS:  I signed it, because I
12  believe that this -- it's a true representation --
13  representation of the declarations I've made.
14  BY MR. MARRIOTT:
15      Q.  Did anyone, Mr. Wilson, on behalf of IBM
16  or anyone else ask you to include in these
17  declarations anything you believe to be untrue?
18          MR. GANT:  Could you read it back, please.
19          (PREVIOUS QUESTION THEN READ)
20          MR. GANT:  Objection.  Vague.
21          THE WITNESS:  They did not.
22  BY MR. MARRIOTT:
23      Q.  Have you ever been employed by IBM,
24  Mr. Wilson?
25      A.  I have not.

Page 107

1       Q.  Anyone in your family ever been employed
2   by IBM?
3       A.  Not to my knowledge.
4       Q.  Have you ever been convicted of a crime,
5   Mr. Wilson?
6       A.  I have not.
7       Q.  Ever been arrested?
8       A.  Yes.
9       Q.  And what were -- for what were you
10  arrested, sir?
11      A.  It was a traffic situation.
12      Q.  A traffic violation?
13      A.  Uh-huh.
14          MR. GANT:  Objection.  Leading,
15  mischaracterizes the testimony.
16      Q.  Mr. Wilson, is there anything about what I
17  said that you think mischaracterizes your
18  testimony?
19          MR. GANT:  Would you like it read back?
20          THE WITNESS:  Yes.
21          (PREVIOUS QUESTION THEN READ)
22          (DISCUSSION OFF THE RECORD)
23          (REQUESTED PORTION OF THE RECORD READ)
24  BY MR. MARRIOTT:
25      Q.  Okay.  Could you explain, please, what you

Page 108

1   mean by, "a traffic situation"?
2       A.  I didn't agree with the arrest -- with the
3   officer that stopped me.
4       Q.  And why were you stopped?
5       A.  Exceeding the speed limit.
6       Q.  Okay.  And that's a traffic violation, is
7   it not?
8       A.  Yes, it is.
9       Q.  How long ago was -- was your arrest,
10  Mr. Wilson?
11      A.  Maybe 40 years ago.
12      Q.  Forty years ago?
13      A.  Forty years ago.  Yeah.
14      Q.  Okay.
15          MR. GANT:  How many?
16          THE WITNESS:  Forty.
17          MR. GANT:  Four, zero?
18          THE WITNESS:  Uh-huh.
19  BY MR. MARRIOTT:
20      Q.  Have you ever been arrested other than
21  that?
22      A.  I have not.
23      Q.  Ever been convicted of any crime?
24      A.  I have not.
25      Q.  Have you received any gifts or

27 (Pages 105 to 108)

Case 1:06-mc-00046-PTS    Document 6-5    Filed 04/21/2006    Page 27 of 28

1 compensation from IBM in connection with this
2 litigation?
3 MR. GANT: Excluding lunch.
4 THE WITNESS: I got lunch yesterday.
5 MR. MARRIOTT: I think lunch is on behalf
6 of the parties, as I understood the arrangement.
7 MR. GANT: Lunch yesterday. I assume you
8 fed him.
9 THE WITNESS: I have not.
10 BY MR. MARRIOTT:
11 Q. What did you do to prepare for this
12 deposition, Mr. Wilson?
13 A. Oh, I read over my declarations. I looked
14 at the -- the attached exhibits to refamiliarize
15 myself with the information contained in them.
16 Q. Did you look at anything besides the two
17 exhibits and the retention letter that's
18 Exhibit 78?
19 A. I did not.
20 Q. Do you have any personal stake in the
21 outcome of this case, Mr. Wilson?
22 MR. GANT: Objection. Vague, leading.
23 THE WITNESS: I do not.
24 BY MR. MARRIOTT:
25 Q. And what's your understanding as to

1 who's -- who has agreed to pay the costs of your
2 legal fees associated with your giving this
3 deposition?
4 A. That's covered in that -- I forget the
5 exhibit. Which exhibit now?
6 MR. GANT: 78.
7 THE WITNESS: It's covered in Exhibit 78.
8 BY MR. MARRIOTT:
9 Q. And it's your understanding that IBM has
10 agreed to cover your legal costs associated with
11 the deposition?
12 A. Yes, it is.
13 Q. Has IBM's agreement to cover your legal
14 costs in any way affected the truthfulness of the
15 testimony you've given?
16 A. It has not.
17 MR. MARRIOTT: I'll try to fill the
18 remaining few moments.
19 MR. GANT: If you don't have questions,
20 you can -- we can take a break and pass.
21 MR. MARRIOTT: I have a few more
22 questions.
23 MR. GANT: Okay.
24 BY MR. MARRIOTT:
25 Q. You made reference earlier, Mr. Wilson, to

1 the exhibits appended to your declarations as tabs
2 one through 10 and one through nine respectively of
3 Exhibits 76 and 75. Do you recall that testimony?
4 MR. GANT: I think you've got it
5 backwards, but --
6 MR. MARRIOTT: I don't think so. Well,
7 let me withdraw it and try again, in case I do.
8 BY MR. MARRIOTT:
9 Q. Do you recall referring earlier to the
10 exhibits appended to your declarations?
11 A. Yes, I do.
12 Q. Did you sign or -- or have signed on your
13 behalf the UNIX licensing agreements between IBM
14 and AT&T and AT&T and Sequent Computer Systems?
15 MR. GANT: Object -- no objection yet.
16 I'd like to hear it again, please.
17 MR. MARRIOTT: Sure.
18 (PREVIOUS QUESTION THEN READ)
19 MR. GANT: Objection. Vague, compound.
20 THE WITNESS: Yes.
21 BY MR. MARRIOTT:
22 Q. Do you think that there's anyone more
23 knowledgeable about AT&T's intent with respect to
24 AT&T's UNIX licensing agreements than -- than are
25 you?

1 MR. GANT: Objection. Leading, vague,
2 compound, lack of foundation, calls for
3 speculation.
4 THE WITNESS: With regard to the licensing
5 agreements themselves, the intent behind the
6 language and the -- and the distribution of the
7 software products associated with those licensing
8 agreements, I -- I believe I have as much knowledge
9 as anyone in the -- than anybody associated with
10 them. More than most.
11 BY MR. MARRIOTT:
12 Q. Would you agree, Mr. Wilson, that a lot of
13 time has passed since you were employed at AT&T?
14 A. It seems like it was just yesterday. No.
15 It's -- yeah. It's been -- it's -- what; 14 years,
16 13 years?
17 Q. And are you -- are you at all concerned
18 that the passage of time has clouded your memory as
19 to the accuracy of the things stated in your
20 declarations?
21 MR. GANT: Objection. Leading, vague,
22 compound.
23 THE WITNESS: No. I believe, in going
24 back and reviewing this -- it's something that we
25 did for over a decade. I was surprised once I

28 (Pages 109 to 112)