started looking at it how quickly it all came back.
MR. MARRIOTT: I have no further questions at this time.
(DISCUSSION OFF THE RECORD)
THE VIDEOGRAPHER: One moment, please. Going off the record. The time is 12:05 p.m.
(RECESS TAKEN AT 12:05 P.M. TO 1:12 P.M.)
THE VIDEOGRAPHER: Back on the record. The time is 1:12 p.m.
Please, continue.
MR. GANT: I just want to confirm that you're done with your principal examination? It's my turn?
MR. MARRIOTT: I think that's right. Yeah. Go ahead.

CROSS-EXAMINATION

BY MR. GANT:
Q. Good afternoon, Mr. Wilson. As you know when we -- when we met earlier this morning, my name is Scott Gant, and I, along with my colleagues here today, represent The SCO Group, the plaintiff in this matter. Thank you for your time. We appreciate your speaking with us today.
You were shown a copy of Exhibit 78 by

Mr. Marriott. Do you recall that?
A. Yes, I do.
Q. Do you still have it in front of you?
A. I do now.
Q. And this document is consistent with your testimony that the law firm of Cravath, Swaine & Moore is representing you; is that correct?
A. That is correct.
Q. All right. Is it also correct that IBM is paying Cravath, Swaine & Moore to work with you in this case?
MR. MARRIOTT: Objection as to form.
THE WITNESS: Correct.
BY MR. GANT:
Q. Does Exhibit 78 accurately describe the terms of your retention of Cravath, Swaine & Moore?
A. Yes, it does.
Q. And is it the case that May 6, 2004 was the effective date of your retention of Cravath, Swaine & Moore?
A. Yes, it is.
Q. Has Cravath, Swaine & Moore represented you in any other matters aside from in connection with this case?
A. They have not.

Q. Have you sought legal advice from them with respect to any other matter?
A. I have not.
Q. Where are you currently employed?
A. I'm retired.
Q. Do you do any kind of work at all for pay?
A. Yes, I do.
Q. What's that?
A. I do -- I do some real estate development. I do consulting in the area of diversity training and also facility management -- facility management at our church.
Q. Facility management. And you're compensated for the facility management at the church?
A. Yes. All three of those.
Q. Taking those three sets of activities together, approximately how many hours a week do you work?
A. Probably 50 hours a week.
Q. Fifty hours?
A. (WITNESS NODS HEAD UP AND DOWN)
Q. That doesn't sound retired to me.
So what did you mean when you said you were retired?

A. I can go home whenever I -- I deem it necessary to go home. Whether it be for a day or a month or whatever. So I'm officially retired. I mean that's -- so I do these things out of a civic responsibility.
I do get paid, but it was motivation by the civic and also by a conversion I went through in the early '90s with regard to the church, and so I feel obligated to be there.
Q. A religious conversion?
A. Yes.
Q. Let's take the last calendar year, 2003, as an example. How much income did you derive from the three activities that you've identified?
A. Oh, about $70,000.
Q. Seven, zero --
A. Uh-huh.
Q. -- thousand?
Are you affiliated with some kind of entity or organization with respect to your real estate development work?
A. No, I'm not.
Q. Do you do it on your own?
A. Yes.
Q. Are you a real estate agent?

THE SCO GROUP, INC. v. INTERNATIONAL BUSINESS MACHINES CORPORATION Doc. 6 Att. 5

A. No. I'm a developer. In other words, I -- I partner with different organizations. Like if we're going to do senior housing, I may be able to group a partner with it. Those types of things. So there's different people that come into the process, but I do it on my own.
Q. And what role exactly do you serve in those activities?
A. Putting together the package.
Q. Bringing the parties together?
A. Right.
Q. And what's the nature of the consulting work that you do? Did you mention diversity training?
A. Diversity training, and also with the -- with regard to the real estate, and a good deal -- I spend a good deal of time doing civic work that I mentioned earlier about -- with children, preparing them to succeed in school.
Q. You mentioned that you left AT&T in 1991; is that correct?
A. That's correct.
Q. Where did you go from there?
A. Stayed right here in Greensboro. In other words, I retired here in Greensboro.

Q. So you retired in the sense that you just described in 1991?
A. Yes.
Q. Was it at that point that you started to undertake the three activities that you've just described, real estate development, consulting and facility development -- was it facilities --
A. Facility management.
Q. Management?
A. Uh-huh.
Q. Is that correct?
A. They evolved, you know. They weren't all present at the -- early on. There was a couple of years I didn't do anything.
Q. Are you married, sir?
A. Yes, I am.
Q. Is this your first marriage?
A. It's not.
Q. How long have you been married to your current wife?
A. Eleven years.
Q. And what's her name, please?
A. Linda.
Q. What's her last name? Is it the same last name as you?

A. It is now. Yeah. Her -- do you want her maiden name?
Q. I just wanted to know if she goes by something else?
A. No. No hyphenated name. No. She -- Linda R. Wilson.
Q. And how many times were you previously married?
A. Twice.
Q. Okay. Could you tell me the names of your ex-wives and when you married and divorced each of them, please?
MR. MARRIOTT: Is this really relevant?
MR. GANT: If you have an objection, you can --
MR. MARRIOTT: Well, I just think it's -- it's irrelevant, but, you know, go ahead. I don't see why his marital status makes any difference.
BY MR. GANT:
Q. Could you tell me, sir?
A. Yeah. I can't remember the exact dates.
MR. MARRIOTT: I'm going to object as to the form. Go ahead. You can answer.
Q. Can you tell me the names of your ex-wives?

A. Yeah. Barbara.
MR. MARRIOTT: Objection as to the form.
Q. Go ahead, please?
A. Yeah. Barbara and Princess.
Q. And what were their maiden names, please?
MR. MARRIOTT: Objection as to form.
Maybe, just for clarification, can I have an objection to the form to the entire line about this, and I won't get in your way. I just don't want -- I don't think this is relevant. So --
MR. GANT: That's fine.
MR. MARRIOTT: And I do think it's otherwise objectional as to the form. So thank you. Continuing objection.
THE WITNESS: Barbara Blakeley and Princess Davenport.
BY MR. GANT:
Q. Thank you.
Have you ever been fired from a job?
A. I have not.
Q. Have you ever been subject to disciplinary action in an employment setting?
A. I have not.
Q. You mentioned that you were in the military; correct?

Case 1:06-mc-00046-PTS Document 6-6 Filed 04/21/2006 Page 1 of 30 Dockets.Justia.com

A. Yes.
Q. And which branch of the armed services was it?
A. The Air Force.
Q. The Air Force. And can you tell me the years of your service in the Air Force?
A. From 1958 to 1962.
Q. And can you describe to me the circumstances of your departure from the military?
A. Expiration of a four-year enlistment.
Q. Were you ever subject to any form of reprimand or discipline while in the Air Force?
A. No, not that I recall.
Q. Have you ever declared bankruptcy?
A. I have not.
Q. Have you ever been a defendant in a civil lawsuit?
A. No.
Q. Are you sure or -- you -- you were hesitating. I just want to make sure that we're not leaving anything out?
A. No, I have not.
Q. Have you ever been a plaintiff in a civil lawsuit?
A. I have not.

Q. You mentioned earlier that you were once arrested; is that correct?
A. That's correct.
Q. All right. And is it correct that that was the only time that you were ever arrested?
A. Yes.
Q. Okay. And were you charged?
A. I don't recall that I was charged. I was released the next morning.
Q. You were held overnight in jail?
A. Right, uh-huh.
Q. Although you don't remember if there was a formal charge, or what it was, if there is one, can you describe to me generally what you were arrested for?
A. I didn't agree with the -- the arresting officer, and I was -- I made my disagreement known in a more vigorous way than I should have.
Q. How did you make your disagreement known?
A. We -- loud conversation back and forth.
Q. Was there any physical --
A. No.
Q. -- altercation?
A. No physical altercation.
Q. You were engaged in some kind of shouting

with the officer?
A. Yes, sir.
Q. All right. Do you think that your conduct at that time was a mistake?
MR. MARRIOTT: Objection as to the form.
THE WITNESS: In retrospect, yes. Many years ago.
BY MR. GANT:
Q. It was just an error in judgment that everyone makes from time to time?
MR. MARRIOTT: Objection as to form.
THE WITNESS: Yes, and also youth.
BY MR. GANT:
Q. Youthful indiscretions?
A. Uh-huh.
Q. Have you ever had a lien or a judgment entered against you?
A. I'm not sure. I'm really not sure about that.
Q. Okay. It may -- it may be because you're not familiar with some technical terms. So can you describe to me what you're thinking of that might have qualified as a yes to my question?
MR. MARRIOTT: Objection as to the form.
THE WITNESS: Okay. I think I had a -- I

had a -- a tax bill that was paid and removed. I think there might have been a lien involved with that, but I'm not sure.
BY MR. GANT:
Q. A tax bill to whom?
A. Guilford County.
Q. Did the county believe that you hadn't made a full payment of taxes owed?
A. Yes.
MR. MARRIOTT: Objection as to form.
Q. When was that?
A. It may be four years ago.
Q. Approximately the year 2000?
A. Uh-huh, yes.
Q. Can you just describe to me the circumstances surrounding that issue?
MR. MARRIOTT: Objection as to form.
THE WITNESS: There was a payment. The payment was made, but it wasn't recorded properly in the -- in the tax office, as best I can recall. And then once they determined that that was the case, they released it.
BY MR. GANT:
Q. Do you have any paperwork related to that issue?

A. I may have. I'm not sure.
Q. Okay. Would you agree to retain that paperwork in the event that we request it from you?
A. Sure.
Q. Thank you.
Have you ever had any other issues related to payment of local, state or federal taxes?
MR. MARRIOTT: Objection as to form.
THE WITNESS: No.
BY MR. GANT:
Q. You're current and paid up in full with your federal income tax?
A. I still have a payment due, because I haven't done this year's taxes yet.
Q. Which tax year is that?
A. 2003.
Q. Do you plan to make a payment for that?
A. I plan to file before August.
Q. You haven't filed your taxes?
A. Right.
Q. Other than that, are you paid up in full on your federal taxes?
A. To the best of my knowledge, yes.
Q. Is the same true for your state and local taxes?

A. Yes.
Q. Do you declare on your income tax reports all the income that you derive from your real estate development work, consulting work and facility management work?
A. Yes.
(MR. DAVIS THEN EXITED THE ROOM)
BY MR. GANT:
Q. Have you ever been deposed before today?
A. Yes, I have.
Q. How many times?
A. Oh, I'd say about -- between four and six. I don't remember exactly. On different issues.
Q. I'll come back to that in a second, but I assume Mr. Marriott has explained these things to you, but I just want to make sure we're in agreement on a couple of things.
You understand that you're still under oath right now; correct?
A. Yes.
Q. And, I take it, you also understand that you're obligated to give truthful, complete and accurate answers to my questions. Do you understand that?
A. Yes.

Q. And do you agree to do so?
A. Yes.
Q. Thank you.
Could you describe to me the circumstances in which you were previously deposed?
A. They were -- it was in conjunction with the licensing of software, the cases that I remember.
Q. All of the occasions --
A. Right.
Q. -- you remember?
A. Right.
Q. Do you remember the disputes or the litigation that was involved?
MR. MARRIOTT: You need to answer audibly.
THE WITNESS: No, I don't. I mean I -- I have to think about it a little bit to recall, but I know one happened early on, back in the early '90s. And then there was a couple right before -- before I retired, but all concerning licensing agreements, those kinds of things.
BY MR. GANT:
Q. Do you recall -- strike that.
Do you have copies of any of the transcripts of your prior deposition testimony?

A. No, I do not.
Q. None of them at all?
A. No.
Q. Do you know if anyone does?
MR. MARRIOTT: Objection as to form.
THE WITNESS: I'm sure the -- the attorneys and folks that were involved would have copies.
BY MR. GANT:
Q. At AT&T?
A. Yes.
Q. Do you remember the names of any of those attorneys?
A. No.
Q. I assume that the testimony you gave in your depositions before today was truthful, accurate and complete; is that right?
A. That's correct.
MR. MARRIOTT: Objection as to form.
Q. Have you ever testified at trial?
A. I have not -- oh, wait a minute. Yes, I have.
Q. Okay. Can you describe those circumstances to me, please?
A. It was under -- again, with the software

agreements. It was -- as much I can remember right now, it was in San Luis Obispo, out in California.
Q. Where in California?
A. San Luis Obispo, I believe. Is that the --
Q. I don't know.
MR. MARRIOTT: Let me just enter an objection. Just so I can have an opportunity to object, if I have an objection. The pace is picking up quicker, and I don't to either get on your toe -- I don't want to step on either of your toes, but, if you can, just give me the opportunity to either go -- you know, wait a little longer after he asks the question, if you could, just so I -- if I have an objection, I can get it in. Go ahead.
THE WITNESS: It had to do with a software licensing issue, and it was in San Luis Obispo, and somewhere in the late '80s.
BY MR. GANT:
Q. Do you remember the parties to the dispute?
A. I don't remember right now.
Q. Was AT&T one of the parties?
A. Yes, yes.

Q. Do you have a copy of your trial testimony?
(MR. DAVIS THEN RE-ENTERED THE ROOM)
THE WITNESS: I do not.
BY MR. GANT:
Q. Do you know who does?
A. I do not.
Q. I assume that testimony was also truthful, accurate and complete?
A. Yes.
Q. Other than the two declarations that have been marked as parts of Exhibits 75 and 76 to today's deposition, have you previously executed any other affidavits or declarations in any matter?
MR. MARRIOTT: Ever?
MR. GANT: (NODS HEAD UP AND DOWN)
THE WITNESS: Other than the previous ones we've talked about? The one in '90 --
BY MR. GANT:
Q. Well, I don't know what you're referring to. So --
A. We --
Q. Other than -- other than the two declarations that are marked as exhibits to today's deposition, have you ever executed any other

affidavit or declaration?
A. In the previous cases where I was disposed (SIC), I -- I actually executed declarations.
Q. Do you remember how many occasions you've executed declarations or affidavits?
A. I'm thinking about four.
THE WITNESS: Am I going too fast?
MR. MARRIOTT: Yeah. I just want to have a chance -- just pause. You know, count to two or something, and give me a chance to --
THE WITNESS: Okay.
BY MR. GANT:
Q. Do you have copies of those declarations or affidavits?
A. I do not.
Q. Do you know who does?
A. I'm sure if I went back and found the attorneys that were involved at the time, we could run them down, but I don't have any copies of them.
Q. Was the testimony that you offered in prior declarations and affidavits true, accurate and complete?
A. Yes.
Q. Was one of the cases in which you gave testimony USL versus Berkeley Software Design?

A. Yes. That sounds -- that sounds familiar. Yes. I -- yeah. That sounds very familiar.
Q. You don't have a copy of any testimony related to that case, I take it?
A. No.
Isn't that the one that was in -- well, I'm not supposed to ask you questions.
MR. MARRIOTT: Yeah. Let him ask the questions.
Q. What's your educational background, sir?
A. The highest level was in the MBA program at -- at -- at Princeton with AT&T and all the prerequisites to get there.
Q. Okay. Do you have a college degree?
A. Yes.
Q. From what university or college?
A. Through this management training program in Georgia State University.
Q. When did you receive that?
A. A night program. Somewhere -- let's see. We finished up in -- it was probably '78. I'm not -- because I was doing it at night school and going back after we transferred.
Q. What's your date of birth?
A. July 24th, 1940.

Q. July 24, 1948?
A. 1940.
Q. '40. Okay. Just trying to help you out.
A. Yeah. I see.
Q. Do you actually have an MBA?
A. No. Other than with this program when I was with AT&T. It was considered an MBA program. There was a certificate issued for that.
Q. I thought you testified earlier that you had an MBA.
A. (WITNESS SHOOK HEAD FROM SIDE TO SIDE)
Q. If you did, that was incorrect?
MR. MARRIOTT: Objection as to form.
THE WITNESS: No. I -- I said I went to an MBA program. It was an accelerated MBA program with AT&T.
BY MR. GANT:
Q. But you did not receive a degree --
A. No.
Q. -- in connection with that program?
A. No, I did not.
Q. What was your undergraduate degree in?
A. Business administration, with a concentration in management.
Q. Do you have any formal technical training

of any sort?
A. The -- through the high school years I was in a dual discipline program with Bullard-Havens Technical School, and so I came out of there as an apprentice electrician.
In the Air Force I was in the airborne radio and communication and radio systems. And in the initial employment with Western Electric I was with telephone repair and those kinds of areas.
Q. Anything else?
A. No.
Q. You're not an -- strike that.
You're not a lawyer, are you?
A. I am not.
Q. You're not an expert in contract interpretation, are you?
MR. MARRIOTT: Objection as to the form.
THE WITNESS: Other than the -- the software agreements, which we --
BY MR. GANT:
Q. I'm asking you about general principles of contract interpretation. Are you --
MR. MARRIOTT: Objection.
Q. Are you an expert in that area?
MR. MARRIOTT: Objection as to form.

THE WITNESS: I would say, no.
BY MR. GANT:
Q. Are you an expert in copyright or copyright law?
A. No.
Q. Are you an expert in trade secrets law?
A. No.
Q. Are you an expert in antitrust law?
A. No.
Q. Are you a computer programmer?
A. Not anymore.
Q. Were you a computer programmer?
A. At one time I was. Yes.
Q. When was that?
A. Back in the late '60s, early '70s.
Q. What types of computers?
A. It was application software. It was in the COBAL language.
Q. Did you ever work as a programmer on UNIX?
A. I did not.
Q. Are you an expert in UNIX code?
A. No, I am not.
Q. You've never worked for IBM; correct?
A. That's correct.
Q. I take it then that you did not work on

the development of AIX; correct?
A. That's correct.
Q. When did you first hear of this case?
A. Last year. 2003. Probably mid-year.
Q. And how did you hear of it at that time?
A. I was contacted by the -- the attorneys representing IBM.
Q. Who specifically contacted you?
A. Gabe Separellia, I believe his name is.
MR. GANT: Does counsel want to clarify?
MR. MARRIOTT: You can ask the questions, and he can provide answers.
BY MR. GANT:
Q. Did that individual work for Cravath, Swaine & Moore?
A. Yes, he did.
Q. And what was the last name?
A. Separellia, I believe. Gabe Separellia. I'm probably pronouncing it incorrectly.
Q. Okay. Well, I'm going to call him Mr. Separellia. And if it turns out his name is something different, you'll know what I'm talking about; correct?
A. Yes. I think that's close enough.
Q. Okay.

Page 137

A. Phonetically.
Q. Okay. How did Mr. Separellia contact you?
MR. MARRIOTT: Well, it's Saltarelli.
MR. GANT: Saltarelli?
MR. MARRIOTT: Saltarelli.
BY MR. GANT:
Q. Okay. Saltarelli. Thank you. How did Mr. Saltarelli contact you?
A. By telephone.
Q. What did he say?
A. He declared that he was an attorney, representing IBM in a -- in a litigation, and asked would I be willing to give a declaration with regard to that case.
Q. Mr. Saltarelli asked you during that initial phone conversation whether you'd be willing to provide a declaration; is that right?
A. Yes, he did.
Q. At what point during the conversation did he ask you that?
A. (NO AUDIBLE RESPONSE WAS GIVEN)
Q. Was that the first thing he said after he identified himself?
A. No. There was some small talk before we got to -- got to that.

Page 138

Q. Nothing substantive?
A. No.
Q. Mr. Saltarelli, didn't he ask -- ask you any questions before he asked if you would be willing to provide a declaration for this case?
A. He gave me background on the -- on the case.
Q. But he didn't ask you any questions before requesting a declaration?
MR. MARRIOTT: Objection as to form.
THE WITNESS: I remember a conversation about how he -- how he was able to get in contact with me and where that had been. He referenced some small talk about the people who worked at the licensing organization.
BY MR. GANT:
Q. But he didn't ask you any questions; correct?
MR. MARRIOTT: Object as to form.
THE WITNESS: I don't recall.
MR. MARRIOTT: Let me just -- maybe I can make this simple too. I -- I'm not entirely sure it's appropriate for you to be asking leading questions, and I'd like to have -- I can either object to every one of your questions on the

Page 139

grounds of form, or you can just give me a continuing objection. Whichever you'd prefer.
MR. GANT: I -- I, of course, disagree with your position on that, and you can have a standing objection.
MR. MARRIOTT: Okay. Thank you.
BY MR. GANT:
Q. Just so the record is clear, you don't remember Mr. Saltarelli asking you any questions during your initial phone conversation with him before he asked you to provide a declaration for this case; correct?
A. I'm sure he did, because there -- there was the dialogue back and forth, talking about the particular case, and --
Q. Okay. I -- I don't mean to cut you off, but I'm not asking --
MR. MARRIOTT: Then just don't. So we -- if you're not -- if you're finished with your answer, then go ahead. If you're not, then go ahead and finish.
THE WITNESS: I remember there was dialogue back and forth, talking about -- about the case and how they got in contact with me and those types of things. So there was questions back

Page 140

and -- back and forth.
BY MR. GANT:
Q. Well, what I was going to say is I don't want you to speculate. What you said to me a moment ago was that you were sure there were, and my question was specific. Not about any assumption. I'm asking for facts. What you know.
So my question again is: Do you remember Mr. Saltarelli asking you any questions during your initial phone conversation with him before he asked you to provide a declaration for this case?
MR. MARRIOTT: Objection.
Q. Yes or no?
MR. MARRIOTT: Objection as to form.
And your answer is what it is. Whether it's yes, no or something else.
THE WITNESS: I remember him asking questions. I don't really know the specifics at this time. I don't recall the specific questions. I know he asked me about my family, what I'd been doing since retirement, and was I aware of this particular litigation. He gave me some background on that, and then we -- he asked could I give a declaration.
BY MR. GANT:

Page 141

Q. Do you remember any other questions asked by Mr. Saltarelli before he asked you to provide a declaration in this case?
A. Other than what I just stated, no.
Q. He didn't ask you anything about the details of your work at AT&T before requesting a declaration?
A. I don't -- I don't recall any.
Q. What was your next contact with someone from Cravath, Swaine & Moore?
A. I believe there were -- subsequent to that telephone conversation, there were a couple other telephones with setting up the details of when we would meet and where.
Q. Were those subsequent conversations also with Mr. Saltarelli?
A. Yes, they were.
Q. Anyone else?
A. Not before that first meeting.
Q. Okay. You at some point then had an in-person meeting with Cravath, Swaine & Moore?
A. Yes, I did.
Q. When was that and with whom?
A. It was with Mr. Dave Marriott and Gabe. And without looking at a calendar, I can't tell you

Page 142

the exact date, but it was sometime March, April. I remember the exact location, but I don't remember the exact date.
Q. And, just so the record is clear, the Mr. Marriott you just referred to is the attorney who is representing you in today's deposition; correct?
A. That's correct.
Q. He's sitting to your left right now; correct?
A. That's correct.
Q. Can you give me your best estimate of approximately when this first in-person meeting occurred between you and Cravath, Swaine & Moore?
A. I can't give you the exact date, because -- are you talking about -- because you asked that earlier. Are you talking about the date?
Q. Yes. I'm asking for your best approximation. A month, a season. The best you can do. Just try --
A. About April. Somewhere around April 2003.
Q. About 14 months ago; correct?
A. No. It wasn't that long ago. It was --
Q. Was it at least --

Page 143

A. I'm trying --
Q. I'm sorry. I didn't mean to cut you off. I was going to say, was it at least a year ago?
A. I think it was less than a year. I'm trying to recall the exact date, because I was actually doing something else at the time, and I'm -- I'm thinking about when the declarations were signed. So it was -- it probably had to be like September or something.
Q. Do you keep a calendar?
A. Yes, I do.
Q. Do you -- well, strike that.
Did you record some or all of the meetings that you had with Cravath, Swaine & Moore in your calendar?
A. Yes, I did.
Q. Do you still have your 2003 calendar?
A. I -- yes.
Q. Is your calendar electronic --
A. Yes, it is.
Q. -- or hard copy?
A. It's electronic.
Q. Or do you have an electronic and a hard copy?
A. I just have an electronic.

Page 144

Q. Would you agree to preserve your calendars from 2003 and 2004 in the event that we request them?
A. Yes.
Q. Thank you.
How many in-person meetings have you had with one or more lawyers from Cravath, Swaine & Moore?
A. Including this -- this week, it would be three.
Q. When did you meet this week?
A. Yesterday.
Q. For how long?
A. Probably a total of about five hours. There was an interruption there, and we had to go somewhere else.
Q. You spent about five hours yesterday preparing for today's deposition?
A. Uh-huh, yes.
Q. And you did that while meeting with counsel for IBM, who were also representing you in this case; is that right?
A. That's correct.
Q. Did you discuss some of the topics that might be covered during today's deposition?

MR. MARRIOTT: Counselor, as you know, you're not entitled to inquire as to what he discussed with his attorneys.

So, Mr. Wilson, I instruct you not to answer the question.

Q. I -- I assume your counsel has advised you that -- about the nature of the attorney/client privilege; is that right?

A. Yes.

MR. MARRIOTT: Counsel -- counsel, you're not entitled to inquire of the witness what I've advised him, and you know that.

So don't answer the question, Mr. Wilson.

MR. GANT: Well, I don't -- I don't want to -- what I was trying to do was to avoid telling the witness what my understanding of the law is, but I'll say it, and you can correct it, if you disagree with it.

MR. MARRIOTT: Go ahead. Say what you'd like.

MR. GANT: Which is that the privilege belongs to Mr. Wilson, not to IBM, or not to Cravath, Swaine & Moore. And that Mr. Wilson has a right to waive his privilege and answer any of my questions that he wants to in his -- and is willing



to.

That is my position. I assume you're not going to disagree with that proposition?

MR. MARRIOTT: Well, Counselor, are you asking Mr. Wilson whether he's waiving the right to keep his communications with me privileged?

MR. GANT: With that understanding, I have a follow-up question, which is whether he's going to follow your advice and refuse to answer the question.

So do you disagree with my characterization?

MR. MARRIOTT: I don't agree or disagree with your -- with your statements. That's not the point. The point is for you to ask questions and for him to answer them, unless I instruct him or advise him not to.

I advise you, Mr. Wilson, that -- as -- as your counsel, that you ought not reveal the substance of your communications with me after the point in time when you retained me to be your lawyer. You can follow or not follow that advice.

And if you want to ask him whether he's going to follow it, go right ahead.

BY MR. GANT:



Q. Okay. Are you going to follow your counsel's advice and refuse to answer my question?

A. I'll follow counsel's advice.

Q. Okay. Fair enough.

Without regard to any of the specifics that you may have discussed with counsel in preparing for today's deposition, by whatever means, did you feel that you had a good sense coming in to today's deposition about what the topics that would be addressed would be?

MR. MARRIOTT: Objection as to form.

Counsel, I think you know well that question appears designed to elicit information covered by the attorney/client privilege.

Mr. -- Mr. Wilson, I instruct you -- or, rather, I advise you, as -- as your counsel, and, in fact, instruct you, and urge you to follow the instruction, not to disclose in response to counsel's questions information provided to you during our sessions in preparation for -- for this deposition.

MR. GANT: And I, obviously, think that my question is proper, and I'm going to ask the court reporter to just read it back.

Your instruction is noted, and I'm just --



the witness can either answer or say that he's not going to answer based on counsel's advice.

MR. MARRIOTT: I think the witness has generally said he's going to follow the advice. Are we going to have to go through every question with you asking whether he's going to follow the advice?

MR. GANT: Well, let's --

MR. MARRIOTT: We have a continuing understanding that he's following --

MR. GANT: Well, I didn't understand him to say that, but I'm happy to try and do that for the sake of efficiency.

BY MR. GANT:

Q. Mr. Wilson, in -- if any question that I ask prompts a response from Mr. Marriott, whereby he advises you not to answer my question on the basis of attorney/client privilege, do you intend in each of those cases to refuse to answer my questions?

A. Yes.

Q. Okay. Who was present during your meeting yesterday preparing for today's deposition?

MR. MARRIOTT: That question you can answer, Mr. Wilson.

THE WITNESS: The folks sitting to my left were all present yesterday.
BY MR. GANT:
Q. Everybody?
A. Uh-huh.
Q. Okay. And they've made their appearances on the record this morning?
A. Yes.
Q. Anybody else present?
A. No.
Q. What's your best approximation of how many telephone conversations you've had with counsel for IBM since first being contacted about this case?
A. Probably about six.
Q. How many of those, if any, were with Mr. Marriott?
A. Half of them. Three of them.
Q. Okay. And were the rest with Mr. Saltarelli, or were there others as well?
A. No. Just Mr. Saltarelli.
Q. So before today's deposition you had met in person three times with counsel for IBM and had approximately six phone conversations with one or more attorneys representing IBM in this case; correct?

A. That's correct.
Q. It's fair to say, Mr. Wilson, isn't it, that you have been cooperating with counsel for IBM in connection with this case?
A. I think that's fair. Yes.
Q. Mr. Marriott asked this, and I just want to make sure that I understand and the record is clear. Have you been received -- strike that.
Have you received or do you expect to receive any form of compensation whatsoever in connection with your time or work on this case?
A. No. The only thing is, I guess, when your firm sent the subpoena there was a check for $40 or something.
Q. A witness fee?
A. Uh-huh.
Q. Other than that, nothing else?
A. No.
Q. Do you own IBM stock?
A. I do not.
Q. Does anyone in your family?
A. Not to my knowledge.
Q. Do you own stock in SCO, the plaintiff in this case?
A. No.

Q. Are you sure?
A. Yeah, I'm pretty sure. The reason -- the only reason I hesitated was that I have a couple of market index funds, and through that -- I don't think that's directly owned, but it could be a part of that portfolio that I'm not aware of.
Q. Presumably you -- you might own some IBM stock through the same vehicles; correct?
A. Could be. Yes.
Q. Do you know for a fact whether or not you do?
A. I do not.
Q. Has anyone acting on behalf of SCO attempted to contact you with respect to this case?
A. They have not.
Q. You're sure about that?
A. Do you want to state the question again?
MR. GANT: Could you read it back for the witness.
(PREVIOUS QUESTION THEN READ)
THE WITNESS: Other than the subpoena, no.
MR. GANT: Well, the subpoena wasn't propounded by SCO, just so the record is clear.
MR. MARRIOTT: The subpoena was served by IBM. So -- for clarification. Yeah. Snell &

Wilmer is perhaps what's confusing you. The two S's. That's what I suspect is going on.
THE WITNESS: Oh, okay.
BY MR. GANT:
Q. Okay. So it's your testimony under oath that nobody identifying themselves as representing or acting on behalf of SCO, the plaintiff in this case, ever attempted to contact you about this matter?
A. No.
Q. No one ever did?
A. No.
Q. Have you -- are you familiar with the name David Markarian?
A. No, I'm not.
Q. Before today had you ever heard the name Boies, Schiller & Flexner?
A. No.
Q. I take it given your prior answers to my questions that you have executed two and only two declarations related to this case; is that right?
A. That's correct.
Q. I assume that there were drafts of each of these declarations; is that right?
MR. MARRIOTT: Objection as to form.

Q. You can answer.
A. Yes. There were drafts.
Q. Well, let's start with the earlier declaration, December 2003. Do you remember how many drafts of that document there were?
A. One.
Q. One draft?
A. Uh-huh.
Q. Is that right?
A. One. Yes.
Q. And then there was the final, which you signed?
A. Yes.
Q. How did you receive the first draft of your December 2003 declaration?
A. By mail.
Q. Sent to you by counsel for IBM?
A. Yes, it was.
Q. And they had drafted the language for you?
A. Yes. After we had made the declaration.
Q. Pardon me?
A. After we had our meeting, yes, they drafted the language.
Q. And do you remember what kinds of changes, if any, you made to the draft declaration that led

up to your December 2003 execution?
MR. MARRIOTT: Objection as to the form. It lacks foundation, and I think misstates the testimony. Although, I don't suggest that it's in any way intentional.
MR. GANT: You can answer, if you understand it.
MR. MARRIOTT: I can clarify on recross or redirect.
THE WITNESS: I don't know exactly. There were very minor changes. Nothing to the substantive part of the declaration. There was a couple of minor references that we --
BY MR. GANT:
Q. Okay. So let me recapitulate and make sure I understand, and make sure Mr. Marriott has no objection, so that we can get a clean record.
You received at some point after meeting with counsel for IBM a draft of a declaration. You made some minor changes to it, and then it was put into final form, which you signed, and, as reflected, as attached to Exhibit 75; is that right?
A. Uh-huh. That's correct.
Q. Do you still have the draft declaration?

A. I do not.
Q. What happened to it?
A. I returned it back to the attorney.
Q. Why did you do that?
A. At their request, after I made the corrections, I sent it back, and they gave me the clean copies to sign.
Q. Counsel for IBM asked you to return the draft to them?
A. Uh-huh.
Q. You have to answer audibly, sir.
A. Yes, they did.
Q. Let's turn to the second declaration that you executed in this case, which is marked at the front of Exhibit 76. You don't need to look at it. I just want to make sure you know what I'm referring to. How many drafts of that declaration do you recall?
A. Just one.
Q. And can you walk me through the process from the receipt of that first draft, including how you got it, to the execution of Exhibit 76 in April 2004?
A. The same process with the -- the first one. It was sent by mail. I reviewed it. Signed

it. Put it back in the mail. I sent it back to New York.
On the last declaration there was a -- when the first one arrived, it -- it got -- it was left on the front porch and got wet. So they sent another one subsequently, and we sent -- sent it back.
Q. Okay. I'm trying to understand if there were any changes at all.
A. No.
Q. So you -- you received a draft of the declaration now marked as Exhibit 76 from Cravath, Swaine & Moore. You signed it without any changes; is that correct?
A. Yes.
Q. Can you explain to me why it is that you executed a second declaration in this case?
A. Yes. In looking at the -- the second declaration was -- was -- on the advice of the IBM attorneys was shorter and included the information on $ echo, and so it essentially was the same thing.
MR. GANT: Could you read back the answer, please.
(PREVIOUS ANSWER THEN READ)

BY MR. GANT:
Q. The attorneys for IBM recommended to you that you execute a second declaration; is that right;
A. That's correct.
Q. And the declaration that you did, in fact, execute on their advice is marked as Exhibit 76; correct?
A. That's correct.
Q. Do you know why, other than the fact that it was shorter, counsel for IBM asked you to execute a second declaration?
A. Other than that, no.
Q. In your mind your first and second declarations, Exhibits 75 and 76, are essentially the same thing?
A. Yes, they are.
Q. You don't have any specific knowledge or understanding about why counsel for IBM deleted some material from Exhibit 75 and gave you a new declaration without that information, which is marked as Exhibit 76?
MR. MARRIOTT: Objection as to the form. I think this has been asked three times.
MR. GANT: Would you read it back.

THE WITNESS: I'm sorry.
MR. GANT: So that he'll know what I said. If you don't understand it, I'll be happy to try again.
THE WITNESS: Okay.
(PREVIOUS ANSWER THEN READ)
MR. MARRIOTT: Objection as to form. I think it -- it was asked and answered, and I think it misstates the prior testimony.
THE WITNESS: Only with regard to the -- as I said earlier, it was shorter, and it included the information from $ echo.
BY MR. GANT:
Q. You're not aware of any reason for any other changes?
A. I'm not.
Q. What's your understanding, if any, about why counsel for IBM wanted your second declaration to address $ echo?
MR. MARRIOTT: Objection as to form. Lacks foundation.
THE WITNESS: No, I do not.
BY MR. GANT:
Q. I think I asked, what is your understanding, if any? I take it, you have no

understanding about why counsel for IBM wanted you to address $ echo in your second declaration?
A. Only that it -- no. The only thing I know is that the -- the second declaration was actually shorter, and it included the information from $ echo, which was not in the first. And that's -- that was the driving impetus for it.
Q. You didn't suggest to counsel for IBM that a new declaration be executed to address $ echo; is that correct?
A. That's correct.
Q. That was the idea of counsel for IBM?
A. Yes, it was -- or -- yes.
Q. Are you -- strike that.
Were you aware before this morning that counsel for SCO, the plaintiff in this case, did not have a copy of either of your declarations prior to approximately 11:00 p.m. this past Tuesday?
A. No. I wouldn't have -- I wouldn't have -- I don't know when they gave you documents.
Q. You didn't know that before today?
A. No.
Q. Does that fact surprise you?
MR. MARRIOTT: Objection as to the form.

THE WITNESS: No. It didn't surprise me. I mean it's -- it was like a non sequitur. I mean --
BY MR. GANT:
Q. Did you know what was going to be done with your declaration at the time you executed your -- strike that.
Did you know what was going to be done with your declarations at the time you executed them?
A. I did not.
Q. Did counsel for IBM tell you anything about how they intended to use your declarations, either before or at the time you executed them?
A. No, other than they would be provided as -- as information in this litigation.
Q. Provided to whom?
A. To -- to the opposing counsel, and -- and it may be -- it may come up in court.
Q. Have you reviewed any drafts or executed declarations or affidavits by other individuals for submission in this case?
A. I have not.
Q. You mentioned David Frasure earlier today. Do you recall that?

Page 161

A. Yes, I do.
Q. Do you know whether or not he's given testimony in this case?
A. I believe he was disposed -- gave testimony this week. He also made declarations. I know that.
Q. How do you know that?
A. I don't know that. I was told he made declarations.
Q. When were you told that?
MR. MARRIOTT: And just to, I guess, state the obvious, you can answer the question with respect to information you learned prior to you having retained us as your counsel. And if that's where your information comes from, then, by all means, provide the answer to the question. If it comes from later, then -- then I think you should not provide it, but --
MR. GANT: Is it your position that that information, if imparted --
MR. MARRIOTT: My position --
MR. GANT: -- is in connection with providing legal advice?
MR. MARRIOTT: My position is what I just said, Counselor.

Page 162

Go ahead and answer the question.
THE WITNESS: Yeah. I -- in the initial telephone conversation --
BY MR. GANT:
Q. Uh-huh.
A. -- and the -- also the meeting, here in Greensboro, we talked about Dave Frasure and a couple of other folks within the organization that would probably -- that may or may not be -- be asked. And Dave Frasure was definitely included in that.
Q. Who were the other people included?
A. I don't know who else was -- that might have been disposed.
Q. Deposed.
A. Deposed. Disposed.
Q. Hopefully -- hopefully that won't happen.
A. Right.
But it was -- only Dave Frasure was the one I knew, but they had talked to other folks. And there was -- there was a lot of people in the organization that -- that names came up. I said, I remember this person. There was Chuck Green and a few others.
Q. All right. Can you list for me all of the

Page 163

names that you remember coming up during that conversation?
A. I remember Dave Frasure and Chuck Green.
Q. Chuck Green. Anyone else?
A. No.
Q. You don't remember any other names, or you didn't know who they were at the time they were mentioned to you?
MR. MARRIOTT: Objection as to form. Lacks foundation. It mistakes the testimony.
THE WITNESS: I don't remember other names coming up in those conversations.
BY MR. GANT:
Q. Now, you said you became aware that Mr. Frasure had submitted a declaration. When did you become aware of that?
A. I'd say that I remember -- I don't know if he did or not, but I thought he was one of the people that was going to be deposed. I knew that the first two meetings.
Q. Has the nature of his declaration ever been described to you?
MR. MARRIOTT: Objection as to form. I think he just testified he didn't know if there was a declaration. So lacks foundation.

Page 164

MR. GANT: Go ahead. You can answer.
MR. MARRIOTT: Misstates the testimony.
MR. GANT: I'm sorry. Are you finished?
MR. MARRIOTT: I think I finished.
THE WITNESS: Can you read back the question?
MR. GANT: Would you like it read back?
THE WITNESS: Yeah.
MR. GANT: Okay. Let's do it.
(REQUESTED PORTION OF THE RECORD READ)
THE WITNESS: No.
BY MR. GANT:
Q. And you said you were aware before today that he had been deposed earlier this week?
MR. MARRIOTT: Objection as to form. It misstates the testimony.
Q. You can answer.
A. I knew that he was one of the people that would be deposed, and I knew that in the first telephone conversation and also in the meeting I had with the IBM attorneys here in Greensboro.
Q. Coming in to today's deposition were you aware of any of the questions that were asked of Mr. Frasure earlier this week?
MR. MARRIOTT: And, here again --

MR. GANT: I think the witness answered the question. Tell him to --
MR. MARRIOTT: Pardon?
MR. GANT: I think the witness already answered that.
MR. MARRIOTT: Well, I don't think so.
MR. GANT: Well, he nodded. Okay. Go ahead.
MR. MARRIOTT: Can I have back the question, please.
(PREVIOUS QUESTION THEN READ)
MR. MARRIOTT: And all I want to do is caution Mr. Wilson not to reveal the content of any of our attorney/client communications. If you can answer the question otherwise, go ahead.
BY MR. GANT:
Q. You answered by nodding yes; isn't that right?
A. No. Repeat the question?
Q. You didn't nod? I just want to -- I thought you did nod. Did you nod, yes, in response to my question?
MR. MARRIOTT: Counselor, are you trying to get beyond the assertion of privilege, because you appear to not have much respect for it. If

you're asking him -- if you're asking for the disclosure of privileged information, I think that that's improper.
If you can answer his question, without doing that, then -- then, please, do so.
MR. GANT: I assume if he answers, that he'll -- he will have reached the conclusion he can answer without revealing the privilege. I can't make the witness say anything. So --
MR. MARRIOTT: Well --
MR. GANT: If you're suggesting that I'm making him do anything, that's obviously preposterous. Mr. Wilson is capable of listening to and following your advice, and --
MR. MARRIOTT: And I'm suggesting --
MR. GANT: I'm asking a follow-up question.
MR. MARRIOTT: -- just what I said. So go ahead, and if you can answer his question without revealing information protected by the privilege, then do that.
Do you have the question in mind, or do you need it read back?
THE WITNESS: You're asking if I knew anything about the -- well, we can read it back, I

guess. That's the best way, to read it back.
MR. GANT: Let's do that. Is that -- is that agreeable?
THE WITNESS: Yeah, because I think I understand it now.
MR. GANT: Okay. Well, let's just read it back. Make sure you understand it. If you're willing to answer it, please, do so. If you're unwilling to answer it, just state that for the record, please.
(DISCUSSION OFF THE RECORD)
(REQUESTED PORTION OF THE RECORD READ)
MR. MARRIOTT: And the instruction is if you can provide that information without revealing communications with counsel, then do so. Otherwise, omit that information from your answer.
THE WITNESS: No.
BY MR. GANT:
Q. No, you weren't, or, no, you're not willing to answer? I just want to be clear.
A. No. I don't have knowledge of --
Q. Okay. Great. Thank you.
A. (WITNESS NODS HEAD UP AND DOWN)
Q. Now, you have previously testified that counsel for IBM drafted your declarations; correct?

A. That's correct.
Q. If you had drafted them, would there have been anything different about them, if you had done all of it yourself?
MR. MARRIOTT: Can I just hear it back, because I want to make sure I got the first part of the question.
(PREVIOUS QUESTION THEN READ)
MR. MARRIOTT: Objection as to form. Calls for speculation.
You may answer the question.
THE WITNESS: If this is the declaration I made in the -- I guess I mentioned this morning there was one -- I think a typographical error that we referenced in paragraph 4.01, 4.03 on page five of the second, but, other than that, no. They're the same.
BY MR. GANT:
Q. So it's your testimony that if you hadn't been aided by counsel for IBM in drafting your declarations marked as Exhibits 75 and 76, they would have been identical in every respect to the way they are as executed?
MR. MARRIOTT: Objection as to form. I think that's a misleading question, and I think

that it also calls for speculation.
You can answer the question.
THE WITNESS: I don't know if they would have been identical. I think the essence of what was said would be the same.
BY MR. GANT:
Q. You might have put things differently?
A. No.
MR. MARRIOTT: Objection as to form.
Q. When you say, the essence would have been --
A. In other words, I'm --
MR. MARRIOTT: Are you asking, Counselor, if the same commas would have been in the same place and the periods in the same spot? I mean is that what you intend to ask?
MR. GANT: I think my question speaks for itself.
THE WITNESS: I think they would -- they would pretty much look like this, if I had to -- if I had to draft it and type it myself. Yes.
BY MR. GANT:
Q. When you say, "pretty much," I'm trying to understand.
A. Well, the grammatical things, you know.

How -- paragraphs starting and those types of things.
Q. Other than grammar and punctuation, the declarations that you've executed in this case would have been the same if you would have drafted them yourself than they are as drafted by counsel for IBM; is that your testimony?
MR. MARRIOTT: Can I just ask, are you asking whether they would be the same in substance? Because if you're asking that, I have no problem. If you're asking him whether they would otherwise be identical in language, then I think that question is unfair, misleading and -- objection on the grounds of issue. So if you can clarify, I may have no objection.
MR. GANT: I'll -- I'll let the question stand. Your objection is noted.
MR. MARRIOTT: Okay.
THE WITNESS: Could you read it back?
(PREVIOUS QUESTION THEN READ)
THE WITNESS: Yes.
BY MR. GANT:
Q. You testified that in preparation for today's deposition you reviewed Exhibit 78 and Exhibit 75 and 76; is that right?

MR. MARRIOTT: Including the attachments too?
MR. GANT: Yes. The entire exhibit?
THE WITNESS: Yes.
BY MR. GANT:
Q. Did you review any other documents in preparation for today's deposition?
A. I did not.
Q. Did you review any documents to refresh your recollection prior to today's deposition?
A. Other than the ones you mentioned earlier?
Q. Yes.
A. No.
Q. Going back to your earlier declaration, Exhibit 75. What documents, if any, did you review prior to signing the declaration?
MR. MARRIOTT: Other than the ones that are appended to it?
MR. GANT: I think you're coaching, Mr. Marriott.
MR. MARRIOTT: I'm asking a question.
MR. GANT: If you have an objection, state it.
MR. MARRIOTT: Well, Counselor, you had -- you had no difficulty during my questioning

clarifying that we were talking about declarations and attachments. So I don't see what the problem is, when I ask the same question you asked. So -- but if you think that's coaching, then I'll object as to form.
MR. GANT: Can you read back the question. I'll listen to it again then, with your objection in mind. See if I want to modify it. If not, I'd ask the witness to answer.
(PREVIOUS QUESTION THEN READ)
MR. GANT: I'll stick with my question. Can you answer, please?
MR. MARRIOTT: Same objection.
THE WITNESS: I reviewed the declaration and the attachments.
BY MR. GANT:
Q. Anything else?
A. No.
Q. When was the first time -- strike that. There are nine documents attached behind tabs to Exhibit 75; correct?
A. That's correct.
Q. And after leaving AT&T when was the last time you saw these documents before you were shown them by counsel for IBM?

Page 173

MR. MARRIOTT: Objection as to form.
THE WITNESS: If you're talking about the specific attachments to the -- to these -- these declarations?
MR. GANT: Yes.
MR. MARRIOTT: I think that -- let me just tell you what my objection is. I think some of these documents are dated differently in time. So I think if you want to ask it separately, I may have no objection, but I think insofar as you're asking a question about nine different documents, I think it's -- it's compound and unfair.
MR. GANT: I understand your comment. I don't think it bears on the question. So I'll stick with it and ask the witness to answer.
MR. MARRIOTT: Okay.
THE WITNESS: I have not looked at any -- any -- any documents since leaving AT&T, other than through being deposed.
BY MR. GANT:
Q. So between the time you left AT&T in 1991 and your contacts with counsel for IBM in this case in 2003, you hadn't looked at any of the documents attached to your declaration in Exhibit 75; correct?

Page 174

A. Right.
Q. And is the same true with respect to all of the documents attached to your declaration at Exhibit 76?
A. That's correct.
Q. At what point -- strike that.
Did -- strike that.
When did counsel for IBM provide you with copies of the documents which are attached to your declarations?
A. Other than the declaration itself, there was -- those documents were available during our first meeting. The software -- in other words, the backup material, the exhibit material, was -- we talked about at our -- at our meetings. In reference to them, I guess, would be the right term.
Q. When you say they were available, what do you mean?
A. They had them with them when they came to Greensboro.
Q. Did they leave copies with you?
A. No.
Q. Did you review all of the pages of all of the documents attached to your declarations during

Page 175

your initial meeting with counsel for IBM?
A. I didn't review all of the pages. I looked at different references. Subsequently I did, but I didn't -- at the time of that initial meeting, you're talking about, in Greensboro?
Q. That's right.
A. I didn't go through every single document.
Q. Did you at least look at every single document?
A. Yes.
Q. When after -- when in relation to that first in-person meeting with counsel for IBM were you sent a declaration for you to sign?
A. When was I sent --
Q. When were you sent the draft of your first --
A. Oh.
Q. -- declaration in relation to the timing of your first in-person meeting?
A. About a week later.
Q. About a week later?
A. Uh-huh.
Q. And how soon thereafter did you execute the declaration, as modified slightly?
A. Well, the date -- I mean the exact date's

Page 176

on there. That's when they were executed.
Q. Well, I understand when you signed it. I'm trying to figure out how -- you signed your first declaration on December 11, 2003; correct?
A. Uh-huh.
Q. Approximately when was that in-person meeting?
A. Oh, it was probably a couple months before that.
Q. A few months?
A. And I'm just speculating now, based on when they were signed.
MR. MARRIOTT: I suspect he doesn't want you to speculate, but -- so in the future --
MR. GANT: Yeah. I don't.
MR. MARRIOTT: -- I would -- I would urge you not to speculate, and I'm sure he doesn't want your speculation.
BY MR. GANT:
Q. Unless I ask you for your best approximation. For instance, that may or may not be speculation in Mr. Marriott's eyes, but I will try and advise you if I'm asking you for something other than concrete personal knowledge. Okay?
A. (WITNESS NODS HEAD UP AND DOWN)

Page 177

Q. Do you understand that?
A. (WITNESS NODS HEAD UP AND DOWN)
Q. You have to answer audibly.
A. Yes.
Q. Okay.
A. A nod doesn't count; right?
Q. Were there any in-person meetings after your first in-person meeting with counsel for IBM prior to your executing your first declaration, dated December 11, 2003?
A. There was not.
MR. MARRIOTT: When you get a convenient moment, it would be great for a break. I need to visit the rest room.
MR. GANT: We have ten minutes on the tape. Is it all right if we go --
MR. MARRIOTT: That should be fine.
BY MR. GANT:
Q. Were you sent any other documents or information after your initial in-person meeting with counsel for IBM prior to executing your December 11, 2003 declaration?
A. Only the draft.
Q. Nothing else?
A. No.

Page 178

Q. So it is accurate, isn't it, that prior to executing your declaration, dated December 11, 2003, you had not read in their entirety all of the pages of all of the documents attached as tabs to that declaration?
MR. MARRIOTT: Objection as to form.
THE WITNESS: That's correct. You said prior to the execution; is that what you said?
BY MR. GANT:
Q. That's right.
A. Uh-huh. I guess I -- make sure I'm clear, because I had read them before.
Q. At the time you were at AT&T?
A. Right.
Q. But you had not read them in their entirety since leaving AT&T --
A. Right.
Q. -- in 1991; correct?
A. That's correct.
Q. So it had been at least 12 years since you had read in their entirety the documents attached as tabs to your December 11, 2003 declaration; correct?
A. That's correct.
Q. You mentioned earlier the term

Page 179

intellectual property. Are you familiar with that term?
A. Yes, I am.
Q. What's your understanding of what the term means?
A. Intellectual property. My understanding is the -- any technical information, any copyright information, any patent information or trade secret information that we had within the AT&T system.
Q. I assume that entities other than AT&T own rights to intellectual property; is that correct?
MR. MARRIOTT: Objection as to form.
THE WITNESS: Yes.
BY MR. GANT:
Q. In your view does intellectual property -- strike that.
In your view is intellectual property entitled to the same protections as physical property?
MR. MARRIOTT: Objection as to form. Lacks foundation. Calls for speculation.
THE WITNESS: Yes.
BY MR. GANT:
Q. While you were at AT&T did you participate in negotiations that related to AT&T's intellectual

Page 180

property?
A. Yes, I did.
Q. Based on your experience at AT&T, is it your understanding that AT&T protected its intellectual property rights?
A. Yes, they did.
Q. Is it also your understanding that AT&T tried to profit by commercializing its intellectual property?
A. Yes.
Q. Do you agree that the owner of intellectual property is free to decide what to do with that property, including determining the circumstances under which it will allow others to use its intellectual property?
MR. MARRIOTT: Can I have the question back, please.
You're getting a note too, Counsel.
Can you read that back.
(PREVIOUS QUESTION THEN READ)
MR. MARRIOTT: Objection as to form. Vague, lacks foundation, seeks a legal conclusion from a lay witness, calls for speculation. You can answer -- vague, and you can answer, if you -- if you can.

THE WITNESS: Yes.

BY MR. GANT:

Q. During any of the breaks today, including lunch -- I'm not interested in what, if anything, was said, but I just want to know if you spoke with counsel for IBM about your testimony today during the breaks of today's deposition?

MR. MARRIOTT: And I'll just caution you not to reveal the substance of any communication.

MR. GANT: I'm just asking a factual question.

MR. MARRIOTT: I understand.

THE WITNESS: Okay. And the question was?

MR. GANT: Let's read it back.

THE WITNESS: Yeah. Read it back.

(PREVIOUS QUESTION THEN READ)

THE WITNESS: Yes.

BY MR. GANT:

Q. Yes, you did?

A. Uh-huh.

MR. GANT: We're almost out of video.

THE WITNESS: And the reason I was trying to clarify that -- no. It's technical. Don't worry about it.

MR. GANT: Okay. It's your answer. You

can stop it whenever you see fit.

We're almost out of tape. So let's take a very short break, so we don't have to keep you here any longer than necessary.

MR. MARRIOTT: Just -- I want to hear what he has to say about if you're --

MR. GANT: Well, why don't you do it on your redirect then.

MR. MARRIOTT: Okay. Fine.

MR. GANT: I mean he --

MR. MARRIOTT: Unless you want to finish, I'll do it on my redirect.

MR. GANT: Coach, coach, coach.

Are we on a break, or are you still testifying, sir?

THE WITNESS: I'm clear about the difference between the IBM attorneys and the counsel representing me. I think I'm pretty clear about the difference between those two, and so that's -- the fact that they're wearing the same hat, does that make a difference? That's -- that's the question in my mind.

MR. GANT: Okay.

MR. MARRIOTT: I think we're -- since you don't get to ask the questions, I think we're done.

THE VIDEOGRAPHER: One moment, please. This marks the end of tape number two in the deposition of Otis Wilson. Going off the record. The time is 2:26 p.m.

(RECESS TAKEN AT 2:26 P.M. TO 2:39 P.M.)

THE VIDEOGRAPHER: Back on the record. Here marks the beginning of tape number three in the deposition of Otis Wilson. The time is 2:39 p.m.

Please, continue.

BY MR. GANT:

Q. Welcome back, Mr. Wilson. During the break we just took did you have discussions with any counsel for IBM about any of my questions today or any of your answers to my questions?

A. I did not.

MR. MARRIOTT: Let me just say too, generally, Counsel, you understand he's counsel -- we're counsel for the witness as well. So you -- you continue to describe us as counsel for IBM.

We are counsel for Mr. Wilson. So if you're going to refer to us, I'd appreciate being referred to as counsel for the witness, Mr. Wilson, as well as counsel for IBM. Okay?

MR. GANT: I'm sure you can imagine my

response, which is that I get to, of course, formulate the questions myself, and you can ask any questions when I'm done.

MR. MARRIOTT: Sure. If you think it's fair to continually refer to us solely as counsel to IBM, then -- then you can do that.

MR. GANT: I don't think that's what I said, but, in any event --

MR. MARRIOTT: I understand you get to formulate -- and if you think it's fair to formulate in that way, then go ahead.

MR. GANT: I absolutely do. If you think it's fair to represent both IBM and Mr. Wilson, I think it's fair for me to explain it that way on the record.

Shall we carry on?

MR. MARRIOTT: Well, I think we should go -- resume with the examination, as opposed to us carrying on.

MR. GANT: I agree.

BY MR. GANT:

Q. Mr. Wilson, in various places in your declarations you described your responsibilities at AT&T, UNIX licensing; correct?

A. That's correct.

Q. And I believe in some places you used the phrase that you were responsible for certain things. Do you recall that?
A. Yes.
Q. And in other places you used the term familiar. Do you remember that?
A. (NO AUDIBLE ANSWER WAS GIVEN)
Q. I could direct you, for example, to Exhibit 76, your declaration. In paragraph eight you say, "I'm also familiar with the following agreements between AT&T and Sequent." Do you recall that?
A. Yes.
Q. What do you mean by the term familiar as used in your declarations?
A. I was aware -- I had knowledge of those agreements and how they were put together and who executed them. So on and so forth.
Q. And when you use the term familiar, I gather that you're not suggesting that you knew everything about either the intent of the parties or the meaning of a particular agreement --
MR. MARRIOTT: Objection as to --
Q. -- is that right?
MR. MARRIOTT: Objection as to form.

THE WITNESS: I mean exactly that I did. In other words, that was my responsibility, to know the intent of the parties, as well as the intention of the language in those agreements.
BY MR. GANT:
Q. Okay. Well, let me break it down. When you say that you're familiar with a particular agreement, is it your testimony that you knew absolutely everything with respect to the intent of each of the parties to that agreement?
MR. MARRIOTT: Objection as to form.
THE WITNESS: With regard to AT&T's intent, I guess I'm fairly clear. To the degree that the licensee stated what their intention was, I -- I know that.
BY MR. GANT:
Q. So it's your testimony that with respect to a particular agreement, that you described yourself as being familiar with, that you knew everything about AT&T's intent with respect to that particular agreement?
MR. MARRIOTT: Objection as to form. Asked and answered.
THE WITNESS: I think that's fair. In other words, you say, "everything." I mean

that's -- to the best of my knowledge, what was contained in those agreements I was responsible for. I was the agent responsible for AT&T's intent, having it reflect in the agreements.
MR. GANT: With all due respect, I don't think you answered my question. So I'm going to ask that it be read back, and if you could do your best to answer my question, I'd appreciate it.
(PREVIOUS QUESTION THEN READ)
MR. MARRIOTT: Is that a question or a statement?
MR. GANT: It's a question. Can you answer the question?
MR. MARRIOTT: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. GANT:
Q. When you described yourself as being familiar with a particular agreement, is it your testimony that you are the only person who was familiar with the intent of AT&T with regard to that agreement?
A. No, I did not. I did not.
Q. I take it, you acknowledge, Mr. Wilson, that others, who were at AT&T at the time of the

particular agreements discussed in your declaration, may well have had or have different recollections about the intent of AT&T with respect to that agreement?
MR. MARRIOTT: Objection as to form. It lacks foundation, calls for speculation.
THE WITNESS: Yeah. The problem I'm having is you're saying, "AT&T." I mean that's a -- that was a huge place. I know -- if you could narrow it, I mean I could -- because I don't know what everybody in AT&T had on their minds.
BY MR. GANT:
Q. You don't know what everyone at AT&T had in their minds with respect to the UNIX licensing agreements?
A. That's correct.
Q. You acknowledge, Mr. Wilson, that the agreements that are attached as tabs to your declaration were executed many years ago; correct?
A. That's correct.
Q. Almost 20 years ago now; isn't that right?
A. '85, '95. Yes, sir. That's correct.
Q. I believe you testified earlier today in response to questions from Mr. Marriott, your counsel, and also counsel for IBM in this case,

that you were surprised when you saw some of the documents, that things that came back to you. Do you recall saying that earlier today?

MR. MARRIOTT: Objection as to form. I think that misstates the testimony.

THE WITNESS: I don't recall the context of when that was stated. I mean if you could --

BY MR. GANT:

Q. You don't recall testifying earlier today that you --

A. Oh, yeah.

Q. -- that you were surprised that your recollection of the documents attached to your declarations came back to you so quickly when you reviewed them with counsel for IBM?

A. Yes. I recall making that statement. And what I was talking about, once -- once I started looking at them, I mean faces came back in, the environment in which they were negotiated. All of those kinds of things came back.

Q. I gather that you were surprised, because these agreements and the events related to them occurred so long ago; is that right?

A. That's correct.

Q. And being human, I assume that you, like

everyone else, has a fallible memory; isn't that right?

MR. MARRIOTT: Objection as to the form.

THE WITNESS: If that's attributable to all humans, I guess so.

BY MR. GANT:

Q. Well, do you acknowledge that your --

A. Of course.

Q. -- memory is fallible?

A. Yes.

(DISCUSSION OFF THE RECORD)

MR. GANT: Okay. Let's take a quick break.

THE VIDEOGRAPHER: One moment, please. Going off the record. The time is 2:46 p.m.

(RECESS TAKEN AT 2:46 P.M. TO 2:48 P.M.)

(MR. DAVIS AND MR. NOTO ARE NOT PRESENT)

MR. GANT: Can you just read back the Q and the A. Then we'll go back on. So I remember where we were and so the witness does.

(REQUESTED PORTION OF THE RECORD READ)

THE VIDEOGRAPHER: Back on the record. The time is 2:48 p.m.

Please, continue.

BY MR. GANT:

Q. Mr. Wilson, you weren't the only person at AT&T involved in the negotiations of UNIX licenses and the drafting of those licenses, were you?

A. I was not.

Q. I gather there were a significant number of people involved in that; correct?

MR. MARRIOTT: Objection as to form.

(MR. DAVIS THEN RE-ENTERED THE ROOM)

THE WITNESS: A significant -- I wouldn't say significant, because it was a very small organization.

BY MR. GANT:

Q. During what period of time at AT&T were you working on negotiating UNIX licenses?

A. From 1980 through 1991.

Q. And let's focus for now on a narrow band of that time from, say, 1984 to 1990. Okay?

A. (WITNESS NODS HEAD UP AND DOWN)

Q. Can you tell me who the people were who were involved in working on UNIX licensing at AT&T?

A. Obviously, the people in our -- in my organization in Greensboro, and as we -- as it got larger, we expanded. We opened an office in Tokyo.

Q. When did that occur?

A. In that time period.

And also in London. And the -- those offices use what we call boilerplate agreements. In other words, the language, the interpretations all came out of the Greensboro office.

Q. And during that period of time, '84 to '90, who worked in the Greensboro office, working on UNIX licensing?

A. All the names you mean?

Q. Yes, please.

A. Yeah. Dave Frasure, which you already know. Steve Edson.

Q. How do you spell his last name?

A. E-D-S-O-N.

Chuck Green, Steve Duksonvich.

Q. How do you spell his last name?

A. D-U-K-S-O-N-V-I-C-H.

Now I forgot who I told you.

Q. You told me Dave Frasure, Steve Edson, Chuck Green, Steve Duksonvich?

A. Max Wicker.

Q. Is it Wicker?

A. W-I-C-K-E-R.

Q. Uh-huh.

A. Evelyn Rochelle.

Q. I'm sorry. The name again?
A. Evelyn Rochelle.
Nina Rici, R-I-C-I.
Q. Anyone else?
A. That's it. I mean that's -- that's all I can remember right now. These were the -- go ahead.
Q. Who was your supervisor during -- from the entire time you were at AT&T, working on UNIX licensing, and -- and if there was more than one, please, tell me who they were at each point in time?
A. Initially it was Dick Sapazzian.
Q. Do you know how to spell the last name?
A. You're on your own on that one.
Q. Did you once know?
A. Yes. S-A --
Q. It's a good thing to know how to spell your boss' last name?
A. Yes. S-A-P-A -- I forget now.
Q. Okay. During what period of time was Mr. Sapazzian your superior?
A. Probably '81 -- '80 to '82 or '3.
Q. Okay. And then who became your --
A. You don't want me to speculate; right?

Q. Right.
MR. MARRIOTT: I'm sorry. I missed that exchange.
MR. GANT: He said, "You don't want me to speculate; right?" And my --
MR. MARRIOTT: Was that speculation or --
THE WITNESS: The exact date when he changed would be speculation. I can tell you the sequence of events.
BY MR. GANT:
Q. You can -- if you're approximating, then you should say you're approximating.
Are you still answering the question, or should I --
A. No. I'm still answering the question.
Q. Okay.
A. Dick Sapazzian. I can see his face. I can't remember his name right now. Bob Guffey.
Q. That was your next supervisor after Mr. Sapazzian?
A. Uh-huh, yes.
Q. Do you remember how to spell his last name?
A. G-U-F-F-E-Y.
And then Mike Defazio, D-E-F-A-Z-I-O.

Q. Mike Defazio was your supervisor?
A. Uh-huh.
Q. And what period of time was that?
A. That sequence. It was Dick Sapazzian, Bob Guffey. Then --
Q. Do you remember approximately during what years Mr. Defazio was your supervisor?
A. Probably the last four years.
Q. From roughly '87 to '91?
A. Uh-huh.
Q. He was your last supervisor?
A. Yes.
Q. And for how many years was Mr. Guffey your supervisor approximately?
A. Approximately three years.
Q. From roughly '84 to '87?
A. Roughly, yes. Uh-huh.
Q. Now, could you explain what your relationship was to your supervisors? What their role was vis-a-vis your responsibilities?
A. Dick Sapazzian was responsible for the -- several areas of intellectual property. Like we had software. We had technical agreements, technical information, and so that was -- he was responsible for several areas of intellectual

property.
And I had one of them. I was a negotiator in the software area. Then we became more focused on the UNIX operating system. That was when Bob Guffey came in. He was responsible mainly for operating systems software and a little of the other technology.
Q. As -- I'm sorry. I didn't mean to interrupt you.
A. And then Mike Defazio's primary responsibility was development, and -- with software being one of the areas, because it was associated with the software development that he was involved. So he had both the technical side and the licensing side.
Q. And all of those gentlemen supervised you in your responsibilities for -- on UNIX licensing issues; correct?
A. Yes.
Q. Including the negotiation of licenses; is that right?
A. Yes.
Q. And as your ultimate supervisor, is it accurate that Mr. Sapazzian and Mr. Guffey and Mr. Defazio were familiar with the intent of AT&T

Page 197

with respect to UNIX licenses?
MR. MARRIOTT: Objection as to form. Lacks foundation.
THE WITNESS: Yes, they were.
BY MR. GANT:
Q. Yes?
A. Yes, they were. Yes.
Q. Are any of the people you mentioned attorneys, who worked on UNIX licensing with you?
A. No, they're not.
Q. Did you work with AT&T attorneys on UNIX licensing issues?
A. Yes.
Q. Which attorneys?
A. Geoff Green.
Q. How do you spell the first and last name, please?
A. G-E-O-F-F. Green, G-R-E-E-N.
Dave Horwitz. Horwitz, H-O-R-W-I-T-Z. They worked out of a pool of intellectual property attorneys, and those were the primary people I dealt with. Any given day you might go to someone else in the group --
Q. And where --
A. -- but I don't remember.

Page 198

Q. I'm sorry.
Where were those gentlemen based at the time they were working on UNIX licensing issues?
A. In Greensboro, North Carolina.
Q. Were those the principal attorneys that you dealt with?
A. Yes.
Q. Were there any others that you can recall?
A. Only from the standpoint that any given day you might -- you might need to talk to someone. You would go to anybody in that -- in that group.
Q. And what were the responsibilities of AT&T's attorneys, who worked on UNIX licensing issues?
MR. MARRIOTT: Objection as to form.
THE WITNESS: They were responsible for ensuring that the -- like the intent and the -- the agreements that were reached were reflected in legal documents in a way that they were legally correct.
BY MR. GANT:
Q. I take it then that the attorneys for AT&T, who worked on UNIX licensing issues, were very familiar with AT&T's intent with respect to those licenses?

Page 199

MR. MARRIOTT: Objection as to form.
THE WITNESS: Yes, they were.
BY MR. GANT:
Q. You mentioned earlier, and we looked at some documents today, where Mr. Frasure signed a document, quote, unquote, for you. Do you recall that?
A. Yes.
Q. Can you explain what it means when Mr. Frasure or someone else signs, quote, unquote, for you?
(MR. NOTO THEN RE-ENTERED THE ROOM)
THE WITNESS: It was a -- it was a delegation that I made to -- to Dave Frasure, which was sometimes necessary if I was at another conference or a meeting or involved with -- with other business at the particular time that the agreement was needed to be signed.
BY MR. GANT:
Q. If both you and Mr. Frasure were present, would you allow Mr. Frasure to sign a document for you?
MR. MARRIOTT: Objection as to form.
THE WITNESS: I would probably sign it when we were both present.

Page 200

BY MR. GANT:
Q. Why is that?
A. Because I -- I had the responsibility to sign those agreements, unless I delegated it, and there would be no need to delegate it, if I was -- if I was there.
Q. In the circumstances when you delegated responsibility for signing a particular document, would you in all cases review the final document before it was signed?
A. Yes, I would.
MR. MARRIOTT: Object as to form.
THE WITNESS: Yes, I would.
BY MR. GANT:
Q. What would happen if there was a situation where you were out of town when a document was being put into final form?
MR. MARRIOTT: Objection as to form.
THE WITNESS: The agreements were pretty much boilerplate, if that's -- if that's a good term to use. In other words, the -- the language reflected in the agreement was the language we used over and over again.
Any specific deviation or modification or changes to that language, we would have discussed

many times before it got to the point of being in the agreement for execution.

So maybe on a given day when that thing had to be signed or when it came back to be signed, I was -- I had already viewed the end -- the content of it. And so I relied on the licensing, Dave Frasure and others to make sure all of the pages were in there and everything was --

BY MR. GANT:

Q. So it's your testimony that any document that was signed for you or on your behalf, you were familiar with all of the substance and details of the document before it was signed by someone at AT&T?

A. Yes.

Q. And I presume you would not have authorized someone to sign a document on your behalf, if the document wasn't completely accurate and did not reflect AT&T's positions --

MR. MARRIOTT: Objection as to form.

Q. -- is that right?

A. That's correct. In other words, I didn't do that lightly.

Q. You didn't do what lightly?

A. Delegate that responsibility. In other

words, whoever I delegated, I trusted they would have the same understanding that I would. Otherwise, I would not have made that delegation.

Q. And your understanding was what?

MR. MARRIOTT: Objection as to the form.

MR. GANT: I withdraw that question. Let me make it clearer.

BY MR. GANT:

Q. When you delegated responsibility to someone to sign a document on your behalf, did you take steps to ensure that the document was accurate and reflected the policies and views of AT&T?

A. Yes. In other words, I did that before I made the delegation. So I made sure that the person I was delegating to was as familiar as I was and would reflect the same thing that I would do, if I was there signing it.

Q. So you were confident --

A. Yes.

Q. -- that in all instances -- you were confident that in all instances when someone signed a document on your behalf that you had prior to the signature being applied carefully examined the document to ensure that it was accurate and reflected AT&T's views and policies?

MR. MARRIOTT: Objection as to form.

THE WITNESS: Yes.

BY MR. GANT:

Q. If someone testified that you, Mr. Wilson, generally became involved in a particular license agreement after the negotiations had been completed, would you agree with that statement?

MR. MARRIOTT: Objection as to form.

Could I hear the question back again, please, too.

(PREVIOUS QUESTION THEN READ)

MR. MARRIOTT: Objection as to form. Vague, calls for speculation.

THE WITNESS: I'm not sure what -- when you say, "after the negotiations had been completed," I'm not sure what's meant by that.

BY MR. GANT:

Q. At what point did you generally become involved in the development and agreement of a particular UNIX license, if there was a typical scenario?

A. A typical scenario. I was involved at the beginning. Most of the agreements, as I mentioned earlier, were pretty much boilerplate. If there was a deviation from the standard language in the

software agreement, we went back and forth until that was clear, and then reduced it to language that we could use in our agreement.

So in most cases it was an insertion of an understanding or a drafting of a side letter with those understandings reflected in that letter. So those -- the content of those things had already been approved before they could go out to a licensee.

Q. AT&T had a standard software licensing agreement for UNIX?

A. Yes.

MR. MARRIOTT: Objection as to form.

Q. And AT&T also had modifications to that agreement, which it entered into with particular licensees?

MR. MARRIOTT: Objection as to form.

THE WITNESS: Yeah. We had a standard agreement, and we had, for lack of a better term, standard modifications. In other words, any -- any change from the standard licensing agreement was reflected in a clarification or a side letter, but that was available to all of our licensees.

So these -- so -- so the boilerplate agreement kept evolving based on any type of

negotiations that caused a change or an interpretation in that agreement.

BY MR. GANT:

Q. You mentioned that AT&T attorneys were involved in developing UNIX licenses; correct?

A. Yes.

Q. Why did they need to be involved?

MR. MARRIOTT: Objection as to form.

THE WITNESS: Just like on this particular declaration. In other words, the attorney ensured that what we were trying to do was in the proper language that would be legally correct in the final document. They were never involved in the actual negotiations.

BY MR. GANT:

Q. And it was AT&T's view that that responsibility was best carried out by an attorney, because the legal language would ultimately determine the meaning of the agreements; is that right?

MR. MARRIOTT: Objection as to form. Lacks foundation, calls for speculation, seeks a legal conclusion from a lay witness, vague.

THE WITNESS: As I -- as I understood, the attorneys were there to make sure that what we

were -- what we were doing was legally correct, just like you do in any business plan or whatever.

They had to make sure that what we were doing was -- was legally correct, and that was their responsibility. And a lot of time was spent, you know, back and forth with the attorneys to make sure that what we were saying was, in fact, what we meant in the language that was finally put out.

Q. And was it the responsibility of the attorneys to make sure that what AT&T meant was expressed in appropriate language?

MR. MARRIOTT: Objection as to form.

THE WITNESS: I think that was the responsibility of the negotiators.

BY MR. GANT:

Q. I thought you just explained that the attorneys --

A. Were making sure that it was legally correct, in other words, but the intent, what was trying to be accomplished, was the responsibility of the negotiator. They were the ones that sat down with the licensee, and they would bring it back.

And then the attorney would draft the language, and we'd talk. Then sometimes we'd go

back to the licensee, and their attorneys would look at it and say, what does this mean, that kind of thing. So it was -- it was having someone to make sure that the language was reflective in a legal way what you were trying to do.

Q. So it was the responsibility of AT&T's attorneys to find out the intent of the parties with respect to a particular UNIX license and then put that into appropriate legal language?

MR. MARRIOTT: Objection as to form. Misstates the testimony.

THE WITNESS: Yes.

BY MR. GANT:

Q. You mentioned earlier in response to a question from Mr. Marriott -- or colloquy, I think, between the three of us about privileged communications between AT&T's attorneys and others.

Before that issue arose this morning what was your understanding about Mr. Marriott's questions when he asked about -- questions about AT&T? Were you leaving out of your answer anything that had been communicated to you by AT&T's attorneys?

A. I did not. No.

Q. Could you take a look at Exhibit 76, the

declaration that you executed in April 2004. Before we do that, let me ask you another question about Mr. Frasure. You mentioned that you recruited him. Do you recall that?

A. Yes.

Q. And I believe one of the things you said in describing your recruitment of Mr. Frasure was that you were interested in his expertise in software. Mr. Frasure is not an expert in computer code, is he?

MR. MARRIOTT: Objection as to form. Lacks foundation, vague.

THE WITNESS: I'm having trouble with the definition of expert, but he was a -- he was in our MIS department, working with computers and code, you know, at the time. So he had a very good background. Expert maybe rises to another level. I'm not sure.

BY MR. GANT:

Q. Okay. Well, if Mr. Frasure testified that he didn't consider himself to be an expert in computer code, would you have any reason to disagree with him?

A. No.

MR. MARRIOTT: Objection as to form.

Page 209

Q. Could you take a look at page six of your April 2004 declaration?
A. (THE WITNESS COMPLIED)
Q. Do you have that in front of you, sir?
A. Yes, I do.
Q. Do you see the first line of that page, where it says, "These provisions set forth our licensees' rights"?
A. Yes, I do.
Q. It's the case, isn't it, that AT&T's UNIX license agreements set forth both rights and obligations of both parties to the agreement?
MR. MARRIOTT: Objection as to form.
THE WITNESS: Yes, they did.
BY MR. GANT:
Q. Two lines down, you say, "At least as I understood these sections," and then the sentence continues on. It's the case, isn't it, that others at AT&T may have had different understandings about the meaning of particular provisions of AT&T's UNIX license agreements than you have?
MR. MARRIOTT: Just let me get my objection in. Objection as to form. Calls for speculation and lacks foundation.
You may answer.

Page 210

THE WITNESS: Yeah. I don't know what -- I mean I don't know when you're referencing other people. I mean I -- I know what was the intent -- you know, with regard to the intent of the licensees, and I was -- our licensing group. But these other people, I don't know. I mean I don't know.
BY MR. GANT:
Q. Okay. But my -- let's focus in on the folks in the licensing group.
A. Okay.
Q. Prior to executing your declaration -- strike that.
Prior to executing your declarations in this case did you speak with any of the people you identified to me a few moments ago who worked in Greensboro or on UNIX licensing?
A. I did not.
MR. MARRIOTT: Just to be clear, you mean after he left the company?
MR. GANT: Yes. That is what I mean.
BY MR. GANT:
Q. Is that how you understood my question?
A. Yes.
MR. MARRIOTT: So the record is clear.

Page 211

MR. GANT: I appreciate that. That's a fair and helpful clarification.
BY MR. GANT:
Q. So during the 12-year period from when you left AT&T and the time you executed your first declaration in this case, did you speak with any of the folks who worked with you in Greensboro on UNIX licensing and ask them about their intent with respect to the UNIX licenses?
A. No.
Q. I take it then that you don't know for a fact one way or another whether any or all of those individuals share your views about what AT&T intended with respect to its UNIX licenses?
MR. MARRIOTT: Objection as to form.
THE WITNESS: I would say just the opposite. I think they did know my views. And I had the -- the responsibility -- they were in the organization, and so any dialogue about intent or the meaning of the language, we -- we discussed that and came to -- to a resolution.
(MR. DAVIS THEN EXITED THE ROOM)
THE WITNESS: If they continued to disagree, I was not aware of it. In other words, that was -- that was part of the process.

Page 212

BY MR. GANT:
Q. All right. I -- again, no disrespect. I think you didn't answer my question.
A. Would you, please, ask it again?
MR. GANT: I'll -- I'll move to strike the question, and I'll ask it to be read back and see how we do.
MR. MARRIOTT: And I -- and, just so the record is clear, I think you did answer his question. And I think there's no basis for a motion to strike, but he can have it read back.
If you have a different answer, you can give it.
(PREVIOUS QUESTION THEN READ)
BY MR. GANT:
Q. Do you understand the question?
A. Yes.
And I would say they did know.
Q. My -- maybe it's my question that's bad. Let me explain what I'm trying to get at and then formulate it in a way that will be clear for the record.
What I'm trying to understand is whether you know for a fact that any of the people who used to work with you in Greensboro on UNIX licensing

Page 213

today share your recollection and understanding of what AT&T's intent was with respect to UNIX licensing? Do you understand what I'm getting at?
A. I think you're saying today -- I mean have I talked with them in the last ten years and find out do they still agree with their views; is that what you're saying?
Q. Yes. That's what I'm trying to --
A. I haven't talked -- as I said earlier, I have not -- I have not talked with them about this since I retired.
Q. You have no idea whether or not the individuals who worked with you on UNIX licensing in Greensboro share your views and understandings about the meaning of --
(MR. DAVIS THEN RE-ENTERED THE ROOM)
MR. GANT: -- UNIX license agreements entered into by AT&T?
MR. MARRIOTT: Objection as to form. I think he -- I think the question is -- is confusing, and, therefore, I object on form. If you can -- if you understand it, please, answer.
THE WITNESS: Yeah. I think they do. In other words, the way you phrased it that time -- in other words, we were in agreement about -- we had

Page 214

to be in agreement, because that was our responsibility, to execute these things fairly and equitable to all of our licensees.
So if their minds have changed over the last ten years after we've all left AT&T, I mean I'm not aware of that. But I know at the time we were working together up until the time I left we were in agreement. And why I say that is because if there was any type of agreement (SIC), that's what we would discuss and -- and get -- you know, get hashed out before we go forward.
Q. Is it possible that your particular recollection of what those agreements were may be inaccurate?
MR. MARRIOTT: Objection as to form.
THE WITNESS: As you mentioned earlier, I may forget things, but I think the -- to the degree of fallibility of -- of the human mind, maybe, but I'm pretty comfortable with the agreements, the intent and those kinds of things.
BY MR. GANT:
Q. But these events occurred almost two decades ago; correct?
A. Yes.
Q. And it's possible that you may be

Page 215

misremembering things; correct?
MR. MARRIOTT: Objection as to form.
THE WITNESS: It's possible, but it's -- that's the reason I read over them again.
BY MR. GANT:
Q. That's the reason you read over what?
A. That's the reason -- like you have notes and things. You go back, and you -- you go back, because you -- you could forget, but you go back, and you -- you look at your notes. In this case we had the agreements to look at, and --
Q. Did you look at any notes to refresh your recollection before signing your declarations?
A. Well, I looked at these declarations and the exhibits.
Q. You looked at --
A. I was using the -- the thing -- like, in other words, you make notes about something, a class or whatever. That's what you go back to refresh, you know, what you're -- your memory.
Q. You testified earlier, though, that you only reviewed parts of the exhibits to your declaration before signing your declaration?
MR. MARRIOTT: Objection as to form. Misstates testimony. He testified he didn't review

Page 216

in their entirety at a certain point in time every page of the attachments.
MR. GANT: Mr. Marriott, I think you are bordering on coaching on this and several other occasions. If you have -- I limited my objections to discrete descriptions of the nature of the objection to allow you to cure, if you were interested. And I would request that you extend me the same courtesy, rather than interrupting the examination.
MR. MARRIOTT: Counsel, I don't intend to interrupt your examination, and I don't intend to extend you any discourtesy. I, at the same time, don't think there's anything inappropriate about that -- about that objection, when I think the question misstates the testimony. So --
MR. GANT: All you have to say is mischaracterizes testimony. I'm sure you can do that.
Could you read back the question and his --
MR. MARRIOTT: I appreciate your vote of confidence. I'll --
BY MR. GANT:
Q. Do you need the question read back?

A. No.
MR. MARRIOTT: I think I do. What's -- what's the question?
(PREVIOUS QUESTION THEN READ)
THE WITNESS: That's incorrect. I did not -- I don't -- I did not state that. I said that I reviewed -- reviewed parts of it during the initial meeting with counsel here in Greensboro. When they actually sent the draft and the declaration and the exhibits, I reviewed those in their entirety before signing the agreement.
BY MR. GANT:
Q. I see. Okay. Thank you for that clarification.
Did they send exhibits when they sent you the first draft?
A. Yes, they did.
Q. And those were the only things you looked at to try and refresh your recollection about the events of 12 -- 15, 20 years ago; correct?
MR. MARRIOTT: Objection as to the form.
THE WITNESS: That's correct.
BY MR. GANT:
Q. Did you consider taking any other steps to refresh your recollection and assure yourselves --

yourself that your sworn testimony was accurate?
A. I did not.
Q. Let's look -- go back to page six of your April 2004 declaration. Five lines down you used the phrase -- let me just read the whole sentence for context.
"At least as I understood these sections and discussed them with our licensees, they do not, and were not intended to, restrict our licensees' right to use, export, disclose or transfer their own products and source code." And then it continues on.
My question is: What did you mean by the terms, "own products"?
A. Anything -- in this context, anything other than our software product that was distributed under the licensing agreement.
Q. And software product is a defined term in the standard software license?
A. Yes.
Q. And that's what you were referring to in your answer a moment ago?
A. Yes.
(DISCUSSION OFF THE RECORD)
BY MR. GANT:

Q. The next clause. You say, "As long as they did not use, export, disclose or transfer." What did you mean by, "use"?
A. In other words, an execution of the rights granted to them under the software agreement. Those -- those stipulations in the agreement defined what they could do with the source code or the software products.
Q. Well, you have, "use," here specifically set out as a separate term. I'm trying to understand what you meant when you signed this declaration.
A. Their rights -- their -- their -- their use rights were defined in the software agreement.
Q. Whose use rights?
A. The licensees.
Q. And there were restrictions on licensees' use rights in the UNIX licenses; correct?
A. Yes, as well as the others, "export, disclose."
Q. And those use restrictions covered the software product as defined in the agreement; correct?
A. That's correct.
MR. MARRIOTT: Can I just have the

question back. I may or may not have an objection to the form. Make sure I've got it.
(PREVIOUS QUESTION THEN READ)
MR. MARRIOTT: Objection as to form.
BY MR. GANT:
Q. And section 2.01 of the standard software agreement included in the term software product derivative works and modifications; correct?
MR. MARRIOTT: Objection as to form.
THE WITNESS: Yes.
BY MR. GANT:
Q. If you could, look two lines down, at the end of that paragraph. Your declaration uses the term, "own original work." What did you mean by, "own original work," when you signed your declaration?
A. Anything that was developed by our licensee was considered their -- you know, their original work. In other words, it was not -- it was theirs.
Q. When you say, "developed," in your answer that you just gave, what do you mean by that?
A. They wrote the code.
Q. You're not a code expert; correct?
A. That's correct.

Page 221

Q. I presume -- well, strike that.
Do you agree that it is a -- it requires technical expertise to determine whether or not an entity's code is their own --
MR. MARRIOTT: Objection as to form.
Q. -- as you used the term?
A. Yes. And we had -- we had those resources available to us, just as we had the legal resources. So those things that we needed to execute and ensure the licensing agreements in the software products we used, as we agreed upon, we sometimes referred to those -- those resources.
Q. If you could, look at paragraph 14 on the same page. The first clause says, "As my staff and I communicated to our licensees," and then it continues on.
Can you identify -- strike that. Let me ask this differently.
That's -- that first sentence in paragraph 14 refers to a provision; correct?
A. It refers to a provision in paragraph 13.
Q. Section 2.01 --
A. Yes.
Q. -- of the standard agreement?
A. Yes.

Page 222

Q. And paragraph 14 says -- and I'm paraphrasing. Please, tell me if I've in any way mischaracterized what paragraph 14 describes, but it says that you and your staff communicated to AT&T's licensees that section 2.01 was only intended to ensure that if a licensee were to create a modification or derivative work, any portion of the original UNIX System V source code that was included in the modification or derivative work would remain subject to the confidentiality and other restrictions of the software agreement. Is that what was being conveyed in paragraph 14?
MR. MARRIOTT: Objection as to -- as to form.
THE WITNESS: Yes, it is.
BY MR. GANT:
Q. Can you explain to me why it is that you and your staff had to communicate with your licensees about the supposed intent behind section 2.01 if the licensees actually had the language of 2.01 themselves?
MR. MARRIOTT: Objection as to form.
THE WITNESS: The -- our licensees wanted to be sure that their interpretation of the clause of the agreements was what they -- they understood

Page 223

it to be.
And so from time to time they would come back and ask for a clarification on a particular clause in the agreements, and -- to make sure that their understanding and our understanding was correct. And in this particular --
Q. Did -- I'm sorry.
A. In this particular clause most of -- many of our licensees were concerned that we were not trying to claim ownership in what they used, what they deemed was their software.
In other words, they might have used our software as a tool to develop or made a derivative work that didn't rely on that product to be used to help create that work.
So they were -- they wanted to make sure they didn't violate the -- the agreement -- of their understanding of the agreement. Make sure they didn't violate the agreement, based on their understanding of the clause. So they wanted to clarify what the clause actually meant.
Q. Some of these requests from licensees came after the agreements were already executed?
A. Some came after. Some came before. I remember -- we talked earlier about the specimen

Page 224

agreements. It was common practice for us to send out specimen agreements for licensees to review before actually executing the -- the official documents.
Q. There were many occasions on which AT&T licensees after having executed a UNIX license with AT&T were unsure about the meaning of some of the provisions in that agreement and requested clarification from AT&T; is that your testimony?
A. Yes. In those -- that normally occurred as they moved closer to going to market or doing something different than what they were doing when they first signed the license.
And so as they moved into a different area, they said, oh, let me go back and clarify, or if they were getting ready to do a commercial offering based on one of our software products, they wanted to make sure that they had the rights to do so.
Q. Did all UNIX licensees have a copy of the agreement that they had entered into with AT&T?
MR. MARRIOTT: Objection as to form. Lacks foundation, calls for speculation.
MR. GANT: Well, let me withdraw the question.

Page 225

BY MR. GANT:

Q. Was it AT&T's practice to provide all of its licensees with a copy of the UNIX license agreements entered into between AT&T and its licensees?

A. Yes. We actually -- it was kind of an elaborate procedure, but we actually -- are you familiar with the term called glue backing? And we'd put the pages together, and we'd -- we'd seal them. We'd send out copies that they could keep. One was for informational purposes only. Two copies, two originals, for execution. They kept one, and we kept one.

Q. So when licensees came to you and others at AT&T with questions about the meaning of provisions in the UNIX license agreements, they in many instances had already signed such agreements and had copies of them at the time they asked for clarification about the meaning of provisions; correct?

MR. MARRIOTT: Objection as to form.

THE WITNESS: I would say it was about 50/50, and -- and I'm kind of approximating, but we had -- we had as many questions before the agreements were executed as we did after.

Page 226

The only -- the only time we had questions after was when the use evolved from what they intended when they first signed the agreements, and how they always don't know what those intentions are, but I could see the -- something came up different that they wanted to do with the software product than what they intended when they first licensed it.

BY MR. GANT:

Q. Based on your experience, many licensees looked at the plain language of the UNIX license agreements and still weren't sure what it meant?

MR. MARRIOTT: Objection as to form. Lacks foundation, calls for speculation.

Q. Is that correct?

A. Again, I know they came in and asked for clarification.

Q. And they had the agreements in front of them; correct?

MR. MARRIOTT: Objection as to form.

THE WITNESS: They did.

MR. MARRIOTT: Lacks foundation, calls for speculation.

THE WITNESS: In most cases they had -- in fact, in all cases they either had a copy of a

Page 227

specimen agreement or their executed agreement when they asked those questions.

BY MR. GANT:

Q. And not withstanding that, the licensees sometimes still didn't know what the language meant; correct?

MR. MARRIOTT: Objection as to form. Lacks foundation, calls for speculation.

THE WITNESS: Again, I don't know whether they did not understand, but they wanted clarification to be specific to whatever their situation was that they were trying to deal with.

A lot of cases -- I think they understood, but they wanted to make sure that it was clarified, as to -- is that what we meant with regard --

BY MR. GANT:

Q. And they requested that clarification, because there was some uncertainty about what it meant; correct?

MR. MARRIOTT: Objection as to form.

THE WITNESS: I can't answer about what they thought.

BY MR. GANT:

Q. Well, I thought you've testified on many occasions today about what licensees thought or

Page 228

intended?

MR. MARRIOTT: Objection to the form.

THE WITNESS: No. I said -- in other words, whatever they intended, they conveyed to us, but what they thought about that -- I mean all I know is what they told us, and that's what we acted on.

BY MR. GANT:

Q. I see. Can you look at the next -- I think it's the next sentence in paragraph 14, which is six lines down. It says, "As we understood section 2.01, any source code developed by or for a licensee and included in a modification or a derivative work would not constitute," open quotes, "resulting materials," closed quotes, "to be treated as part of the original software product, except for any material proprietary UNIX System V source code provided by AT&T or USL and included therein."

Mr. Wilson, could you show me the exact language in section 2.01 which supports your statement that I just read from your declaration? And, in particular, I'd ask you to show me where in -- I'm looking at your April -- Exhibit 76, tab five, which is the agreement between AT&T and

Sequent.
Can you show me where in that agreement the express language sets forth what you have stated in paragraph 14 of your April 2004 declaration?
A. Yeah. I believe that's what 2.01 states.
Q. Can you show me exactly where in 2.01 you believe that is stated?
A. Well, I think that's what -- that's the meaning of that clause. Now, we had a further clarification that we issued later that amended 2.01.
Q. That was an agreement signed by Sequent?
A. It was in the -- the IBM agreement.
Q. Okay. You understand that at the time of these agreements IBM and Sequent were separate companies; correct?
A. Yes, but every -- any -- any modification or change that we made to the agreements were available to all of our licensees. And this particular clarification, this agreement with Sequent, was signed in '85 or April.
And we further clarified that in both the April and August issues of $ echo, as well as in side letters to other licensees. And so our policy

was that any -- any language change provided to one licensees was available to all licensees. And a lot of times it was verbal conversation or --
MR. GANT: I move to strike the answer as nonresponsive.
BY MR. GANT:
Q. Mr. Wilson, my -- I didn't ask about policies. I'm asking about written agreements. My question is: Was there any written amendment to the software agreement between AT&T and Sequent, which is attached as tab five to your April 2004 declaration?
MR. MARRIOTT: Objection as to form. Is that -- I object to your arguing with the witness. I -- I object to the -- to the suggestion that that is a restatement of your previous question.
MR. GANT: I didn't say -- I said it was my question.
MR. MARRIOTT: To the extent that that was, you know, conveyed, I object to it, and I otherwise object to it in form.
If you can answer his question, go ahead.
THE WITNESS: I thought I answered it.
MR. GANT: All right. Let's -- let's have it read back, and, if you could, try and respond.

(PREVIOUS QUESTION THEN READ)
THE WITNESS: Read my answer. I answered that question. I want you to read my answer.
MR. GANT: Sure.
(DISCUSSION OFF THE RECORD)
MR. MARRIOTT: We're on the record.
Just read the -- I think what he wants is -- and I don't want to speak for you. Just read his last question. I don't think you answered his last question.
And if you have a different answer to his last question -- or if you have an answer to his last question, please, provide it, if you understand it. I object to it for the reasons I've stated.
(DISCUSSION OFF THE RECORD)
(REQUESTED PORTION OF THE RECORD READ)
THE WITNESS: And my answer?
BY MR. GANT:
Q. Can you answer that question, please?
A. I think I previously answered that question.
Q. Then I didn't get it. So can you, please, answer it again?
A. Okay. The --

MR. MARRIOTT: And I have the same objection, in case that's not clear.
Go ahead.
THE WITNESS: Several licensees raised the issue of clarification with 2.01, and we, in turn, issued a clarification of that language. The clarification did not change what was meant by 2.01.
It was just a clarification of what we -- we intended by that language. That was made available to licensees, anyone who asked for it, but it was more widely made available by us going proactively to them through our $ echo newsletter or telephone conversations or at seminars or what have you.
BY MR. GANT:
Q. Let me try it this way, Mr. Wilson. Did anyone from Sequent sign a written amendment to the software agreement attached as tab five to your April 2004 declaration? Yes or no?
A. No.
Q. Is it your testimony that a party can be bound to an amendment to a software agreement without having given written authorization to the amendment?

Page 233

MR. MARRIOTT: Let me just get my objection in to that. I object to that question on the grounds that it lacks foundation. It calls for speculation. It seeks a legal conclusion from a lay witness.

You may answer the question, if you can.

THE WITNESS: No.

BY MR. GANT:

Q. No, that's not your testimony, or, no, a document cannot be amended without having that amendment signed in writing?

MR. MARRIOTT: Same objection.

Q. I just want to make the record clear.

A. Yeah, but I think you're asking me two questions. I mean I was answering your question.

Q. All right. Tell me the question you thought you were answering, that you answered, "No," to? Let's do it that way.

THE WITNESS: Read it back?

MR. MARRIOTT: Same objection.

(PREVIOUS QUESTION THEN READ)

MR. MARRIOTT: I want to add an objection, which is that I think there's a -- I think that question is confusing, and -- and to the degree that it's meant to reflect prior testimony, and I'm

Page 234

not suggesting it is, I think it misrepresents it, but go ahead.

MR. GANT: I think the answer is clear, but I want to make sure.

MR. MARRIOTT: You may.

BY MR. GANT:

Q. So, therefore, based on your --

MR. MARRIOTT: Well, I'm sorry. Did -- did we have a --

MR. GANT: There's an answer. He said, "No."

MR. MARRIOTT: Could -- I apologize, but I need -- I want back the question and the answer then, because I didn't hear your answer.

(REQUESTED PORTION OF THE RECORD READ)

BY MR. GANT:

Q. I take it, based on that answer, Mr. Wilson, that Sequent was not bound by or a party to any side letter entered into by IBM and AT&T?

MR. MARRIOTT: Objection as to form.

Q. Am I correct about that?

MR. MARRIOTT: Lacks foundation, calls for speculation. Whatever agreements there are speaks for themselves.

Page 235

THE WITNESS: Sequent had agreements directly with AT&T. That's what they were -- that's what they were bound by. Not by any other licensee.

BY MR. GANT:

Q. And any agreements between Sequent and AT&T were governed only by the express agreements assented to in writing by those parties; correct?

MR. MARRIOTT: Objection as to form. Lacks foundation, calls for speculation, seeks a legal conclusion from a lay witness.

THE WITNESS: That's correct.

BY MR. GANT:

Q. Going back to section -- strike that.

Going back to tab five. I had asked you earlier to show me exactly where in that document was set forth the express language supporting your claim in the last sentence of paragraph 14 of your April 2004 declaration.

All right. You mentioned 2.01 generally when I asked you that earlier. My question is: Can you direct me to any specific language within section 2.01, tab five, that supports your statement in the last sentence of paragraph 14?

A. The last three lines. "Prepare derivative

Page 236

works based on such software product" -- it's the last three lines of paragraph 2.01, under the section, "Grant of Rights."

And it says, "and to prepare derivative works based on such software product, provided the resulting materials are treated hereunder as part of the original software product."

Q. The last sentence of paragraph 14 of your April 2004 declaration uses the phrase, "except for any material proprietary UNIX System V source code provided by AT&T or USL."

Where in section 2.01 does that language appear?

MR. MARRIOTT: Where does the exact language of the paragraph 14 appear in 2.01; is that the question?

MR. GANT: Your objection, to the extent that is one, is noted.

BY MR. GANT:

Q. Can you answer the question, please?

A. Yeah. That was provided in a clarification that's not shown here in Exhibit 5 (SIC), but that was an issue raised by -- by our licensees, which we clarified in subsequent publications, documentations and what have you.