1      Q. It's your testimony that the meaning of
2 2.01 set forth in the last sentence of paragraph 14
3 of your April 2004 declaration is not apparent from
4 the express language of 2.01 --
5      MR. MARRIOTT: Objection as to form.
6 Mischaracterizes --
7      Q. -- as reflected in tab five; is that
8 correct?
9      MR. MARRIOTT: Let me just -- let me just
10 get my objection in.
11      Objection as to form. It misstates the
12 testimony, calls for speculation and lacks
13 foundation.
14      You may answer.
15      THE WITNESS: I'm sorry. You'll have to
16 read the question back again.
17      (DISCUSSION OFF THE RECORD)
18      (PREVIOUS QUESTION THEN READ)
19      MR. MARRIOTT: My objections are there.
20      THE WITNESS: Okay. It was -- it was
21 apparent to -- I say, us, or me, AT&T, when we put
22 the language together, that it did not mean -- it
23 meant exactly what was in the last line of
24 paragraph 16 on page seven.
25      MR. MARRIOTT: 14?

1 BY MR. GANT:
2      Q. You've testified --
3      MR. MARRIOTT: 14? Are we just clear?
4 It's -- he's referring to 14.
5      THE WITNESS: Seven and 16. Yeah.
6 BY MR. GANT:
7      Q. All right. You testified that there was
8 some clarification needed?
9      A. Yes.
10      Q. Why was that?
11      A. It was at the request of our licensees as
12 to what our intent was with that particular
13 language.
14      Q. There was uncertainty about the meaning of
15 2.01?
16      A. Yes.
17      Q. And at least in the minds of the
18 licensees, they couldn't tell exactly what it meant
19 by looking at the language of 2.01; correct?
20      MR. MARRIOTT: Objection as to form.
21      THE WITNESS: I'm not sure about what --
22 again, what they thought, but the reason -- the
23 stated reasons that they came in, the software
24 agreements preceded any commercial offerings that
25 they were trying to put together.

1      And so once that started to happen, and
2 they started developing things of value, they
3 wanted clarification that we did not exercise
4 ownership in that which they were creating. And we
5 clarified we did not, only to the extent it
6 included any part of the software products that we
7 gave them.
8      But there was a lot of conversation about
9 that, and it -- the conversation evolved from the
10 time the source -- source code agreement was
11 executed in some cases until such time as they were
12 getting ready to actually go to market or produce
13 something that they wanted distributed. Normally
14 the questions did not come up when someone was
15 using it for internal purposes.
16 BY MR. GANT:
17      Q. Going back to my question a few moments
18 ago. Can you point me to the express language in
19 section 2.01 of the document at tab five that
20 supports your statement about the meaning of 2.01
21 that appears in the last sentence of paragraph 14
22 of your April 2004 declaration?
23      MR. MARRIOTT: And to that question I
24 object on the grounds that I think it's harassing,
25 because he's answered the question three times.

1 You may not like the answer, but he's answered it.
2 And it's been asked and answered, in light of my
3 additional objection, and also it calls for
4 speculation and lacks foundation.
5      If you have a different answer,
6 Mr. Olson -- Mr. Olson. Mr. Wilson, please, offer
7 it.
8      THE WITNESS: It's as I've previously
9 stated.
10 BY MR. GANT:
11      Q. You can't answer my question?
12      A. I already answered your question.
13      Q. Do you think that you've pointed me to
14 express language in section 2.01 that supports the
15 statement -- statement in paragraph 14? Yes or no?
16      MR. MARRIOTT: Same objections as before.
17      THE WITNESS: It's kind of hard for me to
18 separate the two, because I know what was intended
19 by the overall agreement, and I know what we meant
20 by the language. And so when I look at 2.01,
21 it's -- it's stating what I said in 16 of the
22 declaration.
23      MR. MARRIOTT: Just to clarify, is it --
24 is it 16 or 14?
25      MR. GANT: It's 14. It's 14.

(Pages 237 to 240)

Dockets.Justia.com

1      MR. MARRIOTT: Because I think it's 14,
2  and I wanted to just make sure we're --
3      THE WITNESS: It's 14.
4      MR. MARRIOTT: Paragraph 14. I think
5  that's what you're referring to.
6      THE WITNESS: Yeah. It's the bottom of
7  paragraph 14, which goes into page seven. Right?
8      MR. GANT: That's right.
9      THE WITNESS: Uh-huh.
10      So when I look at 2.01, that's what it's
11  saying to me. And I -- I further clarified that
12  with our licensees.
13  BY MR. GANT:
14      Q.  You can't point me to the words? For
15  instance --
16      A.  No. I can't point you to those exact
17  words. That's correct.
18      Q.  So the phrase, for instance, material
19  proprietary UNIX System V source code does not
20  appear in section 2.01, does it?
21      MR. MARRIOTT: Objection as to form.
22      THE WITNESS: No. We don't see that.
23  BY MR. GANT:
24      Q.  In fact, the term source code doesn't
25  appear there, does it?

1      MR. MARRIOTT: Same objection.
2      THE WITNESS: I think it appears, because
3  of -- again, when I look at these agreements, I
4  have to look at them in their whole, and software
5  product is source code or other materials. In
6  other words, it could mean different things for
7  different products.
8      When I see software product, I go back to
9  the schedule of software or software products
10  defined under the software agreement. And so
11  software products, meaning source code, object code
12  any documentation that was associated with that
13  particular product.
14  BY MR. GANT:
15      Q.  It was your understanding when you were at
16  AT&T that the UNIX license agreements needed to be
17  looked at as a whole to understand their meaning?
18      A.  Yes.
19      Q.  Could you take a look at paragraph 15 of
20  your April 2004 declaration? Do you have that in
21  front of you?
22      A.  Yes, I do.
23      Q.  Do you see in the first line you used the
24  term, "control"?
25      A.  (WITNESS NODS HEAD UP AND DOWN)

1      Q.  Can you direct me -- let's use, again, the
2  document at tab five as an example. Can you point
3  me to anyplace in the software agreement between
4  AT&T and Sequent where the term control is used?
5      MR. MARRIOTT: Do you want him to read the
6  entire Sequent agreement or --
7      MR. GANT: He's reviewed it several times.
8  I presume he has some familiarity. He can tell me
9  if he needs to review it.
10      MR. MARRIOTT: Take whatever time you need
11  to read the document, if you're going to be asked
12  about a document and the contents -- its entire
13  contents.
14      MR. GANT: You're welcome to help him, if
15  you think you know.
16      MR. MARRIOTT: I'm not here to help. I'm
17  just here to protect the witness.
18      MR. GANT: Well, I invite you to show him
19  anyplace where the word appears, for the sake of
20  efficiency. The witness can take whatever time he
21  needs.
22      THE WITNESS: What I was doing was
23  referring back to 7.06(b), where we provided for
24  the -- again, the exact specific words, but, in
25  other words, we -- we required our licensees to

1  adhere to the -- the entire agreement.
2      And we realized that in the use of the
3  software products there may be occasions where they
4  exchange software products with other licensees.
5  And our requirement with that -- that status of
6  that license with the person they wish to exchange
7  or talk to about the code had to be equal scope,
8  and that's -- that's in paragraph 7.06(b).
9  BY MR. GANT:
10      Q.  Is it your testimony that when you use the
11  term, "control," in paragraph 15, that you were --
12  you had in mind section 7.06(b) of the standard
13  software agreement?
14      MR. MARRIOTT: Objection as to form.
15      THE WITNESS: Yeah. That's why it's
16  there. I mean, in other words, the -- we wanted to
17  clarify to our licensees that the -- that they --
18  in other words, where there was a UNIX system users
19  group and there was education licenses. There were
20  commercial licenses and administrative licenses.
21      And part of this growth was that these
22  licensees could talk to each other. And to the
23  degree that it included specific reference to our
24  software products, we required them to verify it,
25  which was the control we -- we extended with regard

Case 1:06-mc-00046-PTS     Document 6-7     Filed 04/21/2006     Page 2 of 32

Page 245

1  to protection of the software products. I mean
2  that was --
3  BY MR. GANT:
4      Q.  You acknowledge that you're using a term,
5  "control," in your declaration. Notwithstanding
6  that the term doesn't appear anywhere in the
7  standard software agreement; correct?
8      MR. MARRIOTT: Objection as to form.
9      THE WITNESS: That's correct, and I'm
10 trying to explain why it used that word, but, yes,
11 I agree with that.
12 BY MR. GANT:
13     Q.  Later in that same paragraph, the last
14 sentence says, "Although, the UNIX System V source
15 code contained in a modification or derivative work
16 continued to be owned by AT&T or USL, the code
17 developed by or for the licensee remained the
18 property of the licensee, and could, therefore, be
19 used, exported, disclosed or transferred freely by
20 the licensee."
21     What did you mean by the phrase, "remains
22 the property of the licensee"?
23     A.  The -- anything that was distributed under
24 the scheduled software product source code, object
25 code, materials, documentation remained the

Page 246

1  property of -- of AT&T. And the code that they
2  developed, independent of that, belonged to the
3  licensee.
4      So we -- the definition was the software
5  product and all of it associated with that
6  particular product was AT&T's. Anything that they
7  developed belonged to the licensee.
8      MR. GANT: Could you read it back, please.
9      (PREVIOUS ANSWER THEN READ)
10 BY MR. GANT:
11     Q.  In your previous answer what did you mean
12 by developed independent -- or independently?
13     A.  I probably misspoke. Not independently.
14 In other words, if it didn't contain any of our
15 code, it was their -- their work, and not ours. We
16 didn't exercise any assertion of rights to the code
17 that was not contained in the software product.
18     Q.  What do you mean, "contained in the
19 software product"?
20     A.  In that each software product had a
21 schedule defining it, a distribution that came with
22 that particular software product, and it included
23 source code, object code, documentation.
24     Q.  Well, how does one tell --
25     MR. MARRIOTT: Are you done? I'm sorry.

Page 247

1  Are you done?
2      THE WITNESS: (NODS HEAD UP AND DOWN)
3      MR. MARRIOTT: I couldn't tell if you were
4  done. I apologize. Go ahead.
5  BY MR. GANT:
6      Q.  How does one tell whether or not AT&T code
7  was contained in a product of a licensee?
8      MR. MARRIOTT: Objection as to form.
9      THE WITNESS: There's actually several
10 ways. I mean you could -- you look at the
11 functionality exhibited by a product and whether it
12 is similar to the one that you have in your
13 software product.
14     And it can go from there, all of the way
15 to the extent where you actually go in and do an
16 audit of the code itself. And on occasion we did
17 that, where we actually had a third party, not a
18 member of AT&T or the licensee --
19     They had an independent, third party
20 computer software expert to go in and look at their
21 code to make sure that it was -- did not contain
22 the software product or if it did contain the
23 software product.
24 BY MR. GANT:
25     Q.  Who is that third party?

Page 248

1      A.  Usually it was someone associated with the
2  academic community that was not commercially
3  involved with any type of a development.
4      Q.  And why were experts hired to assess
5  whether or not improper code was contained in a
6  licensee's product?
7      MR. MARRIOTT: Objection as to form.
8  Misstates the testimony, lacks foundation.
9      THE WITNESS: It was part and parcel -- or
10 part and parcel was protecting the software
11 products under the trade secret agreement. And in
12 some cases we had to actually go in and verify.
13 Some cases we just asked.
14     But we had to have due diligence in making
15 sure that the code deemed for this software product
16 was, in fact, that, or if it was something else, it
17 was, in fact, that.
18     Q.  Did you find instances where there were
19 problems with what a licensee had done?
20     MR. MARRIOTT: Objection as to form.
21 Vague.
22     THE WITNESS: Yes, we did, because -- and
23 I don't -- I can't recall a specific instance
24 without going back and digging through some stuff,
25 but I know there were cases where we actually used

(Pages 245 to 248)

1  independent third parties to look at code.
2      There were cases when we -- we -- I, in
3  person, made calls to licensees based on the
4  functionality being exhibited in their product, to
5  see if they were properly licensed.
6      Because in some cases, you could look at
7  the product, and say, okay. This -- this seems to
8  be based on one of our software products, without
9  actually looking at all of the source code. And in
10  many cases that was enough to cause a declaration.
11  Oh, yes. And the licensee would --
12      Q.  Was there a particular provision of the
13  licensing agreement that set out how this audit
14  would be conducted or that it would be conducted?
15      MR. MARRIOTT: Can I just hear the
16  question back.
17      (PREVIOUS QUESTION THEN READ)
18      MR. GANT: I think it was process, not
19  product, but --
20      THE WITNESS: The exact process that we
21  would use for any given situation was usually
22  negotiated with the licensee to make sure we were
23  respective of their concerns, as well as ours. And
24  so we tried to do it in a way that was not
25  objectional to the licensee, if they didn't have

1  anything to hide.
2  BY MR. GANT:
3      Q.  Was that part of a standard software
4  agreement between AT&T and licensees?
5      A.  It talks about the breach, and how --
6  giving the licensee a period of time to rectify
7  anything that we consider a breach of agreement,
8  and so that is defined in the software agreement.
9      Q.  Was it important to AT&T that it have the
10  right to conduct these audits?
11      MR. MARRIOTT: Objection as to form.
12      THE WITNESS: Yes, it was.
13  BY MR. GANT:
14      Q.  Why is that?
15      A.  Well, in order to assure the compliance
16  with the agreement itself.
17      Q.  Including ensuring that the code hadn't
18  inappropriately been used by licensees?
19      MR. MARRIOTT: Same objection.
20      THE WITNESS: I was just reading back. I
21  think it's paragraph six, but -- yes.
22      MR. MARRIOTT: When you get a moment,
23  maybe --
24      MR. GANT: That's okay. Why don't we --
25      MR. MARRIOTT: We've been going for

1  awhile.
2      MR. GANT: Yeah. Why don't we take a
3  break, and I'll try and streamline during the
4  break.
5      MR. MARRIOTT: Okay.
6      THE VIDEOGRAPHER: One moment, please.
7      MR. MARRIOTT: I'm told -- I just asked
8  Jason to check. I'm told that you've used two and
9  a half hours. So -- just for your information.
10      MR. GANT: Okay.
11      THE VIDEOGRAPHER: One moment, please.
12      Going off the record. The time is
13  3:59 p.m.
14      (RECESS TAKEN AT 3:59 P.M. TO 4:16 P.M.)
15      THE VIDEOGRAPHER: Back on the record.
16  The time is 4:16 p.m.
17      Please, continue.
18  BY MR. GANT:
19      Q.  All right. Mr. Wilson, could you direct
20  your attention to paragraph 16 on page seven of
21  your April 2004 declaration.
22      (MR. DAVIS THEN EXITED THE ROOM)
23      THE WITNESS: Yes.
24  BY MR. GANT:
25      Q.  Do you see where you say, "I do not

1  believe that our licensees would have been
2  willing," and the sentence continues on?
3      A.  Yes.
4      MR. MARRIOTT: I apologize. Where are we?
5      MR. GANT: Paragraph 16, page seven, the
6  first sentence.
7  BY MR. GANT:
8      Q.  Am I correct that you qualified it in that
9  way, because you don't know for a fact whether or
10  not licensees would have reacted in a way you've
11  described?
12      MR. MARRIOTT: Objection as to form.
13  Vague, ambiguous.
14      Q.  Let me ask it this way: Do you have
15  personal knowledge about how licensees -- strike
16  that.
17      Do you have personal knowledge about
18  whether licensees would have been willing to enter
19  into a software agreement if they understood
20  section 2.01 to grant AT&T or USL the right to own
21  or control source code developed by the licensee?
22  Do you have personal knowledge about that?
23      A.  Yes, I do.
24      Q.  You can speak on behalf of the licensees?
25      A.  I can speak on behalf of -- on behalf --

1 no. I cannot speak on behalf of the licensees, but
2 I can speak to what they related to me with regard
3 to the rights --
4 Q. Any -- any --
5 MR. MARRIOTT: Just -- I'm not sure he's
6 done with his answer. So I just want to make sure.
7 (MR. DAVIS THEN RE-ENTERED THE ROOM)
8 MR. MARRIOTT: If I'm wrong in
9 interrupting you, I apologize.
10 Are you done with your answer?
11 MR. GANT: I think you were, but you're
12 doing it in good faith. That's fine.
13 THE WITNESS: All I was saying is that
14 they -- I could talk about what they -- they
15 presented to us.
16 BY MR. GANT:
17 Q. But you would just be retransmitting what
18 they told you?
19 A. That's correct.
20 Q. You -- you don't have any personal
21 knowledge about what was actually in their heads?,
22 A. In their minds?
23 Q. Right.
24 A. No.
25 Q. Can you go down to the fifth line of

1 paragraph 16. It talks about -- actually, let's go
2 one line up and read the whole sentence. "I
3 understood that many of our licensees invested
4 substantial amounts of time, effort and creativity
5 in developing products based on UNIX System V."
6 When you use the phrase, "based on," there, what
7 are you describing?
8 A. I'm trying -- I'm talking about using the
9 software products. In this case specifically
10 UNIX VI and V, and there were others.
11 Q. It was your understanding that many
12 licensees used the software products of AT&T, as
13 defined in AT&T's license agreements, and in turn
14 created new products?
15 A. That's correct.
16 Q. The next line down. You use the word,
17 "appropriate." What do you mean by that? Is that
18 a word you would have used, or was that something
19 that the lawyers put there, and you just let go by?
20 MR. MARRIOTT: Objection as to form.
21 THE WITNESS: It was part of the
22 vernacular that we used. It goes by -- I don't
23 know where I first picked up the word, but we used
24 it.
25 BY MR. GANT:

1 Q. At AT&T?
2 A. At AT&T. Yeah.
3 Q. In connection with what?
4 A. Our licensees and trying to convey what we
5 mean.
6 Q. Did it come up, because AT&T didn't want
7 licensees to appropriate AT&T's intellectual
8 property?
9 MR. MARRIOTT: Objection as to form. I
10 think it's vague, but go ahead.
11 THE WITNESS: No. I don't -- I just think
12 that was the -- that's the proper word for what
13 we're -- we're describing here. I don't think that
14 was --
15 BY MR. GANT:
16 Q. Well, that wasn't my question. Would you
17 like it --
18 A. You said that AT&T -- go ahead.
19 MR. GANT: Could you read my question
20 back, please.
21 (PREVIOUS QUESTION THEN READ)
22 THE WITNESS: No.
23 BY MR. GANT:
24 Q. Was AT&T giving away its intellectual
25 property while you worked there?

1 MR. MARRIOTT: Objection as to form.
2 THE WITNESS: They were not.
3 BY MR. GANT:
4 Q. They were trying to protect it; correct?
5 A. That's correct.
6 Q. And they were trying to figure out how to
7 market it and make a profit; correct?
8 MR. MARRIOTT: Objection as to the form.
9 Vague.
10 THE WITNESS: At some point it evolved
11 into that. It was not the original intent.
12 BY MR. GANT:
13 Q. When did that evolution occur?
14 A. With the UNIX -- I guess with the UNIX
15 System V. Some of the predecessor stuff was always
16 licensed two or three versions older than the
17 current development within the laboratories.
18 And the reason we were able to do this was
19 that we were licensing software that a lot of folks
20 felt it was not leading edge, but that changed over
21 time as it became more and more popular.
22 Q. The objective of AT&T's UNIX licensing
23 program was to try and generate revenue and profit
24 for AT&T; correct?
25 A. Yes. That's what I'm saying. Yes. It

(Pages 253 to 256)

Page 257

1  evolved into that. Initially it was not.
2      Q.  Did anyone ask you or suggest to you that
3  you leave AT&T in 1990 or '91, around the time when
4  you left?
5      A.  I don't believe so.
6      Q.  Were you asked to leave?
7      A.  No.
8      Q.  Did you voluntarily resign?
9      A.  Yes, I did.
10     Q.  Did you get any kind of departure document
11  that -- or did you submit a resignation letter?
12     A.  I actually retired. So there was not a
13  letter submitted. No.
14     Q.  You're no longer authorized to speak on
15  behalf of AT&T, I assume; is that correct?
16     A.  That's correct. Only to the extent, I
17  guess, we're doing here. Yes.
18     Q.  Well, are you -- have you been authorized
19  by AT&T to speak on its behalf during your
20  deposition today?
21     A.  No, I have not.
22     Q.  Have you been authorized by AT&T to speak
23  on its behalf in -- in your declarations submitted
24  in this case?
25     A.  No.

Page 258

1          MR. MARRIOTT: Objection as to form.
2      Q.  Have you requested authorization or
3  permission from AT&T to speak on behalf of AT&T in
4  connection with this case?
5          MR. MARRIOTT: Objection as to form.
6          THE WITNESS: I have not.
7  BY MR. GANT:
8      Q.  I'm sorry. Again?
9      A.  I have not.
10     Q.  Did you understand when you were employed
11  by AT&T that you were an agent of the company?
12         MR. MARRIOTT: Objection as to form.
13         THE WITNESS: Yes, I did.
14  BY MR. GANT:
15     Q.  And did you understand at the time that as
16  an agent of AT&T it was your responsibility to try
17  and protect and advance the best interests of AT&T?
18     A.  Yes, I did.
19     Q.  And did you always endeavor to do so?
20     A.  Yes, I did.
21     Q.  And was one of the ways that you did that
22  to try and obtain the most advantageous license
23  agreements for AT&T as possible?
24         MR. MARRIOTT: Objection as to form.
25         THE WITNESS: I'm not clear about what you

Page 259

1  mean, "most advantageous." I was -- I wanted to
2  make sure that the -- our intent was to make sure
3  that the software or intellectual property was
4  protected.
5  BY MR. GANT:
6      Q.  And was one of your objectives when
7  entering into license agreements with licensees to
8  make sure that the terms of the agreements were as
9  favorable as you could obtain through the
10  negotiation process?
11         MR. MARRIOTT: Objection as to form.
12         THE WITNESS: The way I'm understanding
13  your question, I don't believe so, because the --
14  the terms and conditions were pretty much set in a
15  boilerplate, and any negotiation was usually just
16  clarification to determine which software product
17  someone needed. So there wasn't a specific
18  negotiation with individual licensees that would be
19  any different than the boilerplate standard
20  agreement.
21  BY MR. GANT:
22     Q.  Well, let's focus on the development of
23  this so-called boilerplate for a moment. Am I
24  correct that when that was developed by AT&T it was
25  done with the purpose of trying to get a license

Page 260

1  agreement that was favorable to AT&T; correct?
2          MR. MARRIOTT: Objection as to form.
3  Vague, ambiguous.
4          THE WITNESS: Yeah. When it was
5  developed, it was -- the primary purpose was -- if
6  you mean by favorable, that it protected the
7  underlying intellectual property.
8          So what I said earlier. It evolved out of
9  the intellectual property licensing organization,
10  and the agreements were designed to protect the
11  underlying intellectual property, which was covered
12  by that agreement.
13  BY MR. GANT:
14     Q.  Protect AT&T's intellectual property?
15     A.  Yes. That's correct.
16     Q.  And at the same time try and generate
17  revenue for AT&T; correct?
18         MR. MARRIOTT: Objection as to form.
19         THE WITNESS: Yes.
20  BY MR. GANT:
21     Q.  Would AT&T have entered into license
22  agreements related to its UNIX intellectual
23  property that put it in a worse position than it
24  would have been in if there had been no agreement
25  at all?

65 (Pages 257 to 260)

Case 1:06-mc-00046-PTS    Document 6-7    Filed 04/21/2006    Page 6 of 32

Page 261

1  MR. MARRIOTT: Objection as to form.
2  Lacks foundation, calls for speculation.
3  THE WITNESS: Would you read it again?
4  (PREVIOUS QUESTION THEN READ)
5  THE WITNESS: No.
6  BY MR. GANT:
7  Q.  Can you look at paragraph 18 of your April
8  2004 declaration? Can you just quickly read it to
9  yourself and let me know when you're finished,
10  please?
11  A.  (THE WITNESS COMPLIED)
12  Okay.
13  Q.  In the first sentence you refer to
14  antitrust issues. What do you mean by that?
15  A.  I think we mentioned this morning, We
16  talked about the environment under which AT&T and
17  its operating companies operated under, defined in
18  a 1956 consent decree, and then the breakup of the
19  Bell system in 1983.
20  In both of those areas our main focus was
21  communications. It was a communications business,
22  and not any other business. And so the -- we first
23  started by licensing software, and we were going to
24  Jersey and talking about it.
25  And this was not a business that at the

Page 262

1  time it originated that we wanted to be in, and it
2  was clear it was not something we had been in
3  traditionally.
4  This was software that was developed for
5  our -- at Bell Laboratories for our switching
6  systems and what have you. And so the original
7  licensing program for this brand -- this product
8  was a -- I guess a byproduct of other development.
9  Q.  I take it that neither at the time, nor
10  now, you had any specialized knowledge about
11  antitrust issues; is that right?
12  A.  No.
13  Q.  It's not correct?
14  A.  No. I did not have any specialized
15  knowledge about --
16  Q.  Did you rely on AT&T's lawyers to explain
17  antitrust principles to you and how they might have
18  related to UNIX work?
19  A.  I would have. I don't remember asking
20  those specific questions, but I would have -- had
21  it come up, I would have definitely gone to the
22  AT&T attorneys for that.
23  Q.  Well, in paragraph 18 of your April 2004
24  declaration you describe a relationship between
25  antitrust considerations and your understanding of

Page 263

1  AT&T's UNIX licenses; isn't that right?
2  A.  That's correct.
3  Q.  And what was the basis for your
4  understanding of that relationship?
5  A.  Again, as I stated earlier, it was the
6  environment that we were operating in at the time,
7  and the events that preceded the 1983 break up, and
8  then the issues that were -- from a general term
9  and from reading management books about what
10  happened in 1956.
11  Q.  Did you rely on AT&T's lawyers to explain
12  that relationship to you?
13  A.  No, I did not.
14  Q.  So this is just your layperson's
15  understanding?
16  A.  Yes.
17  Q.  Can you take a look at paragraph 19. The
18  second line from the bottom. You use the phrase,
19  "fully owns." What do you mean by that? Is there
20  a distinction in your mind between ownership and
21  full ownership?
22  A.  Just being emphatic that they -- they own,
23  I guess. So the adverb is maybe not -- maybe it's
24  not needed, but they --
25  Q.  So there's no substantive significance to

Page 264

1  the term, "fully," there; is that right?
2  A.  As opposed to own?
3  Q.  Right.
4  A.  Right.
5  Q.  Now, the first sentence after the block
6  quote there says, "I understand this language" --
7  MR. MARRIOTT: "Stood." Sorry.
8  MR. GANT: "Understood." Thank you.
9  BY MR. GANT:
10  Q.  "I understood this language to mean that
11  IBM, not AT&T or USL, would have the right to
12  control modifications and derivative works prepared
13  by or for IBM. IBM," parenthetically, "like all
14  licensees under the agreements," close parens,
15  "fully owns any modifications and/or derivative
16  works based on UNIX System V prepared by or for
17  IBM, and can freely use, copy, distribute or
18  disclose such modifications and derivative works,
19  provided that IBM does not copy, distribute or
20  disclose any material portions of the original UNIX
21  System V source code provided by AT&T or USL."
22  Can you point me to the exact language in
23  section 2.01 that supports the statement that I
24  just read from paragraph 19 of your April 2004
25  declaration?

**Page 265**

1    A.  I cannot.
2    Q.  Because it doesn't say it expressly;
3  correct?
4        MR. MARRIOTT:  Objection as to the form.
5        THE WITNESS:  That's correct.
6  BY MR. GANT:
7    Q.  The second sentence after the block quote,
8  where it says, "IBM, like all licensees under the
9  agreements."  When you said, "all," were you
10  referring to even those licensees who only had
11  signed and executed the standard software agreement
12  with the original language from 2.01?
13    A.  No.  I was talking about all licensees.
14    Q.  Okay.
15    A.  With and without the clarification.
16    Q.  Well, how is it that a provision that
17  appeared in the side letter could affect the rights
18  and obligations of a party who didn't enter into a
19  side letter agreement?
20        MR. MARRIOTT:  Objection as to form.  It's
21  argumentative, calls for speculation.  Actually, I
22  withdraw the speculation.  It's argumentative, and
23  it's seeks a legal conclusion.
24        You can answer.
25        THE WITNESS:  Yeah.  The side letters were

**Page 266**

1  not agreements.  They were a clarification, and
2  they were executed -- signed by -- by AT&T or my --
3  by myself or -- or someone in my organization.  In
4  other words, it's not an agreement between the two.
5  BY MR. GANT:
6    Q.  Is it your testimony that side letters
7  weren't signed and executed by both parties?
8        MR. MARRIOTT:  Objection as to form.
9        THE WITNESS:  It depends on the content of
10  the particular side letter.  And, I guess, I was
11  talking about clarifications, where we were just
12  restating some of the language that was already in
13  there.  We provided those to the licensee.
14  BY MR. GANT:
15    Q.  So there is more than one kind of side
16  letter?  There are some that just clarify, and
17  there are some that change; is that your testimony?
18    A.  Yes.
19    Q.  And do some of those require signatures
20  and others not --
21        MR. MARRIOTT:  Objection as to --
22    Q.  -- from licensees?
23        MR. MARRIOTT:  Objection as to form.
24  Lacks foundation.
25        THE WITNESS:  Yes.

**Page 267**

1  BY MR. GANT:
2    Q.  Okay.  And which ones require signatures
3  from licensees?
4    A.  The one like in attachment four --
5  Exhibit 4 (SIC).
6    Q.  Uh-huh.
7    A.  It was a clarification that we provided to
8  IBM, which required them to execute that they
9  understood the content.  And that was mainly from
10  the standpoint of what we had negotiated with them.
11  So it was executed by both parties.
12    Q.  Let me make sure I'm understanding you.
13  The document at tab four to your April 2004
14  declaration is a side letter entered into by IBM
15  and AT&T; correct?
16    A.  That's correct.
17    Q.  And they are the only parties to that side
18  letter agreement; correct?
19    A.  That's correct.
20    Q.  And the rights and obligations set out in
21  that document relate to IBM and AT&T only; correct?
22        MR. MARRIOTT:  Objection as to form.
23  Lacks foundation, calls for speculation, seeks a
24  legal conclusion from a lay witness.
25        THE WITNESS:  Specific to this letter,

**Page 268**

1  yes.  It only pertains to IBM and AT&T.
2  BY MR. GANT:
3    Q.  Now, what is your understanding, if any,
4  about why both IBM and AT&T signed the side letter
5  at tab four to your April 2004 declaration?
6    A.  It shows that both parties agreed to the
7  content of that side letter.
8    Q.  And it was important that both parties
9  acknowledged that?
10        MR. MARRIOTT:  Objection as to form.
11        THE WITNESS:  Yes.
12  BY MR. GANT:
13    Q.  Now, let's look at the block quote in
14  paragraph 19.  This is a quotation from the IBM
15  side letter at tab four; correct?
16    A.  Yes.
17    Q.  Now, in the second sentence after the
18  block quote in paragraph 19 you say that, "IBM,
19  like all licensees under the agreement, fully own
20  any modifications of" -- "and derivative works
21  based on UNIX System V prepared by or for IBM."
22  Is that statement based on the language of
23  section 2.01, as set out in the IBM side letter?
24    A.  Yes, it is.
25    Q.  Okay.  Please explain to the jury how it

67 (Pages 265 to 268)

Case 1:06-mc-00046-PTS    Document 6-7    Filed 04/21/2006    Page 8 of 32

1  is that language that appears in the side letter
2  entered into only by AT&T and IBM may have altered
3  the rights or obligations of licensees who weren't
4  a party to that side letter?
5      MR. MARRIOTT: Objection as to form.
6  Lacks foundation, argumentative, seeks a legal
7  conclusion from a lay witness.
8      If you can answer, Mr. Wilson, please, do.
9      THE WITNESS: You said speak to the jury?
10 BY MR. GANT:
11     Q.  Well, you're on videotape. You understand
12 that? And do you understand that your testimony
13 may be played before the jury in this case?
14     A.  Okay.
15     Q.  So that --
16     A.  I understand.
17     Q.  That's what I was referring to.
18     A.  Okay.
19     Q.  Just --
20     MR. MARRIOTT: Explain to the jury. So
21 answer the question, if you can.
22     MR. GANT: That's -- that's how this case
23 should be resolved.
24     And I'd like Mr. Wilson to explain his
25 position to the jury. So why don't we read back my

1  question, so that he can do his best. Thank you.
2      (PREVIOUS QUESTION THEN READ)
3      MR. MARRIOTT: Objection as to the form.
4  My objections -- I don't know if that's a new
5  question or what, but objection as to form.
6      Go ahead, if you can answer.
7      THE WITNESS: It was our policy that
8  any -- any clarification, modification or change to
9  the basic software agreement provided for one
10 licensee was available to all licensees. And once
11 we did that, we made sure that our -- our staff
12 conveyed that.
13     In some cases in the way of a side letter
14 to licensees that requested it or through a --
15 through publication or through telephone calls, but
16 our practice was that any negotiated change,
17 clarification to the software agreements was
18 available to all of our licensees, as well as
19 the -- the pricing structure and so -- what have
20 you. It was always available to everyone.
21 BY MR. GANT:
22     Q.  Okay. You referred to this as a policy or
23 a practice; is that correct?
24     A.  Yes.
25     Q.  You acknowledge that -- strike that.

1      AT&T through some policy or practice
2  couldn't unilaterally alter the rights or
3  obligations of a licensee, could it?
4      MR. MARRIOTT: Objection as to form.
5  Lacks foundation, calls for speculation, seeks a
6  legal conclusion from a lay witness.
7      If you can answer that question,
8  Mr. Wilson, go ahead.
9      THE WITNESS: Yeah. They could not -- no.
10 We could not unilaterally alter the rights granted
11 to our licensees. No. We could not do that.
12 BY MR. GANT:
13     Q.  And you said that -- strike that.
14     Is it your testimony, Mr. Wilson, that the
15 side letter entered into by AT&T and IBM, which is
16 attached as tab four to your April 2004
17 declaration, had no effect on the rights or
18 obligations of either AT&T or IBM?
19     MR. MARRIOTT: Can I hear the question
20 again, please.
21     (PREVIOUS QUESTION THEN READ)
22     MR. MARRIOTT: Objection as to form.
23 Lacks foundation, calls for speculation, seeks a
24 legal conclusion from -- from a lay witness.
25     THE WITNESS: It did alter it.

1  BY MR. GANT:
2      Q.  It did alter the rights and obligations
3  of --
4      A.  In some -- yeah. In some cases. In other
5  words, it -- because I -- I go back and look at the
6  letter. Some of the clarifications in there and
7  the extension to other countries was not in the
8  original document. And going by your earlier
9  question, in other words, it -- it had to be
10 acknowledged by both parties.
11     Q.  The AT&T/IBM side letter was more than a
12 clarification; correct?
13     MR. MARRIOTT: Objection as to form.
14     THE WITNESS: Yes.
15 BY MR. GANT:
16     Q.  Can you look at paragraph 20 of your
17 declaration? This is the April 2004 declaration.
18     A.  (THE WITNESS COMPLIED)
19     Q.  The fourth line down. You use the phrase,
20 "material portions." Do you see that at the end of
21 the fourth line?
22     A.  On page nine?
23     Q.  Yeah. That's right. Paragraph 20, four
24 lines down.
25     A.  I don't see that word.

1    Q.   Do you see paragraph 20?
2    A.   Yes.
3    Q.   It begins, "Clarifications of the kind"?
4    A.   The fourth --
5    Q.   Down four lines. The line begins, "and
6    derivative works." Do you see that?
7    A.   Yes.
8    Q.   At the end of it you use the phrase,
9    "material portions"?
10   A.   Uh-huh.
11   Q.   Referring to original UNIX System V code?
12   A.   Yes.
13   Q.   What did you mean by the phrase,
14   "material" -- by the term, "material"?
15   A.   We were not trying to -- some of our
16   licensees developed application software, and some
17   cases used the algorithms in the code that
18   supported those algorithms or an input or what they
19   called BIOS in the software for the -- for the
20   operating system to be compiled into their -- into
21   an application.
22        In those cases a lot of time it was an
23   insignificant amount of code that was actually
24   included in the application, as opposed to a major
25   turnover of some -- some -- some part of the

1    operating system.
2    Q.   I see. So --
3    A.   The material -- the difference between the
4    material was something substantive, as opposed to a
5    few lines of code to be brought into the
6    compilation.
7    Q.   "Something substantive." What do you mean
8    by that?
9    A.   Something more than, as I said earlier,
10   maybe a sort algorithm or a BIOS process that was
11   used in the operating system that was more
12   efficient to include with their application, as
13   opposed to adding it to the application. They
14   would pull it in on -- on execution from the
15   operating system.
16   Q.   Can you show me where in the side letter
17   there is express language setting forth the idea
18   that you have set forth in paragraph 20 of your
19   April 2004 declaration about an exception for a,
20   quote, unquote, "material portion of original UNIX
21   System V code"?
22   A.   No.
23   Q.   It's not in the side letter?
24   A.   No.
25        MR. MARRIOTT: Objection as to form.

1    Q.   Can you turn to page ten of your April
2    2004 declaration, please?
3    A.   (THE WITNESS COMPLIED)
4    Q.   Before I direct you to anything specific
5    in the declaration, I have a general question for
6    you. Do you know whether AIX is a derivative work
7    or a modification of UNIX?
8    A.   I personally don't know. I do not.
9    Q.   Under the software agreements between AT&T
10   and IBM, was IBM supposed to make any kind of
11   payments to AT&T for the rights to use, in the
12   respect set out in their agreements, UNIX code and
13   software products as defined in the -- strike that.
14        Under the software agreements -- well,
15   strike that. Let's try again. Take three.
16        Under the UNIX license agreements entered
17   into by AT&T and IBM, was IBM obligated to make
18   some payments to AT&T?
19   A.   Yes, they were.
20   Q.   Were you involved in any way in tracking
21   or ensuring that payment was made by IBM?
22   A.   Yes.
23   Q.   And what was your involvement in that?
24   A.   The -- they had to identify the use that
25   they were using the source code for, and our

1    license provided for what was known as designate
2    CPUs, and they had to reveal those to us. And then
3    the subsequent payments were all -- were detailed
4    in the agreement, where they were to be sent.
5    Q.   How often did IBM make royalty payments to
6    AT&T?
7    A.   They were required quarterly.
8    Q.   Did IBM send any kind of statements or
9    paperwork to AT&T in connection with the payment of
10   royalties to AT&T?
11   A.   I was not involved in that aspect of it.
12   I'm -- I know they did, but I was not -- I don't
13   have any direct knowledge.
14   Q.   Did you ever have occasion to see any kind
15   of documents relating to those payments?
16   A.   Only with regard to the -- the payment
17   structure and the designates CPU for the source
18   code. As far as the sublicensing fees and things,
19   those came into our accounting area.
20        MR. GANT: Let's mark as Exhibit 79 -- why
21   don't I let you do it.
22        (DEPOSITION EXHIBIT NUMBER 79 WAS MARKED
23   FOR IDENTIFICATION)
24   BY MR. GANT:
25   Q.   Do you have Exhibit 79 in front of you,

1  sir?
2      A.  Yes.
3      Q.  Do you see that your name appears on here
4  under an attention line.  "Attention:  Mr. O.L.
5  Wilson, division manager"?
6      A.  Yes.
7      Q.  Is that you?
8      A.  Yes.
9      Q.  Would — do you recognize Exhibit 79 as an
10  example of a document you would have received from
11  IBM related to the payment of royalties by IBM to
12  AT&T?
13      A.  These documents went straight to
14  accounting.  I don't remember — I don't recall
15  actually seeing these particular reports.
16      Q.  Even though they were directed to your
17  attention —
18      A.  That's correct.
19      Q.  — they went straight to accounting?
20      A.  Uh-huh.
21      Q.  Is the address of AT&T on here correct?
22  Was that the address of AT&T at the time?
23      A.  I'm sure it is.  It would be in the —
24      MR. MARRIOTT:  The only address I have is
25  a P.O. box.  Is that what you're referring to?

1      MR. GANT:  Yes.
2      THE WITNESS:  Yes.  That's correct.
3  BY MR. GANT:
4      Q.  That is the correct address for AT&T in
5  approximately June of 1987?
6      A.  Yes.  And I'll point out it shows that
7  the — the payments went through our Charlotte
8  office, where we were residing in Greensboro.
9      Q.  So the information on this document is
10  consistent with your understanding of how payments
11  were made by IBM to AT&T at the time?
12      A.  Yes, it is.
13      Q.  Do you have any reason to doubt that this
14  is an authentic version of a document that AT&T
15  received from IBM?
16      MR. MARRIOTT:  Objection as to form.
17      THE WITNESS:  No.  I don't have any reason
18  to doubt it.
19  BY MR. GANT:
20      Q.  And when I ask that, I'm excluding the
21  information at the very top and the very bottom.
22  The top is obviously a fax banner, where we got
23  this document transmitted.  I assume you were
24  ignoring that when you answered my question?
25      A.  That's correct.

1      Q.  And I assume you were also ignoring the
2  numbers, the — labeled confidential on the bottom
3  and the number on the right, which relates to the
4  document production in this case?
5      A.  Yeah.
6      Q.  The very bottom right?
7      A.  Yes.
8      Q.  And, of course, the exhibit number as
9  well; right?
10      A.  Yes, yes, yes.
11      Q.  You referred earlier to the way in which
12  AT&T used the term made available to licensees
13  changes in the software agreements, even though
14  licensees may have not actually entered into
15  agreements.  Do you remember describing that
16  earlier?
17      MR. MARRIOTT:  Objection as to form.
18      THE WITNESS:  Could you be more
19  specific — yeah, I remember —
20  BY MR. GANT:
21      Q.  Well, I just want to sort of orient you
22  to —
23      A.  Okay.
24      Q.  — the discussion.
25      A.  I'm oriented.  Yes.

1      Q.  Okay.  Great.  Thanks.
2      Was it AT&T — strike that.
3      Is it your testimony that AT&T kept making
4  modifications to its UNIX license agreement
5  language more favorable for licensees and was
6  extending to them the benefits of those changes?
7      MR. MARRIOTT:  Objection as to form.
8  Lacks foundation, vague.
9      THE WITNESS:  We were making sure that the
10  agreements reflected the needs of our licensees,
11  and, actually, they would be more favorable for
12  what they were trying to do with the — with the
13  software products.
14      And bear in mind we had different
15  licensees for the same software product, who had
16  different pursuits with the software products.  So,
17  I guess, everything from educational,
18  administrative, to all of the way to the government
19  and — and commercial licensees.  So they were
20  different.  So some of the terms were favorable to
21  others.  Others they didn't really matter.
22  BY MR. GANT:
23      Q.  And its your testimony that AT&T was
24  willing to allow some licensees to in effect
25  benefit from agreements they didn't enter into

70 (Pages 277 to 280)

1  without getting paid additional money by those
2  licensees?
3  MR. MARRIOTT: Objection as to form.
4  THE WITNESS: You mean by -- without the
5  licensees paying AT&T additional dollars?
6  BY MR. GANT:
7  Q.  Correct.
8  A.  That's correct.
9  Q.  Was that a -- strike that.
10  If that's what occurred, was that
11  something that was in the best interest of AT&T, to
12  grant more rights to licensees without getting
13  anything in return?
14  MR. MARRIOTT: Objection as to form.
15  Calls for speculation, lacks foundation.
16  THE WITNESS: I'm trying to think of the
17  things that we -- we modified and changed. What
18  was a basis for the revenue was designated CPUs and
19  object code versions, which were sublicensed.
20  And, to the best of my recollection, any
21  of the changes we did might have extended the area
22  in which they could use the software or sublicense
23  the software, and with that was associated revenue
24  stream.
25  (DISCUSSION OFF THE RECORD)

1  BY MR. GANT:
2  Q.  Let's look at paragraph 25 of your
3  declaration, and we're in the April 2004
4  declaration now. Paragraph 25. There's a sentence
5  after the block quote, where it says, "As we
6  communicated at our seminars in our" -- "and in our
7  newsletters to UNIX System V licensees, this new
8  language was intended only to clarify the language
9  in the original section 2.01, not change its
10  meaning." Do you see that?
11  A.  Yes, I do.
12  Q.  Did any AT&T lawyer ever tell you that
13  this alteration in the language of section 2.01 did
14  not change its meaning?
15  MR. MARRIOTT: Just object here,
16  Mr. Wilson. My -- my advice to you, Mr. Wilson, is
17  not to reveal the advice you've been provided, if
18  any, by -- by your counsel, me, and I -- I -- my
19  recommendation would be to you to respect the
20  privilege of AT&T, but you'll make what choice you
21  wish to make.
22  MR. GANT: I respectfully suggest that
23  horse left the barn a long, long time ago.
24  MR. MARRIOTT: Well, that's an interesting
25  little catchy phrase, but I disagree with it,

1  and -- and, unlike you, who has several times asked
2  questions that seem to suggest no particular care
3  for the privilege, I do wish to respect it.
4  So Mr. Wilson can make what decision he
5  wants, and perhaps he has nothing to say, but
6  that's -- that will be for him to decide.
7  But my advice to you would be to respect
8  the privilege and not to disclose legal advice that
9  you may have received from the lawyers of AT&T, but
10  you make the decision you wish to make, Mr. Wilson.
11  BY MR. GANT:
12  Q.  Mr. Wilson, you understand that this case
13  involves litigation between my client and IBM? You
14  understand that?
15  A.  Yes.
16  Q.  And do you understand that the matters at
17  issue in the litigation are serious and important
18  to all parties?
19  A.  Yes.
20  Q.  And, I take it, that it has not escaped
21  you that IBM is attempting to use your testimony in
22  a way that is disadvantageous to my client, the
23  plaintiff in this case; do you understand that?
24  MR. MARRIOTT: Objection. That's --
25  that's argumentative. That's -- that's

1  inappropriate, and I think you ought not to be
2  asking questions like that.
3  If you can answer the question, go ahead,
4  Mr. Wilson.
5  THE WITNESS: I never thought about it
6  that way. I mean I think the -- either side could
7  have contacted me, and they just -- in my opinion,
8  they just contacted me first. So I mean I would do
9  the same thing. I don't think my testimony would
10  change depending on who was deposing me.
11  BY MR. GANT:
12  Q.  Well, let me ask you then right now. Are
13  you willing to meet with attorneys for SCO and to
14  sit down with us and talk about your experiences at
15  AT&T and the issues in this case, so that we can
16  get a better understanding of -- of what went on at
17  AT&T and what your involvement was? Are you wiling
18  to do that, sir?
19  MR. MARRIOTT: As I advised you, Counsel,
20  at the beginning of the deposition, Mr. Wilson has
21  indicated to me that he wishes to be available for
22  a seven hour -- let me finish, Counsel. He wishes
23  to be available for seven hours of deposition.
24  My advice to Mr. Counsel -- to Mr. Wilson
25  is that that -- that be the time he makes himself

Case 1:06-mc-00046-PTS    Document 6-7    Filed 04/21/2006    Page 12 of 32

1  available, and I would -- you know, I think that's
2  not an appropriate question.
3      And I think, Mr. Wilson, that's a question
4  you should answer after we've had an opportunity to
5  consult and I let you know what your options are
6  with respect to that.
7      MR. GANT: Are you instructing him not to
8  answer the question?
9      MR. MARRIOTT: Did I say that, Counsel?
10     MR. GANT: Well, you just advised him not
11  to answer until you've had a chance to confer. So
12  I'm trying to understand what you mean.
13     MR. MARRIOTT: Well, if you'd let me
14  finish -- do you want -- why don't we take a
15  minute, and we'll confer.
16     MR. DAVIS: Actually, the tape is almost
17  over.
18     MR. MARRIOTT: Well, that makes it better.
19     MR. DAVIS: So you can take more than a
20  minute.
21     MR. MARRIOTT: So we'll take a minute and
22  confer.
23     MR. GANT: Okay.
24     THE VIDEOGRAPHER: One moment.
25     This marks the ends of tape number three

1  in the deposition of Otis Wilson. Going off the
2  record. The time is 4:57 p.m.
3      (RECESS TAKEN AT 4:57 P.M. TO 5:09 P.M.)
4      THE VIDEOGRAPHER: Back on the record.
5  Here marks the beginning of tape number four in the
6  deposition of Otis Wilson. The time is 5:09 p.m.
7      Please, continue.
8      MR. MARRIOTT: Okay. We went off the
9  record to consider two -- two issues. The first is
10  the question of questioning concerning
11  communications that Mr. Wilson may have had with
12  lawyers at AT&T.
13     I've instructed Mr. Wilson that he should
14  not disclose the content of his communications
15  with -- with the lawyers at AT&T, insofar as it
16  would disclose their legal advice or -- or his
17  request for legal advice of them.
18     However, I think he can -- he may be able
19  to answer your question, as it was framed, without
20  raising issues. So you can try that, and we'll
21  see, and maybe that just goes away.
22     The second -- the second concern is you
23  had asked whether or not Mr. Wilson will -- now
24  having spent the day being deposed by you and by --
25  by me, spend additional time talking to you.

1      Mr. Wilson has indicated to me, and you're
2  free to ask him yourself, that he will take the
3  request under advisement and get back to you
4  through me, his counsel. So, with that said, I
5  think you can proceed with your questions, and
6  we'll see if we can --
7      MR. GANT: Okay.
8      MR. MARRIOTT: -- move this along.
9  BY MR. GANT:
10     Q.  Let's just -- with respect to the second
11  issue that you just mentioned, Mr. Wilson, has
12  Mr. Marriott accurately reflected your position
13  about whether or not you're willing to meet with
14  counsel for SCO?
15     A.  Yes.
16     Q.  And you'll take it under advisement and
17  let Mr. Marriott know, who will in turn let us
18  know; correct?
19     A.  That's correct.
20     Q.  Okay. Let me try again, because I think
21  my question does not implicate privilege issues.
22  This is a question I asked you several minutes ago.
23  Did any AT&T lawyer ever tell you that the
24  alteration in the language of section 2.01, which
25  is set forth in paragraph 25 of your April 2004

1  declaration, did not change the meaning of section
2  2.01 as it was previously written?
3      A.  They did not.
4      Q.  Could you turn to page --
5      MR. GANT: Actually, there was one other
6  question pending, which was -- and I'd like it read
7  back, since it was long, and I'll never remember
8  it. And it was the question --
9      MR. MARRIOTT: Well, we have to find it.
10     THE WITNESS: Well, can you -- do you have
11  a word search on there? It's the question about
12  whether he understood -- Mr. Wilson understood
13  that -- Counsel, I'm not trying to make it --
14     MR. MARRIOTT: Why don't you just ask it
15  again? We'll just --
16     MR. GANT: All right. I'll try.
17     MR. MARRIOTT: I don't even remember what
18  you're talking about.
19     MR. GANT: This was the question about
20  Mr. Wilson's understanding with respect to the use
21  of his declaration.
22     MR. MARRIOTT: Oh, you mean -- why don't
23  you just ask your question again. Hopefully in a
24  little fairer light.
25     THE WITNESS: I remember the question.

BY MR. GANT:
2    Q.   You do?
3    A.   Yeah.  And I answered -- yes.  You were
4  saying -- well, go ahead.
5    Q.   Okay.
6    A.   It's not my job.
7        MR. MARRIOTT:  I'm not sure what -- that
8  we understand what the question is, and I think
9  you -- I don't know if he answered or not.  So
10  just -- either go back and read it --
11    Q.   Try and keep my question in mind, because
12  I expected a lengthy objection from Mr. Marriott.
13  My question is whether it was your understanding
14  before today's deposition that IBM intended to use
15  the declarations that you executed in this case in
16  a way that would disadvantage my client, The SCO
17  Group, in this litigation?
18        MR. MARRIOTT:  Objection as to form.
19        THE WITNESS:  No.  That was not my
20  understanding.
21  BY MR. GANT:
22    Q.   You had no understanding with respect to
23  that?
24    A.   With respect to the entire sentence, I --
25  no, I did not.  I -- I thought that the -- it could

1  be used as a document, you know, my declaration.
2    Q.   You didn't know whether it would --
3    A.   Advantage or disadvantage, no.
4    Q.   Correct.
5        What is AIX?
6    A.   I really don't know.  I mean it's the
7  brand name used for a version of the operating
8  system of one of our licensees.  In this case, IBM.
9  They call their operating version of the operating
10  system AIX.
11    Q.   What is Dynix?
12    A.   The same thing.  It's a brand name for one
13  of the licensees in this case.
14    Q.   What's your understanding of the
15  relationship between -- strike that.
16        What is your understanding, if any, of the
17  relationship between AIX and UNIX?
18    A.   Most of our -- well, between --
19  specifically between AIX and UNIX -- in other
20  words, that was the -- the IBM flavor of the
21  operating system, known as UNIX System V.
22    Q.   When you were with AT&T working on UNIX
23  licensing issues, isn't it the case that IBM would
24  sometimes communicate to you and describe AIX as a
25  derivative of UNIX?

1    A.   I don't recall the exact conversation, but
2  that -- or when it actually occurred, but that's
3  the way it was communicated.  Yes.
4    Q.   That's the way it was communicated to you?
5    A.   Uh-huh.  AIX was their version of UNIX
6  System V.
7    Q.   And that AIX was a derivative of UNIX or
8  derived from UNIX?
9        MR. MARRIOTT:  Objection as to form.
10        THE WITNESS:  Yes.  It was based on that.
11  BY MR. GANT:
12    Q.   Can you take a look at page 12 of our
13  April 2004 declaration?  Do you have that, sir?
14    A.   Yes.  It's page 12.  Uh-huh.
15    Q.   Yes.
16        These paragraphs both refer to claims by
17  the plaintiff in this case; isn't that correct?
18    A.   Yes.
19    Q.   And Mr. Marriott asked you earlier today
20  about your understanding of the plaintiff's claims,
21  and I believe you testified that you've never read
22  the Complaint in this case; is that right?
23    A.   That's correct.
24    Q.   And that -- other than what you were told
25  by your counsel, who are also counsel for IBM, you

1  have no independent knowledge about any of the
2  specific allegations in this case; is that right?
3    A.   That's correct.  There was an article in
4  the newspaper one time, I believe, but that was
5  very general.
6    Q.   So any views that you may have expressed
7  in the declaration that might be construed as an
8  opinion about the merits of this case are only
9  based on what you were told by counsel for IBM;
10  correct?
11        MR. MARRIOTT:  Objection as to form.
12  Lacks foundation, misleading.
13        THE WITNESS:  That's correct.
14  BY MR. GANT:
15    Q.   Could you look at paragraph 29 on the
16  third line.  Do you see the term, "exporting,"
17  there?
18    A.   Uh-huh.
19    Q.   Is it your understanding that the standard
20  software agreement placed some limitations on
21  exporting UNIX code?
22    A.   Yes.  It -- it was silent, but, yes, it
23  did.  Correction.  Yes.  Yes, it did.
24    Q.   And were there limitations on IBM's
25  ability -- strike that.

Page 293

1    Were there restrictions on IBM's right to
2  export UNIX code to other countries?
3    MR. MARRIOTT: Objection as to form.
4    THE WITNESS: Yeah. That's what I thought
5  you meant earlier, when you said exporting it out
6  of the country. Yes. The original licenses were
7  for use in the United States.
8  BY MR. GANT:
9    Q. Did the side letter grant IBM the right to
10 distribute certain material outside of the
11 United States?
12   A. Yes, it did.
13   Q. What document did that -- the side letter?
14   A. The side letter.
15   Q. Could you take a look at the side letter,
16 which is behind tab four. Do you see that?
17   A. Yes, I do.
18   Q. And am I correct that paragraph A.1 on the
19 first page of the side letter specified the
20 countries to which IBM could distribute certain
21 UNIX material; is that right?
22   MR. MARRIOTT: Objection as to the form. "
23 As of that day, I assume, you're --
24   MR. GANT: That's correct.
25   THE WITNESS: That's correct.

Page 294

1  BY MR. GANT:
2    Q. Now, is India listed as one of those
3  countries?
4    A. I didn't realize what a poor copy -- I see
5  you're trying to read it too. I don't believe so.
6    Q. If there was no further amendment to the
7  agreement between AT&T and IBM about distribution
8  of UNIX material outside of the United States,
9  would IBM have been permitted to distribute or
10 disseminate any UNIX material to India?
11   MR. MARRIOTT: Objection as to the form.
12 Lacks foundation, calls for speculation, seeks a
13 legal conclusion from a lay witness.
14   THE WITNESS: I would think not. In other
15 words, they were specifically restricted to the
16 United States, and then this amendment extended to
17 these countries specified here.
18 BY MR. GANT:
19   Q. That's what the side letter sets out?
20   MR. MARRIOTT: Objection as to the form.
21   THE WITNESS: Yes.
22 BY MR. GANT:
23   Q. And unless the side letter was amended or
24 superseded, that limitation would have remained in
25 place?

Page 295

1    MR. MARRIOTT: Same objections.
2    THE WITNESS: Yes.
3  BY MR. GANT:
4    Q. Could you take a look at Exhibit 75, which
5  is your December 2003 declaration. In particular,
6  page six, paragraph 14. Do you see that?
7    A. Yes.
8    Q. Mr. Marriott asked you some questions
9  about this paragraph earlier today. He directed
10 you specifically to the term method and concepts on
11 the third line. Do you see that?
12   A. Yes.
13   Q. Do you know why your counsel, who are also
14 counsel for IBM, deleted this passage from your
15 declaration when they generated a new version of
16 it, which you ultimately executed in April of 2004?
17   MR. MARRIOTT: Objection to the form. I
18 think that's been asked and answered several times.
19   THE WITNESS: I do not. No, no.
20 BY MR. GANT:
21   Q. You don't know why?
22   A. Huh-huh.
23   Q. Can you turn to the next page, page seven,
24 paragraph 16. On the third line there, do you see
25 there's a reference to source code?

Page 296

1    A. Yes.
2    Q. And do you recall when you testified
3  earlier today in response to a question from
4  Mr. Marriott that that actually should have said,
5  "software product," instead of, "software code;" do
6  you recall that?
7    MR. MARRIOTT: Objection as to -- can I
8  have the question back.
9    You may have misspoke.
10   MR. GANT: I don't think so.
11   MR. MARRIOTT: Maybe not. We'll find out.
12 Would you read the question back, please.
13   (PREVIOUS QUESTION THEN READ)
14   MR. GANT: I did misspeak. Let me
15 change -- let me try the question again.
16 BY MR. GANT:
17   Q. Do you recall testifying earlier today
18 that the third line of paragraph 16 of your
19 December 2003 declaration should have said,
20 "software product," rather than, "source code"?
21   A. Yes.
22   Q. Now, before you gave that testimony you
23 had previously testified that there was nothing you
24 would want to change in your declaration. Do you
25 recall that testimony?

Page 297

1    A.  Yes, I do.
2    Q.  I take it that your testimony was truthful
3  when you said that there was nothing else that you
4  would want to change in your declarations. Am I
5  right about that?
6    A.  That's correct.
7    Q.  And you simply missed something, and there
8  was an error in your declaration that you didn't
9  catch; is that correct?
10    A.  That's correct.
11    Q.  And it's the case, isn't it, that there
12  may be other errors in your declarations that you
13  simply have not yet caught; am I correct about
14  that?
15    MR. MARRIOTT:  Objection as to form. It
16  calls for speculation.
17    THE WITNESS:  Yes, there could be.
18  BY MR. GANT:
19    Q.  Could you turn to page 13 of your December
20  declaration, please?
21    MR. MARRIOTT:  I'm sorry. Could you say
22  that again? Page --
23    MR. GANT:  13, of the December
24  declaration.
25  BY MR. GANT:

Page 298

1    Q.  There are references to paragraphs on this
2  page -- actually, let me back up.
3    The end of paragraph 32 -- rather, it's
4  the end of paragraph 31, which appears at the top
5  of page 13, refers in a few places to trade
6  secrets. Do you see that?
7    A.  Yes.
8    Q.  What do you mean by the term trade secret?
9    A.  We treated this intellectual property, in
10  which is source code, and the associated materials
11  with the software product, as a trade secret under
12  the covenants of the trade secret law. That's how
13  we used to protect it, as opposed to copyright or
14  patent.
15    Q.  While you were at AT&T, AT&T considered
16  its UNIX material as covered by trade secret law?
17    MR. MARRIOTT:  Objection as to form.
18    THE WITNESS:  Yes. Most of it was covered
19  by trade secret. There were some things that were
20  copyrighted. There were some subsets of the code
21  that was actually covered by a patent. And I can't
22  recall exactly what, but I do know we had some
23  specific sub -- subsets of the code that was
24  covered by a patent.
25  BY MR. GANT:

Page 299

1    Q.  It would be the attorneys at AT&T who
2  would be in the best position to provide
3  information about what UNIX intellectual property
4  was covered by trade secrets, which of it was
5  covered by copyright and which of it was covered by
6  patent?
7    MR. MARRIOTT:  Objection as to form.
8  Lacks foundation, calls for speculation.
9    THE WITNESS:  It would probably be someone
10  in our licensing group or in our development group,
11  who had the patent issue, who copyrighted the
12  order.
13    MR. MARRIOTT:  Let me just interject,
14  Counsel. I recognize you have a different view,
15  but by my count your -- your allotted time is -- is
16  up. So in order to, I think, at least respect the
17  spirit of our agreement, which is that we would
18  each undertake to take three and a half, I'd just
19  urge you to try to -- try to wrap it up, so that I
20  can ask whatever follow-up I have.
21    MR. GANT:  I will do my best, and I
22  certainly won't take the position that you can't
23  complete your redirect. So I'll do my best to move
24  along.
25  BY MR. GANT:

Page 300

1    Q.  Your declaration refers to GPL, General
2  Public License; isn't that right?
3    A.  Yes.
4    Q.  How familiar are you with the GPL?
5    A.  Not very. I just read through it. It's
6  not very lengthy.
7    Q.  Had you ever read through the GPL before
8  you met with counsel for IBM?
9    A.  No.
10    Q.  So they brought it to your attention?
11    A.  That specific agreement, they did. Yes.
12    Q.  And did counsel for IBM ask you to cover
13  in your declaration statements about the GPL?
14    A.  No.
15    Q.  How did it end up in your December
16  declaration?
17    A.  We talked about that during the meeting
18  that we had here in Greensboro, the second -- the
19  first -- after the telephone call, the first
20  meeting in Greensboro.
21    Q.  What -- what was discussed with respect to
22  the GPL?
23    A.  As an example of a public, free software
24  type agreement.
25    Q.  In paragraph 32 you refer to possible ways

75 (Pages 297 to 300)

Case 1:06-mc-00046-PTS   Document 6-7   Filed 04/21/2006   Page 16 of 32

**Page 301**

1  in which UNIX source code may have become available
2  to the general public; is that right?
3    A.  Yes.
4    Q.  Am I correct that the six items listed in
5  paragraph 32 are examples of possible ways; is that
6  correct?
7    A.  That's correct.
8    Q.  And you don't have personal knowledge
9  about whether any of these things have actually
10  occurred, do you?
11    MR. MARRIOTT:  Objection as to form.
12    THE WITNESS:  No.  I don't have any
13  personal knowledge of any of this.  Let me -- I
14  don't have any direct knowledge, except what I
15  talked about earlier, with AT&T Capital -- AT&T
16  Corp., what they did.
17  BY MR. GANT:
18    Q.  No personal knowledge?
19    A.  Huh-huh.
20    MR. MARRIOTT:  Except with the exception
21  that he provided.
22    MR. GANT:  Well, he earlier testified that
23  that wasn't personal knowledge either.  If you have
24  an objection, just state it.
25    MR. MARRIOTT:  Well, if you'd just quit

**Page 302**

1  misrepresenting the testimony, I wouldn't have any
2  objections.  So --
3    MR. GANT:  Well, if you believe that
4  misrepresented the testimony --
5    MR. MARRIOTT:  I do.
6    MR. GANT:  -- then just say,
7  mischaracterizes the testimony.
8    MR. MARRIOTT:  I appreciate your legal
9  advice, as to how I should defend him, but I object
10  to the testimony, because I think it misstates --
11  the question, rather, because I think it misstates
12  the testimony.
13    MR. GANT:  Now, let's read it back, and
14  then the witness can answer the question, please.
15    (PREVIOUS QUESTION THEN READ)
16    (DISCUSSION OFF THE RECORD)
17    (REQUESTED PORTION OF THE RECORD READ)
18    MR. GANT:  And then the next question and
19  answer.
20    (REQUESTED PORTION OF THE RECORD READ)
21  BY MR. GANT:
22    Q.  I believe the question was answered.  So
23  I'm just going to move on, unless Mr. Wilson feels
24  like he needs to elaborate.
25    A.  I do not.

**Page 303**

1    Q.  If you could, look at paragraph three --
2  excuse me 33, on page 13, of your December
3  declaration.  That carries over to page 14.  If you
4  could, flip the page for me.  Three lines down, you
5  say, "Based solely on the breadth of its
6  distribution I believe it is unlikely that there
7  are many, if any, parts of the UNIX System V source
8  code that could be said still to be confidential."
9    Do you see that, sir?
10    A.  Yes, I do.
11    Q.  When you say, "unlikely," are you
12  qualifying it in that way, because you don't
13  actually have personal knowledge about whether or
14  not many, if any, parts of the UNIX System V source
15  code could still be said to be confidential?
16    A.  That's correct.
17    Q.  Could you turn to page 15, paragraph 37?
18    A.  (THE WITNESS COMPLIED)
19    Q.  Do you remember Mr. Marriott asked you
20  some questions about the Lions' book?
21    A.  Yes, I do.
22    Q.  And I believe you testified, and, please,
23  correct me if I'm misspeaking, but you said that
24  you were familiar with the book; do you recall
25  that?

**Page 304**

1    A.  Yes, I do.
2    Q.  Can you explain what you mean, you're
3  familiar with the book?
4    A.  The -- the book was actually provided
5  early on out of my organization in Greensboro to
6  our licensees under an agreement.
7    Q.  Have you ever read the book in its
8  entirety?
9    A.  I have not.
10    Q.  When's the last time you looked at the
11  book in any way?
12    A.  At least 20 years ago.
13    Q.  Do you have any personal knowledge about
14  whether or not the Lions' book has been published
15  with the permission of Santa Cruz, as stated in
16  your declaration?
17    A.  No.
18    Q.  Will you turn to the next page of your
19  declaration?
20    A.  (THE WITNESS COMPLIED)
21    Q.  Paragraph 38.  The first sentence says, "I
22  understand that plaintiff has made certain UNIX
23  source code available for download without charge
24  on the internet."  Do you see that, sir?
25    A.  Yes, I do.

5 (Pages 301 to 304)

1    Q.  Do you have any personal knowledge to
2  support that statement?
3    A.  I do not.
4    Q.  And am I correct that with respect to the
5  information set out in paragraph 39, you also lack
6  personal knowledge about those issues?
7    A.  You are correct.
8    Q.  Could you look at page 17 of your December
9  2003 declaration. That's paragraph 41. Five lines
10  from the bottom, you refer to confidentiality
11  restrictions. Do you see that, sir?
12    A.  Yes.
13    Q.  Could you look up at the top of that
14  paragraph, in particular at the first sentence,
15  where you -- you've quoted language about available
16  without restriction to the general public. When
17  you referred to confidentiality restrictions, were
18  you referring back up to the language from the
19  software agreements about availability without
20  restriction to the general public?
21    MR. MARRIOTT: Objection as to form.
22    THE WITNESS: I'm -- I didn't understand
23  the question. You said was I referring to the
24  software agreements?
25  BY MR. GANT:

1    Q.  Well, let me -- that was a bad question.
2  Let me withdraw it and start again.
3    Paragraph 41 says, "In addition, a
4  software product or any part of the software
5  product is available without" -- "without
6  restrictions to the general public if released,
7  distributed or made available pursuant to an open
8  source license, like the GPL." Do you see that?
9    A.  Uh-huh, yes.
10    Q.  Can you show me exactly where in a
11  software agreement this language appears?
12    A.  I cannot.
13    Q.  It's not in the software agreements?
14    A.  No.
15    Q.  Later in the paragraph you say, "However,
16  the intent was that if source code were distributed
17  without confidentiality restrictions, it would no
18  longer be subject to any confidentiality
19  restrictions." Do you see that, sir?
20    A.  Yes, I do.
21    Q.  Can you point me to any express language
22  in the software agreements which states this?
23    MR. MARRIOTT: Those exact words?
24    MR. GANT: (NODS HEAD UP AND DOWN)
25    THE WITNESS: No.

1    MR. MARRIOTT: Don't get up and dance,
2  Otis, just because you hear the piano.
3    THE WITNESS: Oh.
4  BY MR. GANT:
5    Q.  Could you turn to --
6    THE WITNESS: It's time for tea.
7    Q.  -- paragraph 42. If you could, just take
8  a quick look at that paragraph, and then I have a
9  question for you, please?
10    A.  Okay.
11    Q.  The last clause of the last sentence of
12  that paragraph says, "I believe that it is unlikely
13  that a significant amount of UNIX System V code
14  remains subject to confidentiality restrictions."
15  That statement is not based on personal knowledge,
16  is it?
17    A.  That's correct.
18    Q.  You're simply speculating there on that
19  issue; is that right?
20    THE COURT REPORTER: Your answer?
21    THE WITNESS: I didn't answer yet.
22    Yes.
23  BY MR. GANT:
24    Q.  Could you look at paragraph 43 on that
25  same page. The first sentence reads, "As discussed

1  above, when I headed the UNIX licensing group at
2  AT&T and USL, our stated policy was to treat all of
3  our licensees essentially the same." What do you
4  mean by, "essentially"?
5    A.  I guess I meant exactly the same.
6    Q.  So the language here is imprecise?
7    A.  That's correct.
8    Q.  When you say it was, "our stated policy,"
9  can you think of any written documents that set out
10  this policy?
11    A.  No legal documents, other than our -- you
12  know, our discussion with licensees and our
13  statements at seminars. Those types of things.
14    Q.  When you wrote this statement in your
15  declaration and attested to it under penalty of
16  perjury, did you have any specific written
17  documents in mind?
18    A.  I did not.
19    Q.  Can you state with certainty whether there
20  ever were, in fact, any written documents setting
21  out the policy you've described in the first
22  sentence of paragraph 43?
23    MR. MARRIOTT: Objection as to form.
24    THE WITNESS: I don't recall.
25  BY MR. GANT:

Case 1:06-mc-00046-PTS   Document 6-7   Filed 04/21/2006   Page 18 of 32

1    Q.  You can't state with certainty?
2    A.  I can't state with certainty that that was
3  written.
4    Q.  From whom did you get your understanding
5  of this alleged policy?
6        MR. MARRIOTT:  Objection as to form.
7        THE WITNESS:  That was our policy. That's
8  what we practiced, and -- and that's what led to
9  this -- this most favorite customer clause in our
10  agreement, which was also conveyed to our licensees
11  verbally and through seminars and the newsletter.
12        MR. GANT:  Move to strike as
13  nonresponsive.
14  BY MR. GANT:
15    Q.  My question was:  From -- from whom did
16  you gain your understanding about this so-called
17  policy?
18        MR. MARRIOTT:  Objection as to form. The
19  question was asked and has been answered.  If you
20  have a different answer, Mr. Wilson, give it.
21        THE WITNESS:  I do not have a different
22  answer.
23  BY MR. GANT:
24    Q.  Well, you haven't identified anyone.
25  Should I take that to mean that you don't remember

1  who, if anyone, told you that this was AT&T's
2  policy?
3        MR. MARRIOTT:  Objection as to form.
4  Argumentative, mischaracterizes the prior
5  testimony.
6        THE WITNESS:  That was the policy. I mean
7  that was -- that was the practice that we used in
8  developing our agreements, and it was -- that's
9  what we practiced. I mean that's the way it was.
10      I don't remember ever seeing a specific
11  document that said that, other than things like we
12  talked about, the most favorite clause -- the most
13  favorite customer cause that we put in there, or
14  our behavior was when someone would ask for a
15  modification or a change based on something another
16  licensee had.
17      But we would state that all of the time.
18  I don't know where it -- I don't believe anybody
19  really -- I can't point to an individual that told
20  me that, but that was just our -- that was our
21  practice.
22  BY MR. GANT:
23    Q.  You can't point to anyone who told you
24  that?
25    A.  No.

1    Q.  You can't point to any written document
2  that set out that so-called policy described in the
3  first sentence of paragraph 43; correct?
4    A.  No.  I can only point to language that
5  implemented that policy, but not something that
6  stated the policy.
7    Q.  Can you look after the block quote on
8  paragraph 43.  You refer -- there's a block quote
9  from paragraph A.12 of the IBM side letter there;
10  correct?
11    A.  Yes.
12    Q.  And your declaration says that, "This
13  language meant that if any other licensee were
14  offered or obtained terms more favorable to the
15  licensee than those contained in the IBM-related
16  agreement, then IBM would have the advantage of
17  a" -- "of such more favorable terms, as they had
18  been set forth in the IBM-related agreements."  Do
19  you see that?
20    A.  Yes.
21    Q.  Can you direct me to where exactly in
22  paragraph A.12 a statement appears that supports
23  your recollection about what this language meant?
24    A.  I don't believe it's there, but I'll
25  stipulate for you.  You've already looked at -- I

1  don't believe that's there in the side letter.
2    Q.  Paragraph A.12 doesn't contain language
3  which supports your explanation about the meaning
4  of that language; is that correct?
5        MR. MARRIOTT:  Objection as to form.
6        Take -- take whatever time you need to
7  look at paragraph A.12, Mr. Wilson.
8    Q.  Well, the whole thing is contained right
9  there in paragraph 43; is that correct?
10    A.  Yes.
11        MR. GANT:  So let's read back my question,
12  and see if you can answer it.
13        THE WITNESS:  I thought you were going
14  through the specific language.  So this is what's
15  there in that side letter.
16  BY MR. GANT:
17    Q.  Can you point to any specific language in
18  paragraph A.12 of the IBM side letter that supports
19  your understanding of the meaning of that language,
20  which is set forth in paragraph 43 of your December
21  declaration?
22        MR. MARRIOTT:  I object to the question as
23  vague.  He has pointed to the language, and it is
24  quoted in his declaration.
25    Q.  Can you answer my question?

3 (Pages 309 to 312)

1    A.  I would say paragraph 12.

2    Q.  Which words in particular support your
3  view that if any other licensee were offered or
4  obtained terms more favorable to the licensee than
5  those contained in the IBM-related agreements, that
6  IBM would have the advantage of such more favorable
7  terms?  Where does it say that?

8    MR. MARRIOTT:  Well, you've now asked two
9  different questions.  Where does it say exactly
10  that, or where does he find the support for that?
11  So which of the questions you've asked?

12    Q.  Why don't you take the first part of that
13  question, please.

14    A.  It's not there, because -- it's not there.

15    Q.  Can you look at the next sentence, which
16  says that, "Although, not all of our licensees had
17  a side letter or most-favored customer provision,
18  we interpreted our license agreements in light of
19  the collective body of UNIX license agreements."
20  Do you see that, sir?

21    A.  Yes, I do.

22    Q.  Is it your testimony that to understand
23  what any one UNIX licensing agreement meant, one
24  would have to look at not just that agreement, but
25  also all other UNIX license agreements?

1    MR. MARRIOTT:  Objection as to form.
2  Lacks foundation, calls for speculation, seeks a
3  legal conclusion from a lay witness.

4    THE WITNESS:  On any given day you
5  wouldn't have to look at all of the licensing
6  agreements.  You would look at the -- the software
7  agreement and any side letters that pertained to
8  that software agreement.  So it's not looking at
9  all licensees.  It's looking at the specific side
10  letters that pertain to it.

11  BY MR. GANT:

12    Q.  All right.  Let me rephrase it.  So I make
13  sure I'm getting what you're saying.  Is it your
14  testimony that to understand what any one UNIX
15  license agreement meant, one would have to look not
16  just at that agreement, but also at all side
17  letters executed by all UNIX licensees in order to
18  ascertain the meaning of the UNIX license
19  agreement?

20    MR. MARRIOTT:  Same objections.

21    THE WITNESS:  And only -- the only thing I
22  differ on that is that you could look at the
23  software agreement and side letters, and not all of
24  the side letters were executed by licensees,
25  because there would be -- there's one software

1  agreement.

2    So no matter how many people executed, it
3  would still be the same.  There might have been 15
4  side letters.  Some licensees might have two or
5  three.  Some might have all ten, but if you look at
6  those bodies, you'd have all of the -- you'd have
7  an understanding of all of the agreements.

8  BY MR. GANT:

9    Q.  How many different side letters were there
10  while you were at AT&T?

11    A.  I don't recall.

12    Q.  How would you figure out which side
13  letters AT&T wanted to apply to a particular
14  license agreement under its policy or practice?

15    A.  It was usually driven by the request from
16  the licensee usually for some particular
17  clarification that they needed with regard to the
18  software agreement or by knowledge they gained
19  by -- talking to other licensees that, oh, we
20  have this, or, do you have that in your agreement,
21  that kind of thing, or seminars.  The whole thing.
22  The whole nine yards.

23    Q.  Would those requests sometimes come
24  orally, rather than in writing?

25    A.  Yes.

1    Q.  So would one would need to know whether or
2  not there were oral requests from licensees in
3  order to understand the meaning of a particular
4  UNIX license agreement?

5    MR. MARRIOTT:  Objection as to form.
6  Lacks foundation, calls for speculation, seeks a
7  legal conclusion from a lay witness.

8    THE WITNESS:  No.  I didn't mean to imply
9  that they were oral agreements.  The requests for
10  clarification may have been oral, written or
11  because they talked to the licensees.

12  BY MR. GANT:

13    Q.  So a given licensee -- let's call it
14  Licensee A -- might have orally requested
15  information or clarification about a particular
16  term; correct?

17    A.  Right.

18    Q.  And it's possible that there would be no
19  written record of that request; correct?

20    MR. MARRIOTT:  Objection as to form.  It
21  calls for speculation.

22    THE WITNESS:  That's correct.

23  BY MR. GANT:

24    Q.  If someone two years later wanted to
25  figure out the meaning of the license agreement

Case 1:06-mc-00046-PTS    Document 6-7    Filed 04/21/2006    Page 20 of 32

1 between Licensee A and AT&T, what would someone
2 look at?
3 MR. MARRIOTT: Objection as to form.
4 THE WITNESS: They would look at the
5 agreements.
6 BY MR. GANT:
7 Q. Which agreements?
8 A. Between the licensee and AT&T.
9 Q. Only the ones actually signed and executed
10 by the parties or also other things?
11 MR. MARRIOTT: Objection as to form.
12 THE WITNESS: I don't know, but they
13 would -- but I'm saying that what would govern
14 would be the licensing agreements between the
15 licensee and AT&T. That's what they would look at.
16 If someone wanted to look at it, a third party, are
17 you saying, or --
18 BY MR. GANT:
19 Q. No. I'm saying -- let's say there's a
20 software agreement between AT&T and Licensee A.
21 Okay. And Licensee A subsequently calls up AT&T
22 and asks for what you're describing as
23 clarifications about certain issues. Okay. Are
24 you still following me?
25 A. (WITNESS NODS HEAD UP AND DOWN)

1 Q. And two years later there's a question
2 about the meaning of the agreements between AT&T
3 and Licensee A. What would someone look at -- what
4 documents would someone look at in order to figure
5 out the scope and nature of the agreement between
6 AT&T and Licensee A?
7 MR. MARRIOTT: Objection as to form.
8 Lacks foundation, calls for speculation, seeks a
9 legal conclusion from a lay witness.
10 THE WITNESS: They would look at those --
11 those executed agreements that were in place
12 between Licensee A and AT&T. They would not have
13 the benefit of any phone calls. They would not --
14 BY MR. GANT:
15 Q. Would they look at anything else?
16 MR. MARRIOTT: Objection as to form. Same
17 objections.
18 THE WITNESS: You know, depending on their
19 knowledge of our licensing program, they would
20 probably look at $ echo, that we talked earlier
21 about. Several publications of that to see what
22 interpretations meant.
23 BY MR. GANT:
24 Q. $ echo was sometimes used in interpreting
25 UNIX license agreements?

1 A. $ echo was used -- well, it could have
2 been there -- maybe by our licensees. I'm not
3 speculating. I'm saying that the -- there was
4 information that sometimes folks would look at the
5 licensing.
6 As I mentioned earlier, they would look at
7 the specimen agreement. They would look at that,
8 and then they might look at something such as a
9 seminar or things that were in the $ echo, such as
10 forming what their licensing policy or agreements
11 would do.
12 Q. That's what the AT&T personnel would do in
13 interpreting license agreements?
14 MR. MARRIOTT: Objection as to form.
15 THE WITNESS: No. That what our licensees
16 would do; not AT&T.
17 BY MR. GANT:
18 Q. That would be appropriate for them to do?
19 A. Yes.
20 Q. Could you --
21 MR. MARRIOTT: Back in time -- I'm sorry.
22 We've been going -- let's just take a break here.
23 Are you almost done?
24 Q. Can you look at page 19, paragraph 46, of
25 your December declaration. This language was

1 removed from your declaration when it was revised
2 and you executed it in April of 2004; correct?
3 A. They're kind of running together. I read
4 both of them now. Okay. Yes.
5 Q. The second sentence of paragraph 46 says,
6 "In fact, section 7.10 is not about confidentiality
7 at all." What is your definition of the term
8 confidentiality, as you used it in that paragraph?
9 A. The -- confidentiality is the -- the
10 protective language in the software agreement that
11 defines how licensees could use this sublicense --
12 I mean -- excuse me. Could use the software
13 products.
14 Q. Do those uses include the right to sell,
15 lease or otherwise transfer or dispose of a
16 software product?
17 MR. MARRIOTT: Objection as to form.
18 THE WITNESS: Only as provided in (b),
19 76(b), which was exchange between source code and
20 licensees of equal scope.
21 MR. GANT: Could you read back the
22 question and the answer, please.
23 (DISCUSSION OFF THE RECORD)
24 (REQUESTED PORTION OF THE RECORD READ)
25 THE WITNESS: "Of equal scope."

BY MR. GANT:

1   Q.   Do you acknowledge that confidentiality
2   issues are implicated if someone has the right to
3   sell, lease, transfer or dispose of a software
4   product?
5        MR. MARRIOTT:  Objection as to form.
6   Lacks foundation, calls for speculation, vague and
7   confusing.
8        THE WITNESS:  I think it would be
9   interpreted that way.  Yes.
10  BY MR. GANT:
11       Q.   Can you take a look at the end of
12  paragraph 46.  The last sentence says, "In fact,
13  since section 7.10 does not prohibit the licensee
14  from doing anything or require the licensee to do
15  anything, I do not think it is possible for a
16  licensee to breach section 7.10."
17       Do you see that, sir?
18       A.   Yes.
19       Q.   We've already covered that you're not an
20  attorney; correct?
21       A.   (WITNESS NODS HEAD UP AND DOWN)
22       Q.   Is it your view that whether or not
23  there's been a breach of a license agreement is
24  ultimately a legal question?

1        MR. MARRIOTT:  Objection as to form.
2        THE WITNESS:  I'm not -- I'm not quite
3   sure how to answer that.  From -- in other words,
4   if I would look -- or have some code examined
5   and -- which I thought was in breach, that would
6   be -- is that what you mean by --
7   BY MR. GANT:
8        Q.   Let me --
9        A.   In other words, the evidence of a breach
10  would -- I don't think would be a legal --
11       Q.   Let me try it --
12       A.   -- determination.
13       Q.   I'm sorry.  I didn't mean to cut you off.
14  Let me try a different way.
15       The last clause of paragraph 46 says, "I
16  do not think it is possible for a licensee to
17  breach section 7.10."  You're expressing a
18  layperson's view; is that right?
19       A.   Yes.  That's correct.
20       Q.   And you don't know as a matter of law
21  whether or not the statement you made is accurate?
22       A.   As the statement -- well, that's correct.
23       MR. MARRIOTT:  Are we going to be a lot
24  longer, because, if so, let's just take a break.
25       (DISCUSSION OFF THE RECORD)

1        THE VIDEOGRAPHER:  Going off the record.
2   The time is 5:55 p.m.
3        (RECESS TAKEN AT 5:55 P.M. TO 6:09 P.M.)
4        (DEPOSITION EXHIBIT NUMBERS 80, 81, 82, 83
5   AND 84 WERE MARKED FOR IDENTIFICATION)
6        THE VIDEOGRAPHER:  Back on the record.
7   The time is 6:09 p.m.
8        Please, continue.
9   BY MR. GANT:
10       Q.   Okay.  I'm going to show you some
11  documents, Mr. Wilson, that -- we've premarked a
12  document as Number 80.
13       MR. MARRIOTT:  Can I get copies of all of
14  these, please?
15       MR. GANT:  Yes.  I apologize for throwing.
16       MR. MARRIOTT:  That's all right.
17       MR. GANT:  Big table.
18  BY MR. GANT:
19       Q.   I'll just identify the document for the
20  record while you take a look at it, Mr. Wilson.
21  I'll do that with the next several documents.  So
22  it's -- you can ignore what I'm saying.
23  Mr. Marriott will keep me in line.
24       Exhibit 80 is a document, Bates number
25  SCO1017589 through 1017597.  Have you had a chance

1   to review Exhibit 80?
2        MR. MARRIOTT:  Well, I mean --
3        Q.   Briefly?
4        THE WITNESS:  Seriously.
5        MR. MARRIOTT:  If you're going to ask -- I
6   mean if you're going to ask anything substantive
7   about this, I want him to read the whole document,
8   or we're going to be -- unfortunately, you've
9   pulled this on us now, when you said you've got
10  five minutes left, and given him documents, which
11  are obviously going to take some time to review.
12  If you're just going to say, have you ever seen
13  this before, that's one thing, but if you really
14  want him to answer questions, he's obviously got to
15  read the document.
16       MR. GANT:  You can decide for yourself
17  whether, Mr. Wilson --
18       MR. MARRIOTT:  Well, do you think he
19  should answer questions without reading the
20  document, Counselor?
21       MR. GANT:  Well, why don't you wait to
22  hear the questions?
23       MR. MARRIOTT:  Well, I'm just asking you,
24  if you can tell me, and then we can perhaps
25  avoid --

**Page 325**

1   MR. GANT: It depends on what the question
2   is.
3       MR. MARRIOTT: Okay. Go ahead.
4   BY MR. GANT:
5   Q.   Okay. My first question for you,
6   Mr. Wilson, is: Do you recognize this document as
7   a format of a document that was used by AT&T during
8   your employment there?
9   A.   Yes.
10  Q.   Could you turn to the last page of
11  Exhibit 80. Do you see a signature under AT&T
12  Technologies there?
13  A.   Yes.
14  Q.   Do you recognize that signature?
15  A.   Yes, I do.
16  Q.   Whose is it?
17  A.   Dave Frasure.
18  Q.   And David Frasure signed this document on
19  your behalf?
20  A.   Yes.
21  Q.   Do you have any reason to doubt the
22  authenticity of this document?
23  A.   I haven't read it, and -- so I would have
24  to read it.
25  Q.   Do you have any reason to doubt that this

**Page 326**

1   is a document that came out of AT&T's files?
2       MR. MARRIOTT: Maybe I can -- without
3   reading it, can you answer the question?
4       THE WITNESS: I don't think so.
5   BY MR. GANT:
6   Q.   What was --
7   A.   And the reason I'm saying that, that comes
8   from our licensing operation. You have to read
9   these things. I mean --
10  Q.   The first page of the document has an AT&T
11  logo and address on the right; correct?
12  A.   (WITNESS NODS HEAD UP AND DOWN)
13  Q.   And on the left it has your name and a
14  title. Do you see that?
15  A.   Yes.
16  Q.   Was that your title at that point in time,
17  February 21, 1985?
18  A.   Yes, it is.
19  Q.   And is this the format of letterhead that
20  you used during this period of time?
21  A.   Yes, it is.
22  Q.   Was Digital Equipment Corporation a
23  licensee of AT&T's UNIX?
24  A.   Oh, boy. It's getting late. They were a
25  licensee of software products under the software

**Page 327**

1   agreement. In other words, UNIX -- I'm going to
2   guess, because it's getting late. UNIX is the
3   brand name. So --
4   Q.   Well --
5       I'm sorry. I didn't mean to cut you off.
6   I'm just trying to see if I could ask a different
7   question that may help.
8   A.   Yeah. Well, what helps is -- in other
9   words, the -- the software agreement and UNIX
10  System V -- System V was a particular product under
11  the software agreement.
12      And so just in the first paragraph it
13  talks about the software agreement and the
14  sublicensing agreement. And I don't know what
15  products they had under that agreement, because DEC
16  was one of our earlier licensees, and they go all
17  of the way back prior.
18  Q.   Digital -- Digital Equipment Corporation
19  was a licensee of some AT&T --
20  A.   Software.
21  Q.   -- UNIX licensed products; correct?
22  A.   Yes.
23  Q.   I'm going to show you a document premarked
24  as Exhibit 81. Again, do you recognize the format
25  of this document as one that you used during your

**Page 328**

1   tenure at AT&T during approximately 1987?
2   A.   Yes, I do.
3   Q.   Could you turn to the second page of
4   Exhibit 81. Do you see a signature there under,
5   "AT&T Information Systems"?
6   A.   Yes, I do.
7   Q.   Do you recognize the signature?
8   A.   Yeah. That's my signature.
9   Q.   Do you have any reason to doubt that this
10  is an authentic copy of a letter sent by AT&T to
11  Sequent in July 1987?
12  A.   I do not. Only as I stipulated earlier, I
13  would -- I haven't had -- it looks like it is a
14  document. So I don't have any reason to believe
15  it's not, unless I read it.
16  Q.   I'm going to hand you what's been
17  premarked as Exhibit 82. Let me just go back to
18  81, for the record, and put in the Bates number.
19  The Bates number of Exhibit 81 was SCO0983624
20  through 625. And the Bates numbers of Exhibit 82
21  are SCO1067675 through 1067677, a three-paged
22  document.
23      Again, Mr. Wilson, looking at Exhibit 82,
24  is this the format that you used during your tenure
25  at AT&T?

2 (Pages 325 to 328)

Page 329

1   A.   That's correct.
2   Q.   And, if you could, turn to page three of
3   Exhibit 82. Do you recognize the signature under,
4   "AT&T Information Systems"?
5   A.   Yes, I do.
6   Q.   Is that your signature?
7   A.   Yes, it is.
8   Q.   Do you have any reason to doubt that
9   Exhibit 82 is an authentic copy of a document sent
10  by AT&T to IBM in June 1987?
11  A.   I do not have, but I haven't read them.
12  So I'm --
13  Q.   Right. Looking at the document, this
14  appears consistent with --
15  A.   Yes, it does.
16  Q.   I'm going to hand you what's been
17  premarked as Exhibit 83. While you take a quick
18  look at it, for the record, this document is Bates
19  number SCO1056901 through 1056908, an eight-paged
20  document.
21       Mr. Wilson, directing your attention to
22  the first page of Exhibit 83. Does your signature
23  appear on the document?
24  A.   Yes, it does.
25  Q.   Can you show or read -- describe into the

Page 330

1   record where it appears?
2   A.   It appears on the first page at the
3   bottom, dated --
4   Q.   Above your name?
5   A.   Above my name.
6   Q.   Otis Wilson?
7   A.   Dated August 14th, 1984.
8   Q.   Do you recognize the format of this
9   document?
10  A.   Yes, I do.
11  Q.   What is it?
12  A.   It's an educational software agreement
13  between AT&T Technologies and Toyota Technology --
14  Technological Institute in Japan.
15  Q.   Is this one of the formats used by AT&T
16  for its license agreements during your tenure at
17  AT&T?
18  A.   Yes, it is.
19  Q.   And looking at the form of the document --
20  strike that.
21       Looking at the document, do you see
22  anything that gives you reason to doubt that this
23  is an authentic copy of a document from AT&T's
24  files?
25  A.   No. As I stated, only because I haven't

Page 331

1   read it. I mean it looks -- it appears to be.
2   Q.   Was Toyota Technological Institute a
3   licensee of UNIX products during your tenure at
4   AT&T?
5   A.   Based on this document, I would say, yes.
6   I don't recall that particular institute directly.
7   I don't have any recall at this time. This is 20
8   years ago.
9   Q.   I'm going to hand you what's been
10  premarked as Exhibit 84. For the record, this
11  document is Bates numbered SCO10 -- excuse me.
12  SCO1104142 through 1104149, an eight-paged
13  document.
14       Directing your attention to the first page
15  of Exhibit 84. Do you recognize your signature?
16  A.   Yes, I do.
17  Q.   And was that your signature, which appears
18  above your typewritten initials and last name?
19  A.   Yes, it is.
20  Q.   Again, is this a format for a software
21  agreement that AT&T used during your tenure there?
22  A.   Yes, it is.
23  Q.   Do you have any reason to doubt that this
24  is an authentic copy of a software agreement
25  between AT&T and the University of Tasmania?

Page 332

1   A.   I do not.
2       (DISCUSSION OFF THE RECORD)
3       MR. GANT: I'd like to mark the next
4   document Exhibit 85.
5       (DEPOSITION EXHIBIT NUMBER 85 WAS MARKED
6   FOR IDENTIFICATION)
7   BY MR. GANT:
8   Q.   For the record, this document is Bates
9   numbered SCO1014916 through 1014918, a three-paged
10  document. Could I direct your attention to the
11  second page of the document, Mr. Wilson?
12  A.   Yes.
13  Q.   Do you see your signature there under,
14  "AT&T Technologies"?
15  A.   Yes, I do.
16  Q.   And, again, is this document in the form
17  that was used by you during your tenure at AT&T?
18  A.   Yes, it is.
19  Q.   Do you have any reason to doubt that this
20  is an authentic copy of a letter from you to IBM in
21  May 1984?
22  A.   No.
23       (DISCUSSION OFF THE RECORD)
24       MR. GANT: Pass the witness.
25       MR. MARRIOTT: Okay. Well, let's take a

83 (Pages 329 to 332)

Case 1:06-mc-00046-PTS   Document 6-7   Filed 04/21/2006   Page 24 of 32

Page 333

1    break. Let me look at these documents and see what
2    I -- if anything. I think I'll have a little bit,
3    but not a terrible amount.
4         (DISCUSSION OFF THE RECORD)
5         THE VIDEOGRAPHER: Going off the record.
6    The time is 6:22 p.m.
7         (RECESS TAKEN AT 6:22 P.M. TO 6:41 P.M.)
8         THE VIDEOGRAPHER: Back on the record.
9    The time is 6:41 p.m.
10        Please, continue.
11        REDIRECT-EXAMINATION
12   BY MR. MARRIOTT:
13    Q.  Mr. Wilson, I -- I believe you were asked
14   a question regarding the -- the meaning or
15   definition of the term software product, and I'm
16   not entirely sure that I -- that I correctly heard
17   your answer, but did I understand you to say that
18   as you understand the definition of the term
19   software product it includes modifications and
20   derivative works?
21        MR. GANT: Objection. Vague.
22        THE WITNESS: The software product does
23   not include modifications of derivative works.
24   BY MR. MARRIOTT:
25    Q.  All right. So the term software product,

Page 334

1    as defined in the AT&T, UNIX licensing agreements,
2    does not, as you understand it, include
3    modifications and derivative works?
4         MR. GANT: Objection. Vague and compound.
5         THE WITNESS: That's correct.
6    BY MR. MARRIOTT:
7     Q.  I believe you were asked a question about
8    the meaning of the term control, generally and
9    specifically, as used by you in paragraph 15 of
10   your declaration.
11        As you understand the AT&T, UNIX licensing
12   agreements, did AT&T have any right to control any
13   portion of a modification or derivative work of a
14   software product that did not include a portion of
15   software product?
16        MR. GANT: Objection. Vague, foundation,
17   compound.
18        THE WITNESS: It did not.
19   BY MR. MARRIOTT:
20    Q.  I believe you may have said you had heard
21   said that AIX is a derivative of UNIX. Do you, in
22   fact, know whether AIX is a derivative of UNIX?
23        MR. GANT: Objection. Compound, leading.
24        THE WITNESS: I do not have personal
25   knowledge. No, I do not.

Page 335

1    BY MR. MARRIOTT:
2     Q.  You, I believe, were asked questions about
3    whether you have personal knowledge of certain
4    sales by AT&T Capital Corporation of -- of
5    hardware, including source code.
6         And I believe your testimony was that you
7    didn't have personal knowledge of the actual
8    dispositions by AT&T Capital Corporation of those
9    machines; is that right?
10        MR. GANT: Objection. Vague, compound.
11        MR. MARRIOTT: Well, let me withdraw the
12   question.
13   BY MR. MARRIOTT:
14    Q.  Did you, in fact, have discussions with
15   individuals at AT&T while you were there, employed,
16   Mr. Wilson, about the fact that AT&T Capital
17   Corporation had disposed of hardware, including
18   source code?
19        MR. GANT: Objection. Foundation, vague,
20   calls for speculation.
21        THE WITNESS: Yes, I did.
22   BY MR. MARRIOTT:
23    Q.  You were asked several questions about
24   AT&T's policy with respect to paragraph 43 of -- of
25   your declaration, dated December 11, 2003. Do you

Page 336

1    recall that line of questions, sir?
2     A.  Yes, I do.
3     Q.  You were asked, I believe, specifically
4    about whether you could recall any documents that
5    reflected that policy. Do you recall that
6    testimony, sir?
7     A.  Yes.
8     Q.  Do you have a view as to whether, for
9    example, the $ echo publications of AT&T reflected
10   the company's policy as described in -- in
11   paragraph 43?
12        MR. GANT: Objection. Vague, foundation,
13   calls for speculation.
14        THE WITNESS: Yes. I believe they do.
15   BY MR. MARRIOTT:
16    Q.  And what about the side letters issued by
17   the company, do you believe they reflected the
18   company policy as described in paragraph 43?
19        MR. GANT: Same objections.
20        THE WITNESS: Yes, I do.
21    Q.  And do you have any doubt, Mr. Wilson,
22   about the fact that the policy, as described in
23   paragraph 43, was, in fact, the policy as you knew
24   it and understood it and implemented it while you
25   were employed at AT&T?

4 (Pages 333 to 336)

**Page 337**

1    MR. GANT: Same objections.
2    THE WITNESS: No, I do not.
3  BY MR. MARRIOTT:
4    Q.  You were asked whether it was possible
5  that there might be errors in -- more errors in
6  your declaration. Do you recall that line of
7  questions, Mr. Wilson?
8    A.  Yes, I do.
9    Q.  Are you aware of any -- did you --
10  withdrawn.
11    Did you carefully review both of your
12  declarations before you signed them?
13    A.  Yes, I did.
14    Q.  And have you reviewed them again in
15  anticipation of this deposition?
16    A.  Yes, I have.
17    Q.  And we've discussed them here today at
18  this deposition?
19    A.  Yes, we have.
20    Q.  As you sit here today, Mr. Wilson, other
21  than as you may have clarified or corrected during
22  the course of today's examination, do you believe
23  there are any errors in the declarations that you
24  signed and submitted in this matter?
25    A.  I do not.

**Page 338**

1    MR. MARRIOTT: I pass.
2    MR. GANT: Let's just confer for a second.
3    MR. MARRIOTT: Okay.
4    MR. GANT: It should be quick.
5    MR. MARRIOTT: I hope I gave you the
6  opportunity -- and I should just say, I didn't --
7  Counsel --
8    MR. GANT: We're off the record.
9    MR. MARRIOTT: Well, actually, I wouldn't
10  mind saying this on the record.
11    MR. GANT: Okay.
12    MR. MARRIOTT: Go ahead. Never mind.
13  We're off the record. It's not worth it.
14    (DISCUSSION OFF THE RECORD)
15    THE VIDEOGRAPHER: Going off the record.
16  The time is 6:46 p.m.
17    (RECESS TAKEN AT 6:46 P.M. TO 7:04 P.M.)
18    (REQUESTED PORTION OF THE RECORD READ)
19    THE VIDEOGRAPHER: Back on the record.
20  The time is 7:04 p.m.
21    Please, continue.
22    RECROSS-EXAMINATION
23  BY MR. GANT:
24    Q.  Okay. Mr. Wilson, we just came back from
25  a break. And before the break Mr. Marriott asked

**Page 339**

1  you some questions in response to questions I had
2  asked you. Do you recall that?
3    A.  Yes, I do.
4    Q.  And before Mr. Marriott commenced his,
5  what we'll call, redirect examination of you, there
6  was a break preceding that. Do you recall that?
7    A.  Yes.
8    Q.  During that break -- I don't want to know
9  any specifics of any discussions between you and
10  Mr. Marriott, but I want to know whether or not you
11  were aware before you came back into the room for
12  your redirect examination any of the topics about
13  what you were going to be asked during that
14  redirect?
15    A.  No.
16    Q.  You were not?
17    A.  (WITNESS SHOOK HEAD FROM SIDE TO SIDE)
18    Q.  Would you turn to tab five of your April
19  2004 declaration, please?
20    MR. MARRIOTT: I think the originals are
21  in front of you.
22    MR. GANT: Which is Exhibit 75. Is that
23  right? No. I'm wrong. It's Exhibit 76. Excuse
24  me.
25    MR. MARRIOTT: Tab four or five?

**Page 340**

1    MR. GANT: Five.
2  BY MR. GANT:
3    Q.  This is the agreement between AT&T and
4  Sequent; is that correct?
5    A.  Yes, it is.
6    Q.  And this agreement is a standard software
7  agreement used by AT&T for UNIX licensing; correct?
8    A.  That's correct.
9    Q.  Could you turn to page two of that
10  document, which contains language of section 2.01.
11  Do you see that?
12    A.  Yes.
13    Q.  And I'd like to direct your attention to
14  the last sentence of section 2.01, which begins,
15  "Such right." Do you see that?
16    A.  Yes.
17    Q.  Could you read that sentence into the
18  record, please?
19    A.  "Such right to use includes the right to
20  modify such software product and to prepare
21  derivative works based on such software product,
22  provided the resulting materials are treated
23  hereunder as part of the original software
24  product."
25    Q.  Do you acknowledge, Mr. Wilson, that under

85 (Pages 337 to 340)

Case 1:06-mc-00046-PTS   Document 6-7   Filed 04/21/2006   Page 26 of 32

1 the terms of section 2.01 a derivative work or
2 modification of the software product, as defined in
3 this agreement, is defined as a resulting material
4 in the agreement?
5     MR. MARRIOTT: Objection as to form. The
6 agreement speaks for itself.
7     THE WITNESS: Yes. I agree. Yes, I do.
8 BY MR. GANT:
9     Q.  And do you also acknowledge, Mr. Wilson,
10 that under the terms of section 2.01, resulting
11 materials are to be treated as part of the original
12 software product, as the term software product is
13 defined in the agreement?
14     MR. MARRIOTT: Objection as to form.
15 Lacks foundation. Calls for speculation.
16     THE WITNESS: Yes.
17 BY MR. GANT:
18     Q.  Is the term derivative work defined in the
19 standard software agreement?
20     A.  No.
21     Q.  Is the term modify or modification defined
22 in the standard software agreement?
23     A.  It is not.
24     Q.  Is it your view that if one wants to
25 ascertain whether or not a particular product is a

1 derivative work or modification, as those terms are
2 used in the standard software agreement, one needs
3 to look at other information to make that
4 determination?
5     MR. MARRIOTT: Objection as to form.
6 Vague.
7     THE WITNESS: When you say, "other
8 information," other than the derivative work
9 itself?
10     MR. GANT: Well, let me -- let me withdraw
11 the question and try it differently.
12 BY MR. GANT:
13     Q.  Based on your experience at AT&T how would
14 one ascertain whether or not a particular product
15 is a derivative of or a modification of UNIX?
16     MR. MARRIOTT: Objection as to form.
17     THE WITNESS: You would have to -- you
18 would have to look at the derivative work.
19 BY MR. GANT:
20     Q.  And examine that work?
21     A.  Yes.
22     Q.  Do you acknowledge that under the terms of
23 section 2.01 all derivative works and all
24 modifications of the software product are also to
25 be treated as part of the original software

1 product?
2     MR. MARRIOTT: Objection as to the form.
3 The document speaks for itself.
4     THE WITNESS: Yes.
5 BY MR. MARRIOTT:
6     Q.  Do you recall a few moments ago that
7 Mr. Marriott asked you some questions related to
8 hardware that was once in the possession of AT&T
9 Capital?
10     A.  Yes.
11     Q.  And I believe you testified that you were
12 told by some individuals at AT&T that they might
13 have done something with this hardware. Was that
14 what you were testifying about?
15     A.  Yes.
16     Q.  I want to understand the details of what
17 you were describing when you answered
18 Mr. Marriott's question. So the first thing I'd
19 like to know is when these discussions occurred?
20     A.  I don't recall specifically when they
21 occurred.
22     Q.  You don't recall any specific discussions?
23     A.  Not that I can identify the time and the
24 individuals I actually talked to. I remember
25 discussions taking place, but it was a long time

1 ago.
2     Q.  You don't remember who you had the
3 discussions with?
4     A.  I do not.
5     Q.  You don't remember when the discussions
6 occurred?
7     A.  No.
8     Q.  Do you remember what, if any, hardware was
9 discussed?
10     A.  They talked -- no. The specific hardware?
11 I do not.
12     Q.  And, I take it then, you don't know for a
13 fact one way or another whether if any such
14 hardware was disposed of, whether it contained any
15 software?
16     A.  That's correct.
17     Q.  Mr. Marriott asked you some follow-up
18 questions, which involved the use of the term
19 control. Do you remember that?
20     A.  Yes.
21     Q.  Do you also remember that I asked you some
22 questions about that term?
23     A.  Yes.
24     Q.  And do you remember that you testified
25 that the term control appears nowhere in the UNIX

Case 1:06-mc-00046-PTS    Document 6-7    Filed 04/21/2006    Page 27 of 32

1  license agreements?
2      A.  That's correct.
3      Q.  And your testimony was accurate in that
4  regard?
5      A.  That's what -- yeah.  I believe that's
6  what I said.  Yes...
7      Q.  So when you used the term control in your
8  declaration, that is a term that you've supplied,
9  and does not appear anywhere in any of AT&T's UNIX
10  license agreements; correct?
11      MR. MARRIOTT:  Objection as to form.
12      THE WITNESS:  Yeah.  That specific word.
13  Yes.  That's --
14  BY MR. GANT:
15      Q.  Pardon me?
16      A.  That's correct.
17      Q.  Could you turn to paragraph 43 of your
18  December 2003 declaration.  This -- I'm sorry.
19  I'll wait for you to catch up.
20      A.  Okay.
21      Q.  This paragraph was not carried into your
22  April 2004 declaration; correct?
23      A.  That's correct.
24      Q.  So the most current version of your
25  declaration doesn't contain paragraph 43 at all; is

1  that right?
2      A.  That's correct.
3      Q.  And you don't know why paragraph -- the
4  text that appears in paragraph 43 of your December
5  declaration was dropped and not carried into your
6  April 2004 declaration; is that right?
7      MR. MARRIOTT:  Objection as to the form.
8      THE WITNESS:  That's correct.
9  BY MR. GANT:
10      Q.  Now, as we discussed, the first paragraph
11  of -- excuse me.  As we discussed, the first
12  sentence of paragraph 43 states as follows, "As
13  discussed above, when I headed the UNIX licensing
14  group at AT&T and USL, our stated policy was to
15  treat all of our licensees essentially the same."
16  Do you recall discussing that with me?
17      A.  Yes, I do.
18      Q.  And I believe you testified that upon
19  reflection the word essential shouldn't be in that
20  sentence; is that correct?
21      A.  Yeah.  What I stated was I probably --
22  exactly was -- was probably more appropriate.
23      Q.  So it's your testimony that AT&T's stated
24  policy was to treat all of its licensees exactly
25  the same?  Is that your testimony?

1      MR. MARRIOTT:  Objection as to form.
2      THE WITNESS:  That's correct, given that
3  we understand that there were different groups of
4  licensees.  So if you say, all licensees, all
5  licensees were not equal.
6  BY MR. GANT:
7      Q.  I'm not following your explanation.
8      A.  Well, we had educational licenses.  We had
9  commercial licenses.  We had --
10      Q.  Okay.  Well, I'm -- I'm reading the
11  sentence that you put in your declaration --
12      A.  Rights.
13      Q.  -- as clarified during your deposition
14  today.
15      A.  Right.
16      Q.  So let me just make sure we've got this
17  clearly.  Your declaration, as amended by your --
18  your refinement of the language earlier today,
19  states, "As discussed above, when I headed the UNIX
20  licensing group at AT&T and USL, our stated policy
21  was to treat all of our licensees exactly the
22  same"?
23      A.  Yeah.  That's correct.
24      Q.  Okay.  That's what your declaration says,
25  as modified today; correct?

1      A.  Yes.
2      Q.  And you stand by that statement?
3      A.  Yes, I do.
4      Q.  And it's the case, isn't it, that in
5  response to my questioning you were unable to
6  identify any written documents that reflected this
7  so-called policy to treat all of AT&T's licensees
8  exactly the same?  Isn't that what you told me when
9  I asked you that question?
10      A.  I believe I qualified it by saying that
11  the -- the policy was reflected in our agreements,
12  side letters and $ echo, for example.
13      Q.  Do you recall adding that qualification
14  when Mr. Marriott asked you some questions?
15      A.  They're running together right now.  I'm
16  not quite sure who asked the question.
17      Q.  Is it your testimony that side letters
18  entered into by AT&T with licensees sets forth
19  explicitly in writing AT&T's supposed policy that
20  it will treat all licensees exactly the same?
21      MR. MARRIOTT:  Objection as to form.
22  Misstates the testimony.
23      THE WITNESS:  Well, the policy, per se,
24  was not stated in those side letters.  It was --
25  those things that were reflected in the side

87 (Pages 345 to 348)

1 letters were available to all of our licensees.
2 BY MR. GANT:
3    Q.   But the side letters themselves do not set
4 forth the policy referenced in the first sentence
5 of paragraph 43; is that correct?
6    A.   That's correct. That's correct.
7    Q.   And is it also correct that the $ echo
8 publications do not set forth the so-called policy
9 of AT&T to treat all of its licensees exactly the
10 same?
11    A.   That's correct.
12       MR. MARRIOTT: Objection as to form.
13    Q.   So to restate my question, which I think I
14 asked, but I want to make sure it's clear. Are you
15 able to identify any written documents that set
16 forth AT&T's supposed policy that it would treat
17 all of its licensees exactly the same? Can you
18 identify any written document that sets forth that
19 policy?
20    A.   I cannot.
21       MR. GANT: I pass the witness back. If
22 you're done --
23       MR. DAVIS: Scott --
24       MR. GANT: No, I'm not. One moment,
25 please.

1       (DISCUSSION OFF THE RECORD)
2       MR. GANT: Just a few more. Thank you.
3 BY MR. GANT:
4    Q.   I showed you some documents that we marked
5 as Exhibits 80 through 85, I believe. Do you
6 recall that?
7    A.   Yes, I do.
8       (DISCUSSION OFF THE RECORD)
9 BY MR. GANT:
10    Q.   And we've also looked today at Exhibits 75
11 and 76 and the attachments thereto, which contain a
12 number of agreements between AT&T and UNIX
13 licensees; correct?
14    A.   That's correct.
15    Q.   With respect to those agreements, you
16 described them as standard form agreements, some of
17 them; is that -- is that right?
18    A.   Yes.
19    Q.   Who drafted the language for the standard
20 form agreement?
21    A.   By name? Specifically by name?
22    Q.   Was it an attorney?
23    A.   Yes.
24    Q.   Who was it?
25    A.   Again, I don't know specifically.

1    Q.   Did AT&T attorneys draft all of the
2 licenses used by AT&T to license its UNIX
3 materials?
4    A.   Yes, they did.
5       (DISCUSSION OFF THE RECORD)
6       MR. MARRIOTT: We're going a little bit
7 beyond the scope, guys.
8       MR. GANT: Are you going to have any, if I
9 stop now?
10       MR. MARRIOTT: Well, yeah, because I have
11 questions -- yeah, I do have some.
12       MR. GANT: Okay. Then --
13       MR. MARRIOTT: But within the scope, I
14 think. I mean are you done, because I don't want
15 to just hear you have --
16       MR. GANT: I'll pass.
17       MR. MARRIOTT: No. I want to let you
18 finish, and then --
19       MR. GANT: No. I'm going to pass it back
20 to you. I --
21       MR. DAVIS: This is a discovery
22 deposition.
23       MR. GANT: I just want to put on the
24 record our position about whether the deposition
25 remains open. So if you're -- if you're done, then

1 I'll --
2       MR. MARRIOTT: So you have no more
3 questions?
4       MR. GANT: That's right. I'll pass the
5 witness back.
6       MR. MARRIOTT: All right. I have a couple
7 of questions.
8       REDIRECT EXAMINATION
9 BY MR. MARRIOTT:
10    Q.   Mr. Wilson, with respect to paragraph 43
11 of your declaration, which makes reference to a
12 policy to treat licensees the same, do you have any
13 doubt that that was your policy?
14       MR. GANT: Objection. Vague, leading,
15 foundation, calls for speculation and for legal
16 conclusions.
17       THE WITNESS: I do not.
18 BY MR. MARRIOTT:
19    Q.   Did AT&T -- with respect to control, did
20 AT&T intend to control any modification or
21 derivative work of its software products, except
22 insofar as such modifications or derivative works
23 might include a portion of the software product?
24       MR. GANT: Objection. Leading, vague,
25 foundation, compound, calls for speculation and

Page 353

1  legal conclusions.
2          MR. MARRIOTT: I don't think you missed
3  any objection known to man, but you can --
4  BY MR. MARRIOTT:
5      Q.   You can go ahead and answer the question.
6  Do you need it read back?
7      A.   No, we did not.
8      Q.   Did AT&T intend to assert control over its
9  licensees' products except to the extent those
10 products might include AT&T's software products?
11         MR. GANT: Same objections.
12         THE WITNESS: We did not.
13 BY MR. MARRIOTT:
14     Q.   Okay. As AT&T understood its -- its UNIX
15 agreements, its licensees could do whatever they
16 wanted with modifications and derivative works of
17 the software product, so long as they did not --
18         (DISCUSSION OFF THE RECORD)
19         MR. GANT: I'm going to need it read back
20 when you're done too.
21 BY MR. MARRIOTT:
22     Q.   -- disclose any portion of the software
23 product that might have been in the modification or
24 derivative work; is that correct?
25         MR. GANT: And before you answer, I'd like

Page 354

1  it read back and then have the chance to object.
2          (REQUESTED PORTION OF THE RECORD READ)
3          (DISCUSSION OFF THE RECORD)
4  BY MR. MARRIOTT:
5      Q.   As AT&T understood its UNIX licensing
6  agreements, could its licensees do whatever they
7  wanted with modifications or derivative works of
8  the software product, so long as they did not
9  disclose any portion of the software product that
10 might have been included in the modification or
11 derivative work?
12         MR. GANT: Same objections.
13         THE WITNESS: That's correct.
14         MR. MARRIOTT: Okay. Do you want to make
15 your statement, and then we can all go home?
16         MR. GANT: Well, I just want to ask one
17 last question and then make my statement. Then
18 we're done.
19         MR. MARRIOTT: We may be going at this
20 forever.
21         MR. DAVIS: You guys should play tennis.
22         RECROSS-EXAMINATION
23 BY MR. GANT:
24     Q.   Mr. Wilson, were all of the answers that
25 you provided today in response to my questions

Page 355

1  true, accurate and complete?
2      A.   Yes, with the exception of one. I was
3  thinking about when you asked me about the wives.
4      Q.   Yes.
5      A.   Yeah. I missed one.
6      Q.   You missed a wife?
7      A.   Yeah.
8      Q.   You had three -- three ex-wives?
9      A.   You said three. You said three. Yeah.
10     Q.   Okay.
11     A.   And that was Janet Smith.
12     Q.   Okay. Thank you for that clarification.
13         Beyond that -- and we won't tell her.
14     A.   Please, don't.
15     Q.   Is there anything else about your
16 testimony in response to my questions that was
17 anything other than true, accurate and complete?
18     A.   No.
19     Q.   And is there anything about Mr. Marriott's
20 follow-up questions, in response to my questions,
21 that has led you to conclude that any of your
22 answers to my questions were false, inaccurate or
23 incomplete?
24     A.   No.
25         MR. GANT: All right. With that, I

Page 356

1  assume --
2          MR. MARRIOTT: Well, I have now one
3  question.
4          MR. GANT: Okay.
5          REDIRECT EXAMINATION
6  BY MR. MARRIOTT:
7      Q.   Is there anything, Mr. Wilson, about the
8  testimony that you've provided in response to any
9  of my questions that you think was inaccurate or
10 incomplete or incorrect or needs in any way to be
11 modified?
12     A.   No.
13         MR. MARRIOTT: Thank you.
14         Now you can make your statement. I hope.
15         MR. GANT: I can.
16         For the reasons set forth at the outset of
17 the deposition, we reserve the right to resume the
18 deposition and to seek any other appropriate relief
19 from the court based on the untimely disclosure of
20 Mr. Wilson's declarations. Other than that, I
21 thank Mr. Wilson for his time.
22         MR. MARRIOTT: And I will make just a
23 statement.
24         There was no untimely disclosure of any
25 declarations. The declarations were provided on

89 (Pages 353 to 356)

## Page 357

1  the schedule provided for by Magistrate Judge
2  Wells. I think the opportunity that you've had
3  today to examine this witness has been full and
4  fair and complete.
5  And as much as you'd like to describe
6  the -- the availability of the declarations as
7  somehow an impediment today, it seems to me, if
8  anything else, I've given you even a fuller
9  opportunity at examination of Mr. -- of Mr. Wilson.
10  And I think with that said, you know our
11  position, which is that this is it. So -- thank
12  you.
13  THE VIDEOGRAPHER: One moment, please. If
14  you could, just pause a moment.
15  This concludes the deposition -- this
16  day's deposition of Otis Wilson. The number of
17  tapes used was four. The master video tapes will
18  be retained by Russell Court Reporting,
19  Incorporated.
20  Going off the record. The time is
21  7:27 p.m.
22  (SIGNATURE RESERVED)
23  (DEPOSITION CONCLUDED AT 7:27 P.M.)
24
25

## Page 358

1
2  WITNESS' CERTIFICATE
3
4  I, Otis L. Wilson, do hereby certify that I
5  have read and understand the foregoing transcript
6  and believe it to be a true, accurate, and complete
7  transcript of my testimony, subject to the attached
8  list of changes, if any.
9
10
11  _____
12  OTIS L. WILSON
13
14  This deposition was signed in my presence
15  by _____, on the _____ day
16  of _____, 2004.
17
18
19
20
21  _____
22  Notary Public
23
24  My commission expires: _____
25

## Page 359

1  Russell Court Reporting, Inc.
   P.O. Box 507          (Page 1 of 2)
2  Lewisville, North Carolina 27023
3  E R R A T A   S H E E T
4  RE: SCO vs. IBM
5  DEPOSITION OF: Otis L. Wilson
6  Please read this transcript with care, and
   if you find any corrections or changes you wish
7  made, list them by page and line number below. DO
   NOT WRITE IN THE TRANSCRIPT ITSELF. Return the
8  Certificate and Errata Sheet to this office after
   it is signed. We would appreciate your prompt
9  attention to this matter.
   To assist you in making any such
10  corrections, please use the form below. If
   supplemental or additional pages are necessary,
11  please furnish same and attach them to this errata
   sheet.
12
13  Page ____ Line ____ should
14  read: _____
15  Page ____ Line ____ should
16  read: _____
17  Page ____ Line ____ should
18  read: _____
19  Page ____ Line ____ should
20  read: _____
21  Page ____ Line ____ should
22  read: _____
23  Page ____ Line ____ should
24  read: _____
25

## Page 360

1  Page ____ Line ____ should          (Page 2 of 2)
2  read: _____
3  Page ____ Line ____ should
4  read: _____
5  Page ____ Line ____ should
6  read: _____
7  Page ____ Line ____ should
8  read: _____
9  Page ____ Line ____ should
10  read: _____
11  Page ____ Line ____ should
12  read: _____
13  Page ____ Line ____ should
14  read: _____
15  Page ____ Line ____ should
16  read: _____
17  Page ____ Line ____ should
18  read: _____
19  Page ____ Line ____ should
20  read: _____
21  Page ____ Line ____ should
22  read: _____
23  Page ____ Line ____ should
24  read: _____
25

Page 361

```
1    STATE OF NORTH CAROLINA
     COUNTY OF JOHNSTON
2
3         REPORTER'S CERTIFICATE
4         I, Lisa A. DeGroat, RPR, a Notary Public in
5    and for the State of North Carolina, do hereby
6    certify that there came before me on Thursday,
7    June 10th, 2004, the person hereinbefore named, who
8    was by me duly sworn to testify to the truth and
9    nothing but the truth of his knowledge concerning
10   the matters in controversy in this cause; that the
11   witness was thereupon examined under oath, the
12   examination reduced to typewriting under my
13   direction, and the deposition is a true record of
14   the testimony given by the witness.
15        I further certify that I am neither
16   attorney or counsel for, nor related to or employed
17   by, any attorney or counsel employed by the parties
18   hereto or financially interested in the action.
19        IN WITNESS WHEREOF, I have hereto set my
20   hand and affixed my official notarial seal, this
21   the 15th day of June, 2004.
22
23
24
25        _____
          Lisa A. DeGroat, RPR
```

Case 1:06-mc-00046-PTS    Document 6-7    Filed 04/21/2006    Page 32 of 32